# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FOX CORPORATION; FOX MEDIA LLC; FOX SPORTS EN ESPAÑOL LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MEDIA DEPORTES MEXICO, S. de R.L. de C.V.,<br><br>Defendant. | Civil Action No. 1:25-cv-06703<br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT** |

Plaintiffs Fox Corporation, Fox Media LLC, and Fox Sports en Español LLC (collectively, "Fox"), for their complaint against Defendant Media Deportes Mexico, S. de R.L. de C.V. ("MDM"), allege as follows:

## NATURE OF THE CASE

1. MDM is misappropriating Plaintiffs' intellectual property, pursuing litigation before a foreign tribunal in breach of an exclusive jurisdiction clause, misleading that tribunal in ex parte proceedings, and weaponizing the fruit of that bad-faith litigation to interfere with Fox's business relationships.

2. MDM used to hold a non-exclusive license to use Fox Sports trademarks in Mexico.

3. Fox terminated MDM's non-exclusive license because of the severe damage that MDM caused to the reputation and goodwill associated with the Fox Sports trademarks.

4. MDM has nevertheless continued to use the Fox Sports trademarks without authorization or legal right.

5. The agreement that granted MDM a non-exclusive license to the Fox Sports trademarks was subject to an exclusive forum selection clause, which required all disputes relating to the license to be brought in New York.

6. MDM has breached that forum selection clause. MDM has sought and obtained a bad-faith, no-notice injunction in a Mexican court premised on the false claim that MDM has an *exclusive* license to the Fox Sports marks. MDM has used that no-notice injunction to prevent Fox and its business partners from using the Fox Sports marks in Mexico.

7. MDM has weaponized this bad-faith injunction, including by causing officials from the Mexican Trademark Office to raid and shut down the production facilities of one of Fox's business partners, MediaPro, which produces Fox content for distribution in the United States.

8. MDM's actions are intended to disrupt and interfere with Fox's third-party business partners in an effort to undermine Fox's ability to compete against it. That bad faith was on full display in the MediaPro raid, as MediaPro produces content for Fox using marks that are entirely distinct from the Fox Sports marks to which MDM claims to have rights. As a result, MDM has interfered with Fox's rights over its Mexico-registered and U.S.-registered trademarks.

9. MDM has injected its unauthorized use of the Fox Sports marks into the United States as well, despite having a (now-terminated) license expressly limiting the use of the Fox Sports marks to Mexico.

10. Fox files this lawsuit to litigate this dispute in the forum that MDM is contractually-bound to litigate in. Fox seeks to recover the damage caused by MDM's harm to its trademarks in Mexico, MDM's interference with Fox's relationships with its business

partners, and MDM's unlawful use of Fox Sports trademarks in the United States. Fox also seeks injunctive relief to prevent further, imminent injuries by MDM.

**PARTIES**

11. Plaintiff Fox Corporation is incorporated in Delaware and maintains its principal place of business in New York, and therefore pursuant to 28 U.S.C. § 1332(c)(1) is a citizen of Delaware and New York.

12. Plaintiff Fox Media LLC is a limited liability company whose sole member is Foxcorp Holdings LLC, a Delaware limited liability company. Foxcorp Holdings sole member is Fox Corporation. Fox Media is therefore a citizen of Delaware and New York. Plaintiff Fox Media LLC registered the Fox Sports marks in Mexico and the United States.

13. Plaintiff Fox Sports en Español LLC is a limited liability company whose sole member is Fox Sports Holdings, LLC, a Delaware limited liability company. Fox Sports Holdings' sole member is Foxcorp Holdings LLC, a Delaware limited liability company. Foxcorp Holdings' sole member is Fox Corporation, a Delaware corporation. Fox Sports en Español LLC is therefore a citizen of Delaware and New York.

14. Defendant Media Deportes Mexico, sociedad de responsabilidad limitada de capital variable, is an entity formed under the laws of Mexico that can own property, make contracts, transact business, and litigate in its own name, and is recognized as a judicial person under the laws of Mexico. On information and belief, Defendant Media Deportes Mexico is a subsidiary of Altener S.A. de C.V., a foreign entity formed in Mexico. Defendant Media Deportes Mexico is a citizen of Mexico.

**JURISDICTION & VENUE**

15. The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because Fox Corporation, Fox Media LLC, and Fox Sports en Español LLC are United States citizens, and

MDM is a citizen of Mexico, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

16. Additionally, the Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) because this action arises under the Lanham Act 15 U.S.C. § 1051, *et seq*.

17. Additionally, the Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Fox's breach of contract and tortious interference claims because those claims are so related to the Lanham Act trademark infringement claim over which this Court has original jurisdiction that they form part of the same case or controversy. Specifically, all claims asserted by Fox involve MDM's unauthorized use of the same Fox Sports trademarks.

18. This Court has personal jurisdiction over MDM and venue is proper in this Court because MDM "irrevocably consent[ed] to the exclusive jurisdiction, forum and venue of the . . . United States District Court for the Southern District of New York over any and all claims, disputes, controversies, or disagreements between [them] under or related" to the agreement by which MDM claims the right to use the trademarks at issue in this litigation.

## FACTUAL ALLEGATIONS

### A. The Fox Sports Trademarks are Registered with Authorities in the United States and Mexico.

19. This case involves trademarks that have been registered both in the United States and Mexico.

20. Fox Corporation, through its subsidiary Fox Media LLC, is the owner of several registered trademarks with various depictions of the words "Fox Sports."

21. In 1994, Twentieth Century Fox Film Corporation ("21CFFC"), the predecessor to Twenty-First Century Fox, Inc., ("21CF") filed an application for a trademark—a standard character mark without claim to any particular font style, size, or color—to "Fox Sports." In

Case 5:25-cv-00703-JSR Document 1 Filed 05/14/25 Page 5 of 38

1995, the United States Patent and Trademark Office granted the registration with a serial number of 74486901. The mark applies to television and cable television broadcasting services, and is classified as Class 038. In 2001, 21CFFC file its affidavit of continuous use and incontestability under sections 8 and 15 of the Lanham Trademark Act.

22. In 1994, 21CFFC filed another application for a standard character trademark to "Fox Sports," but for entertainment services in the nature of production and distribution of television programs and under Class 041. In 1997, the United States Patent and Trademark Office granted the registration with a serial number of 74802818. In 2003, 21CFFC filed its affidavit of continuous use and incontestability under sections 8 and 15 of the Lanham Trademark Act.

23. In 1998, 21CFFC filed another application for a standard character trademark to "Fox Sports" providing on-line information in the field of sports via global communications network and under Class 041. In 1999, the United States Patent and Trademark Office granted the registration with a serial number of 75524006. In 2005, 21CFFC file its affidavit of continuous use and incontestability under sections 8 and 15 of the Lanham Trademark Act.

24. In 2004, 21CFFC filed an application for a trademark to "Fox Sports," a particular illustration with Fox Sports surrounded by a stylized oval was filed for television transmission services under Class 038. In 2005, the United States Patent and Trademark Office granted the registration with a serial number of 78488856. The mark is as follows:

FOX SPORTS

In 2005, 21CFFC file its affidavit of continuous use and incontestability under sections 8 and 15 of the Lanham Trademark Act.

25. In 2004, 21CFFC filed another application for a trademark for the same mark but for entertainment services in the nature of television programming; providing on-line information in the field of sports via the Internet under Class 041. In 2005, the United States Patent and Trademark Office granted the registration with a serial number of 78488865. In 2011, 21CFFC file its affidavit of continuous use and incontestability under sections 8 and 15 of the Lanham Trademark Act.

26. Certain Fox Sports trademarks (the "Fox Sports Trademarks") were also filed and registered in Mexico by Fox as described below:

| | Mark Name | Mark Image | International Classes | Country | Status | App No. | Registration Number |
|---|---|---|---|---|---|---|---|
| 1 | AGENDA FOX SPORTS | | 41 | Mexico | Registered | 1717649 | 1652939 |
| 2 | CIRCUITO FOX SPORTS | | 41 | Mexico | Registered | 1436830 | 1449424 |
| 3 | COPA FOX SPORTS KIDS | | 9 | Mexico | Registered | 1350927 | 1369012 |
| 4 | COPA FOX SPORTS KIDS | | 38 | Mexico | Registered | 1350928 | 1369013 |
| 5 | COPA FOX SPORTS KIDS | | 41 | Mexico | Registered | 1350930 | 1369014 |
| 6 | FOX FIGHT CLUB | | 41 | Mexico | Registered | 1488645 | 1478480 |
| 7 | FOX GOL MEXICO | | 41 | Mexico | Registered | 684259 | 867973 |
| 8 | FOX SPORTS | | 16 | Mexico | Registered | 751483 | 915316 |
| 9 | FOX SPORTS | | 41 | Mexico | Registered | 265809 | 636281 |
| 10 | FOX SPORTS | | 38 | Mexico | Registered | 265830 | 636282 |
| 11 | FOX SPORTS | | 9 | Mexico | Registered | 1535691 | 1525583 |
| 12 | FOX SPORTS (Oval Two) | | 38 | Mexico | Registered | 1306552 | 1339943 |
| 13 | FOX SPORTS (Oval Two) | | 41 | Mexico | Registered | 1306549 | 1339940 |
| 14 | FOX SPORTS (Oval Two) | | 25 | Mexico | Registered | 1610071 | 1600735 |
| 15 | FOX SPORTS+ (Banner) | | 41 | Mexico | Registered | 1035021 | 1132836 |
| 16 | FOX SPORTS+ (Banner) | | 38 | Mexico | Registered | 1035022 | 1138645 |
| 17 | FOX SPORTS 2 | | 38 | Mexico | Registered | 1299816 | 1338102 |
| 18 | FOX SPORTS 2 | | 41 | Mexico | Registered | 1299817 | 1336234 |
| 19 | FOX SPORTS 2 | | 38 | Mexico | Registered | 1306550 | 1339941 |

KeyCite Yellow Flag
Distinguished by Old Republic National Title Insurance Company v. Bell, Tex., June 1, 2018

278 S.W.3d 333
Supreme Court of Texas.

RETAMCO OPERATING, INC., Petitioner,
v.
REPUBLIC DRILLING COMPANY, Respondent.

No. 07–0599
|
Argued Sept. 11, 2008.
|
Decided Feb. 27, 2009.

**Synopsis**
**Background:** Following an interlocutory default judgment against Texas corporation in action over unpaid royalties related to oil and gas interests, plaintiff, another Texas corporation, amended its petition to include claim against nonresident transferee of such gas and oil interests. Transferee filed special appearance arguing lack of jurisdiction. The trial court denied special appearance and transferee filed interlocutory appeal. The Court of Appeals for The Fourth District of Texas, Karen Angelini, J., 2007 WL 913206, reversed. Plaintiff appealed.

**Holdings:** The Supreme Court, Green, J., held that:

[1] transferee had purposely availed itself of privilege of conducting activities in Texas;

[2] allegations were sufficient to demonstrate alleged tort occurred at least, in part, in Texas; and

[3] exercise of specific jurisdiction over nonresident transferee of Texas oil and gas interests would not offend traditional notions of fair play and substantial justice.

Reversed and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (27)

[1] **Courts** ⇐ Allegations, pleadings, and affidavits

Under the Texas long-arm statute, plaintiff has the initial burden to plead sufficient allegations to confer jurisdiction.

30 Cases that cite this headnote

[2] **Courts** ⇐ Presumptions and Burden of Proof as to Jurisdiction

Defendant seeking to avoid being sued in Texas has the burden to negate all potential bases for jurisdiction pled by the plaintiff.

10 Cases that cite this headnote

[3] **Appeal and Error** ⇐ Absence of findings; assumed or implied findings

When the trial court does not make findings of fact and conclusions of law in support of its ruling, all facts necessary to support the judgment and supported by the evidence are implied.

24 Cases that cite this headnote

[4] **Appeal and Error** ⇐ Personal jurisdiction

Personal jurisdiction is a question of law which the Texas Supreme Court reviews de novo.

10 Cases that cite this headnote

[5] **Constitutional Law** ⇐ Non-residents in general

**Courts** ⇐ Actions by or Against Nonresidents, Personal Jurisdiction In; "Long-Arm" Jurisdiction

Texas courts may assert in personam jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

47 Cases that cite this headnote

[6] **Courts** Business contacts and activities; transacting or doing business

Texas long-arm statute's broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow. U.S.C.A. Const.Amend. 14.

19 Cases that cite this headnote

[7] **Constitutional Law** Non-residents in general

Under constitutional due-process analysis, personal jurisdiction is achieved when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the assertion of jurisdiction complies with traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

75 Cases that cite this headnote

[8] **Courts** Factors Considered in General

Texas Supreme Court focuses on a defendant's activities and expectations when deciding whether it is proper to call the defendant before a Texas court.

2 Cases that cite this headnote

[9] **Courts** Purpose, intent, and foreseeability; purposeful availment

A defendant establishes minimum contacts with a state, for purposes of determining whether personal jurisdiction exists, when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

148 Cases that cite this headnote

[10] **Courts** Purpose, intent, and foreseeability; purposeful availment

To establish personal jurisdiction over a nonresident defendant, defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court.

53 Cases that cite this headnote

[11] **Courts** Unrelated contacts and activities; general jurisdiction

**Courts** Related contacts and activities; specific jurisdiction

A nonresident's contacts with a jurisdiction can give rise to either specific or general jurisdiction.

11 Cases that cite this headnote

[12] **Courts** Unrelated contacts and activities; general jurisdiction

General jurisdiction arises when the defendant's contacts with the forum are continuous and systematic.

14 Cases that cite this headnote

[13] **Courts** Related contacts and activities; specific jurisdiction

Specific jurisdiction arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities.

78 Cases that cite this headnote

[14] **Courts** Related contacts and activities; specific jurisdiction

In a specific jurisdiction analysis, the Texas Supreme Court focuses on the relationship among the defendant, the forum, and the litigation.

4 Cases that cite this headnote

[15] **Courts** Purpose, intent, and foreseeability; purposeful availment

**Courts** ⇐ Agents, Representatives, and Other Third Parties, Contacts and Activities of as Basis for Jurisdiction

Texas Supreme Court considers three issues in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas: first, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

133 Cases that cite this headnote

[16] **Courts** ⇐ Nature, number, frequency, and extent of contacts and activities

In determining whether personal jurisdiction over a nonresident defendant exists, minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number.

29 Cases that cite this headnote

[17] **Courts** ⇐ Property disputes; wills, trusts, and estates

Purchases of oil and gas interests located in Texas by nonresident transferee of Texas oil and gas interests were purposeful, not random, fortuitous, or attenuated contacts with Texas, and thus transferee had purposely availed itself of the privilege of conducting activities in Texas, as required to support finding of specific jurisdiction over transferee in action over unpaid royalties related to oil and gas interests, despite transferee's having never physically entered the State; such ownership allowed transferee to enjoy the benefits and protection of Texas laws, contacts with Texas were not the result of unilateral actions of a third party, and transferee had reaped benefits from the property.

35 Cases that cite this headnote

More cases on this issue

[18] **Mines and Minerals** ⇐ Interest in real estate

Oil and gas interests are real property interests.

3 Cases that cite this headnote

[19] **Courts** ⇐ Factors Considered in General

Jurisdiction may not be avoided merely because the defendant did not physically enter the forum state.

4 Cases that cite this headnote

[20] **Courts** ⇐ Nature, number, frequency, and extent of contacts and activities

Purchase of real property in Texas does not establish a single contact, for purposes of determining whether a nonresident defendant is subject to personal jurisdiction, like that of a sale of personal property.

2 Cases that cite this headnote

[21] **Courts** ⇐ Related contacts and activities; specific jurisdiction

Purposeful availment alone will not support an exercise of specific jurisdiction unless the defendant's liability arises from or relates to the forum contacts.

13 Cases that cite this headnote

[22] **Courts** ⇐ Related contacts and activities; specific jurisdiction

In determining whether a nonresident defendant is subject to personal jurisdiction, the Texas Supreme Court looks for a substantial connection between defendant's forum contacts and the operative facts of the litigation.

18 Cases that cite this headnote

[23] **Courts** ⇐ Fraud, racketeering, and deceptive practices

Allegations that nonresident transferee of Texas oil and gas interests received transfer of Texas real property from a Texas resident, during the

pendency of a Texas suit, for the purpose of defrauding a Texas resident were sufficient to demonstrate alleged tort occurred at least, in part, in Texas, as required to support finding of specific jurisdiction over transferee. V.T.C.A., Civil Practice & Remedies Code § 17.042.

30 Cases that cite this headnote
More cases on this issue

[24] **Constitutional Law** ⚿ Manufacture, distribution, and sale

**Courts** ⚿ Property disputes; wills, trusts, and estates

Exercise of specific jurisdiction over nonresident transferee of Texas oil and gas interests would not offend traditional notions of fair play and substantial justice; controversy began in Texas, action involved real property within Texas border, prior litigation dealt with this property and it was most efficient to continue to use Texas as the forum to resolve the dispute, and transferee's forum state had much less of an interest in resolving Texas real property disputes.

28 Cases that cite this headnote
More cases on this issue

[25] **Constitutional Law** ⚿ Non-residents in general

Having determined that a nonresident defendant has minimum contacts with Texas sufficient to support specific jurisdiction, the Texas Supreme Court must determine whether an assertion of jurisdiction over defendant comports with traditional notions of fair play and substantial justice.

52 Cases that cite this headnote

[26] **Constitutional Law** ⚿ Non-residents in general

Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state.

41 Cases that cite this headnote

[27] **Constitutional Law** ⚿ Non-residents in general

In determining whether an assertion of jurisdiction over defendant comports with traditional notions of fair play and substantial justice, the Texas Supreme Court considers: (1) burden on the defendant; (2) interests of the forum state in adjudicating the dispute; (3) plaintiff's interest in obtaining convenient and effective relief; (4) interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) shared interest of the several States in furthering fundamental substantive social policies.

41 Cases that cite this headnote

**Attorneys and Law Firms**

***335** James L. Drought, Calhoun Bobbitt, Drought Drought & Bobbitt LLP, James W. Carter IV, San Antonio TX, for Petitioner.

Juan M. Castillo, Ray B. Jeffrey, Patricia F. Miller, Stumpt Craddock Massey & Farrimond, PC, Jeffrey D. Small, Law Office of Jeff Small, San Antonio, Douglas Alexander, Alexander Dubose Jones & Townsend, LLP, Austin TX, for Respondent.

**Opinion**

Justice GREEN delivered the opinion of the Court.

In this case, we decide whether a Texas court has personal jurisdiction over an out-of-state ***336** company accused of violating the Uniform Fraudulent Transfer Act (UFTA) by acting as the transferee of Texas oil and gas interests. We hold that, under the facts of this case, the defendant is subject to the jurisdiction of the Texas courts and, therefore, reverse the court of appeals' judgment and remand for trial.

**I**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Retamco Operating, Inc. (ROI), a Texas corporation, sued Paradigm Oil, Inc. (Paradigm), another Texas corporation, in a Texas district court, over unpaid royalties related to oil and gas interests in several Texas counties. After a finding of discovery abuse, sanctions were assessed against Paradigm and the trial court entered a $16 million default judgment against Paradigm. [1] Following this interlocutory judgment, ROI amended its petition to include a claim against Republic Drilling Company (Republic), a California corporation, for violation of the Uniform Fraudulent Transfer Act. *See* TEX. BUS. & COM.CODE § 24.001–.013. ROI claimed that during the pendency of the litigation, Paradigm assigned to Republic [2] a 72% interest in Paradigm's oil and gas wells and leases in Fayette County and a 72% interest in an option to acquire an interest in a lease in Dimmit and Webb Counties. [3] ROI alleged that these transfers were fraudulent, and that they led to Paradigm's insolvency, rendering it unable to satisfy ROI's claims.

In response to the amended petition, Republic filed a special appearance, arguing that it does not have minimum contacts with Texas, and that even if it did, ROI's cause of action did not arise from or relate to those contacts. It also argued that the trial court's assertion of jurisdiction offended traditional notions of fair play and substantial justice. Specifically, ***337** Republic argued that because the allegedly fraudulent assignment of the Texas leases occurred entirely outside of Texas—in California—the Texas court did not have personal jurisdiction over Republic. Following a hearing, the trial court denied Republic's special appearance, making no findings of fact or conclusions of law. Republic then filed an interlocutory appeal with the court of appeals. The court of appeals reversed, holding that Republic is not subject to personal jurisdiction in Texas. 2007 WL 913206, *6–7. Because we conclude that by its actions Republic subjected itself to the jurisdiction of Texas courts, we reverse the court of appeals' judgment.

## II

**[1]** **[2]** **[3]** Under the Texas long-arm statute, the plaintiff has the initial burden to plead sufficient allegations to confer jurisdiction. *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002). The defendant seeking to avoid being sued in Texas then has the burden to negate all potential bases for jurisdiction pled by the plaintiff. *Id.* When, as here, the trial court does not make findings of fact and conclusions of law in support of its ruling, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002) (citations omitted). Here, ROI has pled that Republic is subject to personal jurisdiction because it is the fraudulent transferee of Texas real property—oil and gas interests. Republic does not dispute that the property at issue is located in Texas or that it was transferred from Paradigm to Republic. However, Republic argues that because the transaction causing the transfer occurred in California, jurisdiction is negated. For the reasons discussed below, we disagree.

**[4]** **[5]** Personal jurisdiction is a question of law which we review *de novo. Id.* at 794. "Texas courts may assert *in personam* jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007).

### (1) The Long Arm Statute

**[6]** As an initial matter, Republic argues that ROI "never fulfilled its initial pleading burden to bring Republic within the reach of the long-arm statute," because ROI alleged no acts that constitute "doing business" under the long-arm statute. But the Texas long-arm statute's broad doing-business language "allows the statute to reach as far as the federal constitutional requirements of due process will allow." *Id.* at 575 (citations omitted); *accord Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 788 (Tex.2005). [4] Therefore, we only analyze whether Republic's acts would bring Republic within Texas' jurisdiction consistent with constitutional due process requirements. *See* ***338** *Moki Mac,* 221 S.W.3d at 575 (citations omitted); *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). [5]

### (2) Due Process Constraints

**[7]** **[8]** Under constitutional due-process analysis, personal jurisdiction is achieved when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the assertion of jurisdiction complies with "traditional notions of fair play and substantial justice." *Moki Mac,* 221 S.W.3d at 575 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). We focus on the defendant's activities and expectations when deciding

whether it is proper to call the defendant before a Texas court. *Int'l Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154.

**(A) Minimum Contacts**

**[9] [10] [11] [12] [13] [14]** A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (citing *Int'l Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Am. Type Culture Collection,* 83 S.W.3d at 806 (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). A nonresident's contacts can give rise to either specific or general jurisdiction. *Am. Type Culture Collection,* 83 S.W.3d at 806. General jurisdiction arises when the defendant's contacts with the forum are continuous and systematic. *Id.* at 807. Specific jurisdiction, which is alleged here, arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *National Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex.1995). In a specific jurisdiction analysis, "we focus ... on the 'relationship among the defendant, the forum [,] and the litigation.' " *Moki Mac,* 221 S.W.3d at 575–76 (citing *Guardian Royal,* 815 S.W.2d at 228).

***1. Purposeful Availment***

**[15] [16]** We consider three issues in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas:

> ***339** First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Moki Mac,* 221 S.W.3d at 575 (internal citations and quotations omitted). Additionally, the minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number. *Am. Type Culture Collection,* 83 S.W.3d at 806. Here, these considerations lead us to conclude that Republic purposefully availed itself of the privilege of conducting activities in Texas.

**[17] [18] [19]** Republic's contacts with Texas were purposeful, not random, fortuitous, or attenuated. Oil and gas interests are real property interests. *Renwar Oil Corp. v. Lancaster,* 154 Tex. 311, 276 S.W.2d 774, 776 (1955); *State v. Quintana Petroleum Co.,* 134 Tex. 179, 133 S.W.2d 112, 115 (1939) (citing *Sheffield v. Hogg,* 124 Tex. 290, 77 S.W.2d 1021, 1030 (1934)). Republic was aware that the oil and gas interests it received were located in Fayette, Dimmit, and Webb Counties, Texas. Thus, Republic purposefully took assignment of Texas real property. And while Republic may not have actually entered the state to purchase this real property, "[j]urisdiction ... may not be avoided merely because the defendant did not physically enter the forum state." *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."). Republic, by taking assignment of Texas real property, reached out and created a continuing relationship in Texas. Under the assignment, it is liable for obligations and expenses related to the interests. This ownership also allows Republic to "enjoy ... the benefits and protection of [Texas laws.]" *Michiana,* 168 S.W.3d at 787 (citing *Int'l Shoe,* 326 U.S. at 319, 66 S.Ct. 154). Unlike personal property, Republic's real property will always be in Texas, which leaves no doubt of the continuing relationship that this ownership creates.

**[20]** We noted in *Michiana* that "in some circumstances a single *contract* may meet the purposeful-availment standard, but not when it involves a single *contact* taking place outside the forum state." *Id.* at 787. (emphasis in original) (holding that an Indiana RV dealer did not have minimum contacts with Texas where the dealer's only contact with Texas was

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

the Texas resident's decision to place an order from Texas). But the purchase of real property in Texas does not establish a single contact like that of the sale of the recreational vehicle in *Michiana*. *See id.* Rather, the purchase and ownership of real property could "involve[ ] many contacts over a long period of time," which would carry with it certain continuing obligations; *e.g.*, valuation and tax issues, and potential expenses of maintaining the interest. *See id.* In *Michiana*, we found it "hard to imagine what possible benefits and protection Michiana enjoyed from Texas law." *Id.* at 787, 794. To the RV dealer, the destination of the RV was fortuitous. Here, the location of the transferred asset is not fortuitous; the property's location is fixed in this state. This case, then, is different from *Michiana*, and we have no difficulty imagining just how Republic would benefit ***340** from the processes and protections of Texas law. Should Republic ever wish to enforce rights under its interest in Texas oil and gas leases and wells, it is this state where those rights can be enforced, not California.

Republic's contacts with Texas were also not the result of the unilateral actions of a third party. Republic was a willing participant in a transaction with an affiliated Texas company to purchase Texas real property. Unlike in *Michiana*, where the contacts with Texas and the sale at issue was "initiated entirely by [the plaintiff]," 168 S.W.3d at 784, Republic here went well beyond answering a phone call from a Texas resident or shipping goods to Texas. Where a phone call originates or where a shipment ends up may be random or fortuitous, but when purchasing real property, the location matters.

Lastly, Republic has sought a "benefit, advantage or profit" in Texas. *Id.* at 785. The assignment gave Republic valuable assets in Texas, including the right to enforce warranties and covenants related to the real property. Republic's additional conduct since the transfer also indicates that Republic sought a benefit from the transaction. *See Moki Mac*, 221 S.W.3d at 577 ("In determining whether the defendant purposefully directed action towards Texas, we may look to conduct beyond a particular business transaction at issue...."). Republic has reaped benefits from the property in the amount of approximately $1.2 million in revenues, and has sold some of the property.

We have said that "a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as to neither profit from the forum's laws nor be subject to its jurisdiction." *Michiana*, 168 S.W.3d at 785. Certainly this is true in some transactions, such as the purchase of personal property or out-of-state services. *See, e.g., BMC Software Belgium*, 83 S.W.3d at 793 (finding no personal jurisdiction where details of a personal services contract were discussed in Texas); *U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 763 (Tex.1977) (finding no personal jurisdiction over Oklahoma defendant where the contract for installation of highway advertisement signs by Texas company was signed and performed in Oklahoma). But we have found that, even in instances where a contract was signed in another state, an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the company purposefully directed its activities towards Texas. *See, e.g., Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662, 665–66 (Tex.1987) (finding personal jurisdiction where out-of-state contract was formed "for the sole purpose of building a hotel in Texas"); *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437 (Tex.1982) (finding personal jurisdiction where enrollment for out-of-state school was "actively and successfully solicited" in Texas even though the defendant signed the contract in Arizona). Here, we find the same. Republic, by purchasing Texas real property, has purposefully availed itself of the privilege of conducting activities in Texas. *See Michiana*, 168 S.W.3d at 784–85.

***2. Arise From or Related to***

**[21]** **[22]** "[P]urposeful availment alone will not support an exercise of specific jurisdiction ... unless the defendant's liability arises from or relates to the forum contacts." *Moki Mac*, 221 S.W.3d at 579. We look for a "substantial connection between [the defendant's forum] contacts and the operative facts of the litigation." *Id.* at 585. Thus, we must consider the claims involved in the litigation to determine the operative facts. ROI alleges that Republic is the transferee of a fraudulent transfer in ***341** violation of the UFTA. The UFTA provides, in part, that "[a] transfer ... is fraudulent ... if the debtor made the transfer ... with actual intent to hinder, delay, or defraud any creditor of the debtor; or without receiving a reasonably equivalent value in exchange for the transfer or obligation." TEX. BUS. & COM.CODE § 24.005(a)(1), (2); *Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (noting that "the UFTA not only creates liability against 'the person for whose benefit the transfer was made,' such as the debtor, but also against 'the first transferee of the asset,' or any 'subsequent transferee' ").

Republic argues that the focus of the litigation will be on the assignment that took place in California because the operative

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

facts involved will be whether reasonably equivalent value was given for the property and whether the leases were taken in good faith. *See* TEX. BUS. & COM.CODE §§ 24.005(a)(2), .006, .009. We agree that the assignment will be an operative fact, but the real property itself will also be an operative fact, or at the very least, will have a substantial connection to the operative facts. Without an asset, no fraudulent transfer can occur under the UFTA. *See id.* § 24.002(12) ( " 'Transfer' means ... disposing of or parting *with an asset or an interest in an asset* ....") (emphasis added). Here, the Texas oil and gas interests are the assets. Proof that these assets were transferred and an assessment of their value will be essential to the UFTA analysis; without that proof, the UFTA claim fails.

**[23]** Republic is alleged to have received transfer of Texas real property from a Texas resident, during the pendency of a Texas suit, for the purpose of defrauding a Texas resident. As a result of this transaction, assets ROI may have recovered from Paradigm are now in the possession of Republic. These contacts are sufficient to demonstrate that this alleged tort occurred at least, in part, in Texas. *See* TEX. CIV. PRAC. & REM.CODE § 17.042 ("a nonresident does business in this state if the nonresident ... commits a tort in whole or in part in this state"); *see also In re Tex. Am. Express, Inc.*, 190 S.W.3d 720, 725 (Tex.App.-Dallas, no pet.) (noting that a fraudulent transfer under the UFTA is a tort).

**(B) Traditional Notions of Fair Play and Substantial Justice**

**[24]** **[25]** **[26]** **[27]** Having determined that Republic has minimum contacts with Texas sufficient to support specific jurisdiction, we must determine whether an assertion of jurisdiction over Republic comports with "traditional notions of fair play and substantial justice." *Guardian Royal*, 815 S.W.2d at 228. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* at 231 (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). Nonetheless, we still consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Guardian Royal*, 815 S.W.2d at 228, 231 (citing *Burger King*, 471 U.S. at 477–78, 105 S.Ct. 2174). These factors weigh heavily in ROI's favor. ROI has an interest in resolving this controversy in Texas because that is where the litigation began. Texas has an interest in resolving controversies involving real property within its borders ***342** and, given that the prior litigation deals with this property, it is most efficient to continue to use Texas as the forum to resolve the dispute. Moreover, California has much less of an interest in resolving Texas real property disputes than does Texas. Republic may be burdened by litigating outside its home state, but these other factors weigh heavily against this burden.

**III**

Republic has established minimum contacts with Texas, and the trial court's assertion of jurisdiction over Republic does not offend traditional notions of fair play and substantial justice. *See Guardian Royal*, 815 S.W.2d at 228. Therefore, we reverse the court of appeals' judgment and remand to the trial court for further proceeding consistent with this opinion.

**All Citations**

278 S.W.3d 333, 171 Oil & Gas Rep. 266, 52 Tex. Sup. Ct. J. 395

## Footnotes

1 Numerous appeals have been spawned by the *ROI v. Paradigm* litigation. First, the "death penalty" discovery sanctions against Paradigm were upheld on appeal, but the court of appeals remanded the case for a determination of unliquidated damages. *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 161 S.W.3d 531, 540 (Tex.App.-San Antonio 2004, pet. denied). The trial court then found actual damages of $5.6 million, as well as, attorney's fees and exemplary damages. *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 242 S.W.3d 67, 70 (Tex.App.-San Antonio 2007, pet. denied). Next, the court of appeals reversed this finding

due to insufficient evidence and remanded for another hearing on unliquidated damages. *Id.* at 75. ROI also originally sued Finley Oilwell Service, but the claim was severed. The result was the same. *Finley Oilwell Service, Inc. v. Retamco Operating, Inc.,* 248 S.W.3d 314, 317 (Tex.App.-San Antonio 2007, pet. denied). Following a default judgment, the trial court entered actual damages of $5.6 million, along with attorney's fees and exemplary damages. *Id.* The court of appeals reversed this due to insufficient evidence. *Id.* Finally, one other case arising from this litigation involved a severed claim against the alleged alter ego of Paradigm and Finley. *See Carone v. Retamco Operating, Inc.*, 138 S.W.3d 1, 15 (Tex.App.-San Antonio 2004, no pet.) (dismissing claim against alleged alter ego of companies due to lack of personal jurisdiction).

2 Paradigm and Republic are affiliated, but the record is unclear as to the extent and structure of that affiliation.

3 ROI also sued Douglas McCallum, LLC (DMLLC), a Colorado limited liability company, alleging fraudulent transfer. DMLLC was the recipient of the remaining 28% of the assignment of interests and options. DMLLC also filed a special appearance, which was granted following the court of appeals holding in this case. DMLLC's special appearance ruling was then appealed and affirmed. *Retamco Operating, Inc. v. McCallum,* 2008 WL 939196, *5 (Tex.App.-San Antonio 2008). ROI has appealed this ruling to the Court as well. These two cases pose almost identical issues, as DMLLC argues it is not subject to personal jurisdiction because the contract to assign the oil and gas interests was signed in Colorado. *See Retamco Operating, Inc. v. McCallum,* 278 S.W.3d 778 (Tex.2009) (per curiam).

4 The Texas long-arm statute provides:

> "In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
>
> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) commits a tort in whole or in part in this state; or
>
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state."

TEX. CIV. PRAC. & REM.CODE § 17.042.

5 Republic also argues that the business certification waiver provision of section 8.01B(13) of the Texas Business Corporation Act limits jurisdiction. TEX. BUS. CORP. ACT § 8.01B(13) ("a foreign corporation shall not be considered to be transacting business in this state ... by reason of ... acquiring, in transactions outside of Texas, royalties and other non-operating mineral interests"). The certification provisions of the Business Corporation Act do not limit the scope of the Texas long-arm statute. *Moki Mac,* 221 S.W.3d at 575 ("the long-arm statute's broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow' "). Thus, the Act has no bearing on constitutional due-process analysis. *See Amer. Type Culture Collection,* 83 S.W.3d at 806 ("We rely on precedent from the United States Supreme Court as well as our own state's decisions in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction.") Further, the business certification requirements do not act as a definitive list of those out-of-state defendants that would or would not have a reasonable expectation of being called into a Texas courtroom.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 20 | FOX SPORTS 2 | | 41 | Mexico | Registered | 1306551 | 1339942 |
| 21 | FOX SPORTS 3 | | 38 | Mexico | Registered | 1299818 | 1336215 |
| 22 | FOX SPORTS 3 | | 41 | Mexico | Registered | 1299820 | 1336216 |
| 23 | FOX SPORTS 3 | | 38 | Mexico | Registered | 1306556 | 1339945 |
| 24 | FOX SPORTS 3 | | 41 | Mexico | Registered | 1306555 | 1339944 |
| 25 | FOX SPORTS CANTERA | | 41 | Mexico | Registered | 1406680 | 1417195 |
| 26 | FOX SPORTS PLAY | | 9 | Mexico | Registered | 1285315 | 1324838 |
| 27 | FOX SPORTS PLAY | | 38 | Mexico | Registered | 1285316 | 1327158 |
| 28 | FOX SPORTS PLAY | | 41 | Mexico | Registered | 1285318 | 1322027 |
| 29 | FOX SPORTS PLAY | | 42 | Mexico | Registered | 1285320 | 1327174 |
| 30 | FOX SPORTS RADIO | | 38 | Mexico | Registered | 1233187 | 1283912 |
| 31 | FOX SPORTS RADIO | | 41 | Mexico | Registered | 1233191 | 1284787 |
| 32 | LATITUD FOX (Grayscale) | | 41 | Mexico | Registered | 1860943 | 1770079 |
| 33 | FOX PLAY | | 9 | Mexico | Registered | 1282827 | 1319645 |
| 34 | FOX PLAY | | 38 | Mexico | Registered | 1282829 | 1319646 |
| 35 | FOX PLAY | | 41 | Mexico | Registered | 1282831 | 1320073 |
| 36 | FOX PLAY | | 42 | Mexico | Registered | 1282832 | 1320537 |

**B. MDM Obtains a Non-Exclusive License to Use Fox's Mexico-Registered Marks in Mexico.**

27. In 2017, The Walt Disney Company announced that it would acquire 21CF. That acquisition was completed on March 20, 2019. The day prior, on March 19, 2019, certain of 21CF's assets were spun off into a new company called Fox Corporation. The Fox Sports Trademarks were among those assets that were excluded from the acquisition deal. On March 19, 2019, Fox Corporation—the then-owner of the Fox Sports Trademarks—granted 21CF a non-exclusive license to use the Fox Sports Trademarks (the "Fox-21CF License Agreement").

Fox Corporation continues to own the Fox Sports Trademarks through its subsidiary Fox Media LLC.

28. On November 10, 2021, 21CF assigned that non-exclusive license to use the Fox Sports Trademarks in Mexico to MDM. Pursuant to that assignment, MDM or its agents or affiliates began using the Fox Sports Trademarks to broadcast sports in Mexico under the brand "Fox Sports Mexico."

29. On July 25, 2022, 21CF and MDM entered into an Amended and Restated License Assignment Agreement, which amended and restated the Assignment but did not alter the non-exclusive nature or geographic scope of the license to use the Fox Sports Trademarks.

30. The November 2021 and the July 2022 License Assignment Agreement between 21CF and MDM shall be collectively referred to as the "21CF-MDM Assignment Agreement."

31. The 21CF-MDM Assignment Agreement expressly incorporated the obligations and limitations over the Fox Sports Trademarks that were included in the Fox-21CF License Agreement. The 21CF-MDM Assignment Agreement attached a redacted copy of the Fox-21CF License Agreement and expressly stated that MDM adopted all obligations under the Fox-21CF License Agreement that were not redacted:

> This Amended and Restated License Assignment Agreement (the "Agreement"), dated as of July 25, 2022 (the "Execution Date"), is by and between Media Deportes Mexico, S. de R.L. de C.V, a *sociedad de responsabilidad limitada de capital variable* (limited liability company) organized under the laws of Mexico ("Mexico Newco"), and TFCF Corporation (f/k/a Twenty-First Century Fox, Inc.), a Delaware corporation ("Assignor" and, together with Mexico Newco, each a "Party" and collectively the "Parties"). Any capitalized terms used but not otherwise defined in this Agreement shall have the meaning given to them in the Purchase Agreement (as defined below).

> 4. Mexico Newco hereby undertakes, with respect to the Fox Sports Trademarks and Fox Sports Domain Names and from and after the Original Execution Date, to meet all of the disclosed obligations of Assignor as set forth in the Redacted TMLA.

> (d) "Redacted TMLA" means the Trademark License Agreement as attached in redacted form hereto as Exhibit 1.

32. The incorporated Fox-21CF License Agreement, in turn, stated the precise scope of the license, including that the license to use the "Fox Sports" mark was non-exclusive and limited to use within Mexico:

> TRADEMARK LICENSE AGREEMENT (this "Agreement"), dated as of March 19, 2019 (the "Effective Date"), by and among FOX Corporation ("FOX"), and Twenty-First Century Fox, Inc., a Delaware corporation ("Remainco," and, together with FOX, each a "Party" and collectively the "Parties") [redacted].

. . .

> (e) Grant of International Channel Trademark License. Subject to the terms and conditions of this Agreement, FOX hereby grants to the Remainco Group [redacted] during the International Channel Term [redacted] a non-exclusive, [redacted] irrevocable and royalty-free license to use the International Channel Marks, solely in the International Channel Field in the International Channel Territory (the "International Channel License").

33. The "International Channel Marks" is defined to include the "Fox Sports Trademarks," which in turn refers to a list of Mexico-registered Fox Sports Trademarks. The International Channel Territory is defined as Mexico.

> (d) the International Channel Marks shall be deemed a reference to the Fox Sports Trademarks;

> (b) "Fox Sports Trademarks" means the trademarks listed on Schedule A attached hereto;

> (f) the International Channel Territory shall be deemed a reference to Mexico;

34. At no point did MDM ever own an exclusive license to the Fox Sports Trademarks, a license to use those marks in the United States, or a license to any United States-registered trademarks relating to the Fox Sports Trademarks.

35. Under the Fox-21CF License Agreement, the licensee was required to consent to exclusive jurisdiction in New York regarding any and all claims, disputes, controversies, or disagreements between Fox and Defendant related to the Fox Sports Trademarks licensed under the Fox-21CF License Agreement. That provision was incorporated into the 21CF-MDM Assignment Agreement.

> 12.3. Governing Law and Submission to Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each Party irrevocably consents to the exclusive jurisdiction, forum and venue of the Commercial Division of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York over any and all claims, disputes, controversies or disagreements between the Parties or any of their respective successors and assigns under or related to this Agreement.

36. Under the Fox-21CF License Agreement, the licensee was required to acknowledge and affirm its familiarity with "the high standards, quality, style, and image of the Trademarks to which it receives a license under this Agreement" and was prohibited from using the marks in a manner that would have an adverse effect on the image or reputation of the Fox Sports Trademarks or Fox Corporation. That provision was incorporated into the 21CF-MDM Assignment Agreement.

> 4. Quality Control.
>
> 4.1. Quality. Each Party acknowledges and is familiar with the high standards, quality, style, and image of the Trademarks to which it receives a license under this Agreement and shall, at all times, conduct its business under such Trademarks and use such Trademarks in a manner consistent with these standards, quality, style, and image. [Redacted]. Each Party shall ensure that all services and goods provided by it, under or in association with any of the Trademarks to which it receives a license under this Agreement, shall (i) be substantially the same as or greater than the quality of the services and goods provided under such Trademarks as of the Distribution Effective Time and (ii) not have an adverse effect on the image or reputation of any such Trademarks,

> Remainco, or FOX. Without the other Party's prior written consent, a Party shall not: (i) knowingly take any action which would reasonably be expected to dilute or impair the Trademarks to which it receives a license under this Agreement, or tarnish or bring into disrepute the reputation of or goodwill associated with such Trademarks or (ii) use the Trademarks to which it receives a license under this Agreement in any jurisdiction, including within the Licensed Territory, after such time that such Party has received a judgement from a court of competent jurisdiction that such use infringes, dilutes or otherwise violates the trademark rights or other proprietary rights of another Person.

## C. MDM's Failure to Maintain the Reputation of Fox's Marks Leads Fox to Terminate the Licensing Agreement.

37. Since securing a license to use the Fox Sports Trademarks, MDM entered into numerous contracts to broadcast major sporting events, including with the National Football League, CONCACAF, The Kings and Queens League, and multiple Mexican soccer clubs. MDM, however, repeatedly failed to pay its licensing fees for these broadcasts—leading to broadcast interruptions and the termination of their rights contracts.

38. Since January 2024, MDM has had its broadcasts interrupted or lost its licensing rights from nearly a dozen sports properties for failure to pay licensing fees. These broadcast interruptions and rights losses were widely reported in the public media.

a. Liga Mx Club Monterrey (soccer) – License not renewed for non-payment of licensing fees;

b. Liga Mx Club Tijuana (soccer) – License terminated for non-payment of licensing fees;

c. Liga Mx Club Queretaro (soccer) – License terminated for non-payment of licensing fees;

d. National Football League(football) – License was suspended for two weeks for non-payment of licensing fees;

e. Liga Mx Club Pachuca (soccer) – License was not renewed for non-payment of licensing fees;

f. Liga Mx Club Leon (soccer) – License was not renewed for non-payment of licensing fees;

g. Liga Mx Club Juarez (soccer) – License was not renewed for non-payment of licensing fees;

h. Concacaf Champions Cup (soccer) – License was not renewed for non-payment of licensing fees;

i. Kings and Queens League (soccer) – License was not renewed for non-payment of licensing fees;

j. Liga Mx Club Mazatlan (soccer) – License terminated for non-payment of licensing fees;

k. Liga Mx Club Puebla (soccer) – License terminated for non-payment of licensing fees;

l. Formula One (motorsports) – License temporarily suspended for nonpayment of licensing fees and eventually lost entirely.

39. These rights losses were publicized in a manner that damaged the reputation of Fox and the Fox Sports Trademarks. As just one example, after MDM failed to pay licensing fees owed to the NFL, the NFL posted the following message on its X account. The post was viewed over one million times.




40. The broadcast disruptions and rights terminations occurred because of MDM's failure to pay its licensing fees. MDM's failures to pay occurred publicly under the banner of the Fox Sports Trademarks, which damaged the reputation and goodwill associated with the Fox Sports Trademarks.

41. The sports broadcasting business is competitive. Reliability in broadcasting games is a vital component of a sports broadcasting brand. Small disruptions in broadcasting sports events lead disappointed viewers to substitute away to other broadcasts reputed to be more reliable. That in turn affects the willingness of advertisers to advertise on those broadcasts.

Viewers associate their frustration with Defendant's broadcasting black outs with the Fox Sports Trademarks, damaging the marks.

42. In March 2025, Fox informed MDM that it was terminating MDM's license to use the Fox Sports Trademarks based on MDM's material breach of the quality control provision of the 21CF-MDM Assignment Agreement. In its letter, Fox Corporation cited numerous instances of MDM damaging the reputation and goodwill of the Fox Sports Trademarks by associating the marks with MDM's repeated failures to pay licensing fees and the barrage of negative press that accompanied those failures.

**D. MDM Attempts to Seize Control of the Fox Sports Trademarks and Tortiously Interfere with Fox's Business Relationships.**

43. Despite the termination of the license, not only did MDM refuse to cease using the Fox Sports Trademarks, MDM has attempted to prevent Fox from using the Fox Sports Trademarks in Mexico and the United States.

44. On March 26, 2025, MDM[1] obtained a no-notice injunction from a court in Mexico City (the "Judicial Trademark Injunction"), which enjoined Fox Corporation, Fox Media LLC, and Fox Cable Network Services LLC, from "interfering" with MDM's rights to use the Fox Sports Trademarks.

45. MDM seeking the Judicial Trademark Injunction in a court in Mexico City breached the forum selection clause in the 21CF-MDM Assignment Agreement because MDM did not seek the injunction in New York, the forum that MDM agreed to exclusively litigate disputes over the Fox Sports Trademarks.

---

[1] Listed as plaintiffs was MDM, who purports to hold the license to the Fox Sports Trademarks, and Mexico Sports Distribution, LLC—MDM's affiliate. Both are subsidiaries of Altener, S.A. de C.V. and both companies operate jointly under the brand "Fox Sports Mexico."

46. The injunction purported to prohibit Fox from using its "Fox Deportes" mark, a distinct Mexico-registered trademark that was not included in the Fox Sports Trademarks enumerated in the 21CF-MDM Assignment Agreement. The injunction also barred Fox's business partners from using the Fox Sports Trademarks. MDM's request for an injunction, and the subsequent order issuing the injunction, identified seventeen companies by name with whom Fox has a business relationship.

47. The allegation at the heart of MDM's injunction request was that MDM had an *exclusive* license to use the Fox Sports Trademarks. MDM claimed that Mexico's telecommunications regulator, the Instituto Federal de Telecomunicaciones ("IFT"), had issued a resolution in 2019 (the "2019 IFT Resolution") requiring that MDM's license to use the Fox Sports Trademarks be exclusive in nature.

48. That allegation was false.

49. In reality, the 2019 IFT Resolution required only that any license for the Fox Sports Trademarks be used exclusively for sports content, not that it created an exclusive license for sole use by the licensee. In a letter dated July 14, 2025, the IFT confirmed that it did not require an exclusive license be issued to MDM. To the contrary, the IFT reaffirmed that it specifically authorized the 21CF-MDM Assignment Agreement, which assigned a non-exclusive license to MDM for the Fox Sports Trademarks.

50. The 21CF-MDM Assignment Agreement expressly stated that MDM's license was non-exclusive. MDM did not reveal to the Mexico City court that the language of the 21CF-MDM Assignment Agreement expressly granted a non-exclusive license.

51. MDM publicly acknowledged that Fox had the right to use the Fox Sports Trademarks. In a notice published in a Mexican newspaper in 2025 announcing the license,

MDM admitted that the registrant of the Fox Sports Trademarks (*i.e.*, Fox) is authorized to use and exploit the Fox Sports Trademarks.

| | |
|---|---|
| En consequencia, **unicamente el titular de dichos registros y/o Media Deportes Mexico, en su caracter de licenciataria autorizada en exclusiva, se encuentran facultados para usar y explotar las marcas previamente especificadas** mediante la prestacion de servicios comprendidos en las Clases Internacionales 42, 21, 38, 25, 16, 9, y relacionadas que ostenten y/o se distingan y/o identifiquen por medio de las marchas registradas antes mencionadas. | Consequently, **only the owner of said registrations and/or Media Deportes Mexico, in its capacity as exclusive authorized licensee, are authorized to use and exploit the previously specified trademarks** by providing services included in International Classes 42, 21, 38, 25, 16, 9, and related ones that bear and/or are distinguished and/or identified by means of the aforementioned registered trademarks. |

52. The original registrant is Fox.

53. MDM knew from its license agreement that Fox was the owner of the registrations for the Fox Sports Trademarks.

54. MDM did not disclose that information to the Mexican court when seeking its Judicial Trademark Injunction.

55. MDM asked the Mexican court to notify seventeen of Fox's business partners of the injunction, thus interfering with their business relationship with Fox. At MDM's request, the Judicial Trademark Injunction required notice of the injunction to be provided to the following Fox business partners: Telefonía por Cable S.A. de C.V., Cablemas Telecommunications S.A. de C.V., Total Play Telecommunications S.A.P.I.D, Amazon.com Services LLC, Corporación Novavisión S. de RL de C.V., Claro Video LLC, Grupo W COM S.A. de C.V., Apple Store LLC, Google Store LLC, Stripe LLC, ROKU LLC, Radio Movil Dipsa S.A. de C.V., Libros Foráneos S.A. de C.V., Soccer Media Solutions S.A. de C.V., Next Natal S.A.P.I de C.V., and Wis Master Mexico S.A. de C.V.

56. Fox has received calls from at least two entities that received the Judicial Trademark Injunction—Amazon.com Services LLC and Radio Movil Dipsa S.A. de C.V.—requesting an explanation of Fox's basis for doing business in Mexico.

57. MDM's purpose in noticing these third parties was to call into question the third parties' ability to legally conduct business with Fox in Mexico and increase the perceived risk of doing business with Fox, thereby damaging Fox's reputation with these third parties.

58. MDM also sought provisional relief from Mexico's Trademark Office, the Instituto Mexicano de la Propiedad Industrial ("IMPI"), advancing the same false representations they made in their request for the Judicial Trademark Injunction—that MDM had an exclusive license to the Fox Sports Trademarks (which it did not) and that the IFT had required that license to be exclusive (which it had not).

59. On April 11, 2025, MDM induced IMPI to issue a no-notice order, which incorporated the Judicial Trademark Injunction, authorizing IMPI officials to conduct an unannounced raid on Audiovisuales Media Pro Mexico, S.A. de C.V. (MEXICO) ("MediaPro"), one of Fox's broadcast production partners in Mexico that creates streaming content for "Fox en Tubi" in Mexico and television content for "Fox Deportes" in the United States under a contract with Fox Sports en Español.

60. On June 27, 2025, IMPI officials, along with lawyers for MDM, attempted to raid MediaPro's offices and production studios in Mexico to confiscate material that displayed the Fox Sports Trademarks. The basis for this raid—that MDM has an exclusive license—was lawless. Nevertheless, a group of IMPI officials and lawyers for MDM demanded access to MediaPro's offices. MediaPro's lawyers refused IMPI entry due to inconsistencies and handwritten alterations on the IMPI Raid Order.

61. The raid caused significant disruption to MediaPro's business and has negatively affected Fox's relationship with MediaPro. MediaPro decides with whom to do business. Its selection of business partners is informed by whether a business partner is subject to disproportionate regulatory scrutiny (rightfully or wrongfully), including whether doing business with a partner carries increased risk of raids of MediaPro facilities by the Mexican government, which will necessarily disrupt MediaPro's own ability to do business and may cause MediaPro harm to its own reputation based on how the enhanced regulatory scrutiny is perceived by the public.

62. The IMPI raid, premised on MDM's bad-faith litigation regarding the Fox Sports Trademarks, has harmed MediaPro's business relationship with Fox. Since the raid, MediaPro now requires Fox to provide evidence that it has rights to the trademarks that MediaPro uses to produce content on Fox's behalf. MediaPro also now requires Fox to indemnify it for any injury it may suffer arising from the use of marks in the production of Fox content. These new requirements have caused Fox to suffer economic loss.

63. On August 11, 2025, IMPI and MDM's lawyers returned to MediaPro's offices—this time with the Mexican police. The police escorted all MediaPro employees from the building and shut down MediaPro's facilities, including by sealing MediaPro's offices.







64. IMPI claimed that the closure arose from MediaPro's refusal in June 2025 to permit IMPI entry to MediaPro's facilities in connection with "trademark violations" stemming from MediaPro's use of the "Fox Deportes" mark, notwithstanding the fact that the "Fox

Deportes" mark is owned by, and registered to, Fox Corporation through its subsidiary Fox Media. The closure may last at least three days.

65. MediaPro does not use the "Fox Deportes" mark in Mexico. All content that MediaPro produces using the "Fox Deportes" mark is for broadcast in the United States only.

66. The injury that Fox has suffered from this second MediaPro raid is significant. Because of MediaPro's shutdown, Fox currently has been denied its principal live studio operations for its Spanish-speaking sports news coverage in the United States. In other words, Fox's ability to provide its Spanish-speaking audience in the United States with sports news coverage, including developments in baseball, football, hockey, basketball, or any other topical news stories in sports, has been seriously compromised.

67. Fox is currently moving rapidly to fill the production blackout that MDM has caused by inducing IMPI to conduct its second raid. The costs associated with those efforts include talent costs, crew costs, engineering costs, and technical costs relating to relaying content through different channels other than MediaPro.

68. The IMPI raid has also increased MediaPro's perceived costs of doing business with Fox. That is a concrete reputational harm suffered by Fox. Such reputational harm is difficult to quantify, as all reputational harm is, but it is no less damaging to Fox's ability to conduct business with MediaPro and its other partners.

**E. MDM Uses the Fox Sports Trademarks in the United States.**

69. Not only did MDM unlawfully interfere with Fox's right to use the Fox Sports Trademarks in Mexico, MDM has infringed Fox's U.S.-registered Fox Sports trademarks in the United States.

70. Even though the 21CF-MDM Assignment Agreement granted MDM rights to use the Fox Sports Trademarks only in Mexico, MDM uses the equivalent, U.S.-registered Fox Sports marks in websites and social media platforms that reach into the United States.

71. MDM uses the "Fox Sports" standard characters on content displayed within the domain name www.foxsports.com.mx, which can be viewed in the United States.




72. MDM claims ownership of the copyright at the bottom of the page of http://foxsports.com.mx.

© 2024 Copyright, Media Deportes México, S. de R.L. de C.V.

73. MDM uses Fox's registered "Fox Sports" oval, on its website, which is viewable in the United States.




74. MDM uses the "Fox Sports" standard characters in the form of a stylized logo on its Facebook page, which is viewable in the United States.




75. MDM uses the "Fox Sports" standard characters in the form of a stylized logo on its X (f/k/a Twitter) account, which is viewable in the United States.




76. MDM uses the "Fox Sports" standard characters in the form of a stylized logo on its YouTube account, which is viewable in the United States.




77. MDM uses Fox's registered "Fox Sports" oval on its YouTube videos, which are viewable in the United States.




78. MDM uses the "Fox Sports" standard characters in the form of a stylized logo on its TikTok account, which is viewable in the United States.




79. MDM uses the "Fox Sports" standard characters in the form of a stylized logo on its Instagram account, which is viewable in the United States.




80. These channels compete with Fox in the United States for viewers.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT (FORUM SELECTION CLAUSE)

## (FOX CORPORATION AGAINST MDM)

81. Fox incorporates by reference the allegations in Paragraphs 1 to 80 as though fully set forth herein.

82. Fox Corporation, through its wholly-owned subsidiary Fox Media LLC, owns the Fox Sports Trademarks at issue, and licensed them to 21CF in the Fox-21CF License Agreement. 21CF was permitted to assign those rights to another party, subject to the terms of the license agreement with Fox. 21CF assigned those rights to MDM in the 21CF-MDM Assignment Agreement. In that agreement, MDM agreed to as exclusive forum selection clause that required litigation arising under its license agreement to be brought in New York.

83. In the 21CF-MDM Assignment Agreement, through which MDM claims the right to use the Fox Sports Trademarks, MDM agreed that New York would be the exclusive forum for "any and all claims, disputes, controversies or disagreements" "under or related to" the Fox Sports Trademarks.

84. By pursuing and acquiring the Judicial Trademark Injunction before a tribunal in Mexico, MDM breached that forum selection clause because it sought to resolve a dispute over the Fox Sports Trademarks between itself and Fox Corporation in a judicial forum outside New York. Namely, in those proceedings, MDM sought to resolve whether it had the right to use the Fox Sports Trademarks and whether it had the right to prevent Plaintiffs from using them in Mexico.

85. Fox Corporation has performed its obligations under the Fox-21CF License Agreement or its performance has been excused.

86. Fox Corporation has been injured as a result of MDM pursuing the Judicial Trademark Injunction in Mexico, including by being forced to litigate in a foreign forum.

**SECOND CAUSE OF ACTION**

**BREACH OF CONTRACT (QUALITY CONTROL PROVISION)**

**(FOX CORPORATION AGAINST MDM)**

87. Fox incorporates by reference the allegations in Paragraphs 1 to 86 as though fully set forth herein.

88. Fox Corporation, through its wholly-owned subsidiary Fox Media LLC, owns the Fox Sports Trademarks at issue, and licensed them to 21CF in the Fox-21CF License Agreement. 21CF was permitted to assign those rights to another party, subject to the terms of the license agreement with Fox. 21CF assigned those rights to MDM in the 21CF-MDM Assignment Agreement. In that agreement, MDM assumed the obligation to maintain the quality and standards of the Fox Sports Trademarks and refrain from taking action that would injure the Fox Sports Trademarks or Fox.

89. In the 21CF-MDM Assignment Agreement, MDM agreed to maintain the high quality, reputation, and goodwill associated with Fox's marks. MDM also agreed not to do anything that would have an adverse effect on the reputation of the Fox Sports Trademarks. The 21CF-MDM Assignment Agreement obligated MDM to maintain the high quality of the Fox Sports Trademarks and not to do anything that would negatively impact the reputation and goodwill associated with those marks.

90. MDM's failure to pay their broadcast licensing fees resulted in highly public broadcast interruptions and contract terminations, which harmed the reputation of the Fox Sports Trademarks and Fox itself. This constituted a material breach of the quality control provision of the 21CF-MDM Assignment Agreement. Because of that material breach, Fox terminated

MDM's license. MDM, however, continues to use the Fox Sports Trademarks and thereby continues to harm the reputation of Fox and the Fox Sports Trademarks.

91. As a result of MDM's mismanagement, MDM experienced broadcast disruptions or lost contract rights to over a dozen sports broadcast properties.

92. Fox Corporation has performed its obligations under the Fox-21CF License Agreement or its performance has been excused.

93. As a result of MDM's breaches, the reputation and goodwill associated with Fox's marks have been damaged in breach of the Quality Control Provision. This reputational damage is particularly severe because the loss of contract rights and broadcast disruptions have been widely reported in the media.

94. As a result of MDM's continued unauthorized use of the Fox Sports Trademarks, Fox Corporation is suffering damage in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

**(FOX CORPORATION AND FOX EN ESPAÑOL AGAINST MDM)**

95. Fox incorporates by reference the allegations in Paragraphs 1 to 94 as though fully set forth herein.

96. Fox Corporation and Fox Sports en Español have business relationships with MediaPro, as well as with Telefonía por Cable S.A. de C.V., Cablemas Telecommunications S.A. de C.V., Total Play Telecommunications S.A.P.I.D, Amazon.com Services LLC, Corporación Novavisión S. de RL de C.V., Claro Video LLC, Grupo W COM S.A. de C.V., Apple Store LLC, Google Store LLC, Stripe LLC, ROKU LLC, Radio Movil Dipsa S.A. de C.V., Libros Foráneos S.A. de C.V., Soccer Media Solutions S.A. de C.V., Next Natal S.A.P.I de C.V., and Wis Master Mexico S.A. de C.V.

97. MDM has interfered with those business relations via improper means by initiating bad-faith litigation to interfere with Fox's relationship with these third parties.

98. MDM's interfering conduct was done for a wrongful purpose and used improper means. MDM pursued both the Judicial Trademark Injunction for the wrongful purpose of interfering with Fox's business relationships. That injunction constitutes an improper means because MDM did not believe in the merits of its lawsuit. It independently constitutes an improper means because MDM initiated the lawsuit in bad faith to harass Fox's third-party business partners.

99. Specifically, MDM engaged in bad faith litigation when it pursued the Judicial Trademark Injunction based on the knowingly false claim that MDM had an exclusive license to the Fox Sports Trademarks. That misconduct caused the Mexico court to notice the Judicial Trademark Injunction to parties that have business relationships with Fox and caused IMPI to raid and shut down Fox's business partner, MediaPro. That misconduct interfered with Fox's business relationships.

100. MDM's bad-faith litigation has targeted specific business relationships maintained by Fox, most notably its relationship with MediaPro, but also Fox's advertising partners, technical service providers, distributors, and other business partners specifically identified by name in the Judicial Trademark Injunction.

101. Fox Sports en Español has a business relationship with MediaPro because it has a contract with MediaPro for production services. The contract between MediaPro and Fox Sports en Español permits the benefits of the agreement to be extended to Fox Sports en Español's divisions, subsidiaries, affiliates, and parent companies, including Fox Corporation.

102. Fox Corporation has a distinct business relationship with MediaPro. Fox Corporation has business dealings with MediaPro that concern which of Fox Corporation's subsidiaries and affiliates MediaPro will produce content for, among other things.

103. MDM's bad faith-litigation has injured the relationship between Fox and MediaPro. As a result of the IMPI raid, Fox's reputation with MediaPro has been damaged. Namely, the trust that MediaPro has in its relationship with Fox Corporation and Fox Sports en Español has been compromised. As immediate evidence of that deterioration, MediaPro has demanded that Fox Corporation and Fox Sports en Español prove their entitlement to use trademarks in Fox content and has demanded that Fox Corporation and Fox Sports en Español indemnify MediaPro on matters concerning the use of Fox marks. Those requirements have caused Fox economic injury.

104. Mediapro's new demands of Fox are emblematic of the reputational injury Fox has suffered with MediaPro. MediaPro clearly perceives increased cost and risk in doing business with Fox Corporation and Fox Sports en Español. This constitutes distinct reputational injury suffered by Fox Corporation because it has caused MediaPro to impose additional costs and requirements as a condition of doing business with Fox Corporation or any other of its affiliates or subsidiaries that it designates in the future.

105. MDM's bad-faith litigation has also harmed Fox by causing IMPI to shut down MediaPro's production facilities. Because of MediaPro's shutdown, Fox currently has no live studio operations in Mexico for its Spanish-speaking sports news coverage in the United States. MediaPro's production facility in Mexico was Fox's principal location for broadcasting live Spanish-language content into the United States. . Although Fox is currently moving rapidly to

fill the production blackout that MDM has caused, Fox has had to incur costs to fill the content blackout, including talent costs, crew costs, engineering costs, and other technical costs.

106. Fox's impaired ability to produce Spanish-language sports content has also resulted in reputational harm and loss of good will from its Spanish-speaking viewership in the U.S. This reputational harm was caused by MDM's bad-faith litigation.

107. MDM's bad faith litigation has injured the relationship between Fox and Telefonía por Cable S.A. de C.V., Cablemas Telecommunications S.A. de C.V., Total Play Telecommunications S.A.P.I.D, Amazon.com Services LLC, Corporación Novavisión S. de RL de C.V., Claro Video LLC, Grupo W COM S.A. de C.V., Apple Store LLC, Google Store LLC, Stripe LLC, ROKU LLC, Radio Movil Dipsa S.A. de C.V., Libros Foráneos S.A. de C.V., Soccer Media Solutions S.A. de C.V., Next Natal S.A.P.I de C.V., and Wis Master Mexico S.A. de C.V. whose business relationships with Fox are clouded by the threat of illegal harassment by MDM should they choose to do business with Fox.

108. This injury to Fox's reputation with its business partners is evidenced by the fact that Fox has received calls from at least two entities that received notice of the Judicial Trademark Injunction—Amazon.com Services LLC and Radio Movil Dipsa S.A. de C.V.—inquiring as to the status of Fox's trademarks and requesting an explanation of the documents that they received.

109. These third parties are also at imminent risk of suffering further harm and disruption to their businesses, as the IMPI raid and shutdown of MediaPro makes clear.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE LANHAM ACT, 15 U.S.C. §§ 1114, 1125

## (FOX MEDIA LLC AGAINST MDM)

110. Fox incorporates by reference the allegations in Paragraphs 1 to 109 as though fully set forth herein.

111. Fox Media has valid marks that are entitled to protection. Fox Media registered these marks with the United States Patent and Trademark Office. These marks are incontestable because Fox Media filed the appropriate affidavits of continuous use and incontestability under sections 8 and 15 of the Lanham Trademark Act.

112. MDM uses Fox's U.S.-registered trademarks in commerce in the United States without authorization. That conduct is likely to cause confusion as to the origin or sponsorship of MDM's channels in the United States. MDM uses the domain name www.foxsports.com.mx, which can be viewed in the United States. MDM uses a "Fox Sports" logo and purport to be "FOX Sports MX" on its YouTube, TikTok, and Instagram accounts, which can all be viewed in the United States.

113. MDM uses on their website and YouTube accounts Fox's "Fox Sports" oval, which is registered with the United States Patent and Trademark Office.

114. MDM's use of the domain name and other U.S.-registered Fox Sports marks in social media are directed at the United States and are likely to confuse United States viewers into thinking that MDM's domain and social media are provided or authorized by Fox when they are not. These channels compete with Fox in the United States for viewers, as well as advertising revenue.

115. As a result of MDM's unauthorized use of Fox Media's Fox Sports marks in the U.S., Fox Media has been injured.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

a. Judgement in Plaintiffs' favor and against MDM on all causes of action;

b. An injunction prohibiting MDM from using Fox Sports marks in the United States;

c. An injunction prohibiting MDM from using the Fox Sports Trademarks in Mexico;

d. An injunction prohibiting MDM from interfering with Fox's business relationships, including those specifically mentioned in the Judicial Trademark Injunction.

e. An anti-suit injunction prohibiting MDM from seeking to enforce the Judicial Trademark Injunction and or seek any other relief in Mexico related to the 21CF-MDM Assignment Agreement;

f. For other equitable and provisional relief;

g. An award of general, compensatory, expectation, and consequential damages to Plaintiffs;

h. An award of punitive damages;

i. Reasonable attorneys' fees and costs, as allowed by law;

j. Pre-judgment and post-judgment interest, as allowed by law; and

k. Such further relief as the Court may deem just and proper.

Dated: August 13, 2025

ELLIS GEORGE LLP

By: *__/s/ Stephen P. Farrelly__*
Stephen P. Farrelly

Eric M. George
Katherine A. Petti, *Pro Hac Vice*
Christopher T. Berg, *Pro Hac Vice*
ELLIS GEORGE LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
egeorge@ellisgeorge.com
kpetti@ellisgeorge.com
cberg@ellisgeorge.com

Stephen P. Farrelly
ELLIS GEORGE LLP
Carnegie Hall Tower
152 West 57th Street, 28th Floor
New York, NY 10019
Telephone: (212) 413-2600
Facsimile: (212) 413-2629
sfarrelly@ellisgeorge.com

*Attorneys for Plaintiffs Fox Corporation, Fox Media LLC, and Fox Sports en Español LLC*