**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **FOX CORPORATION, FOX MEDIA LLC, and FOX SPORTS EN ESPAÑOL LLC,** | § | |
| **Plaintiffs,** | § | |
| | § | **CAUSE NO. 4:25-CV-04650** |
| **V.** | § | |
| | § | |
| **LAURA PAOLA ARROYO RODRIGUEZ,** | § | |
| **Defendant.** | § | |
| | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S TRIAL MEMORANDUM**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

RELEVANT BACKGROUND FACTS ........ 2

ARGUMENT ........ 4

A. Defendant's arguments regarding Arroyo's fraudulent intent under TUFTA Section 25.005(a)(1) are unavailing and inconsistent with the evidence ........ 4

1. Timing: Transfer occurred shortly after incurring substantial debt – TUFTA Section 24.005(b)(10) ........ 5

2. Insider ........ 10

3. Retention of control – TUFTA Section 24.005(b)(2) ........ 11

4. Concealment – TUFTA Section 24.005(b)(3) ........ 12

5. Notice of Suit – TUFTA Section 24.005(b)(4) ........ 14

6. Transfer was substantially all of debtor's assets ........ 15

7. Lack of reasonably equivalent value – TUFTA Section 24.005(b)(8) ........ 16

8. Insolvency – TUFTA Section 24.005(b)(9) ........ 16

9. Pattern of conduct – Non-statutory factor ........ 17

B. Plaintiffs also prevail on two independent constructive fraud theories under TUFTA ........ 18

1. TUFTA Section 24.005(a)(2) ........ 18

2. TUFTA Section 24.006(a). ........ 19

3. Rodriguez's improper 24.009(f)(2) affirmative defense ........ 22

CONCLUSION ........ 23

# TABLE OF AUTHORITIES

## Cases

*Illinois v. Allen*, 397 U.S. 337, 350 (1970) .................... 16
*In re Bradley*, 501 F.3d 421, 434 (5th Cir. 2007) .................... 13
*In re Brass*, No. 6:23-cv-00002, 2025 WL 2162300, at *17 (S.D. Tex. July 29, 2025)................ 5
*In re CRCGP LLC*, No. 04-31993, 2008 WL 4107490, at *18–19 (Bankr. S.D. Tex. Aug. 28, 2008) .................... 11, 17
*In re Ritz*, 567 B.R. 715, 748 (Bankr. S.D. Tex. 2017).................... 13
*In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) .................... 6
*In re Strange*, 664 B.R. 143, 157 (Bankr. W.D. Tex. 2024).................... 11
*In re The Heritage Org., L.L.C.*, 413 B.R. 438, 488 (Bankr. N.D. Tex. 2009) .................... 5
*Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 387 (5th Cir. 2017).................... 17
*Matter of Galaz*, 850 F.3d 800, 805 (5th Cir. 2017).................... 11
*Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex. App.—Houston [14th Dist.] 2004, no pet.) . 4
*Roland v. United States*, 838 F.2d 1400, 1402 (5th Cir. 1988).................... 5
*Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. App.—Houston [1st Dist.] 2002 no pet.).................... 5
*Thibodeaux v. Olivier*, 819 F.2d 550, 553 (5th Cir. 1987) .................... 13
*Williams v. Woodard*, 384 F.3d 567, 627 (9th Cir. 2004).................... 16
*Zahra Spiritual Tr. v. United States*, 910 F.2d 240, 248 (5th Cir. 1990).................... 21

## Statutes

Tex. Bus. & Com. Code § 24.002(12) .................... 17
Tex. Bus. & Com. Code § 24.003(a) .................... 19
Tex. Bus. & Com. Code § 24.003(b) .................... 2, 17, 19
Tex. Bus. & Com. Code § 24.005(a)(1).................... 1, 23
Tex. Bus. & Com. Code § 24.005(a)(2).................... 1, 18, 19, 23
Tex. Bus. & Com. Code § 24.005(a)(2)(B) .................... 2, 18
Tex. Bus. & Com. Code § 24.005(b)(1) .................... 11
Tex. Bus. & Com. Code § 24.005(b)(5) .................... 16
Tex. Bus. & Com. Code § 24.005(b)(9) .................... 11, 16
Tex. Bus. & Com. Code § 24.005(b)(10) .................... 5
Tex. Bus. & Com. Code § 24.006(a) .................... 1, 2, 19, 22
Tex. Bus. & Com. Code § 24.006(b) .................... 22, 23
Tex. Bus. & Com. Code § 24.007(1)(A).................... 5
Tex. Bus. & Com. Code § 24.009(f)(2) .................... 22

Plaintiffs Fox Corporation, Fox Media LLC, and Fox Sports en Español LLC (collectively, "Plaintiffs") submit this response to the trial memorandum filed by Defendant Laura Paola Arroyo Rodriguez ("Rodriguez"), pursuant to the Court's order. *See* ECF No. 104.

**INTRODUCTION**

After the Court's rulings from docket call, this case has returned to a straightforward fraudulent transfer case. It boils down to one question: did Manuel Arroyo transfer the Philbrook Way property on September 2, 2025 to prevent it from being seized by creditors? The evidence makes clear that is exactly what he did. Defendant's entire case is based on the theory that Arroyo took initial steps earlier in 2025 to begin the process to transfer the Philbrook Way property. As discussed below, binding Fifth Circuit precedent deems that evidence irrelevant. It is irrelevant because it is not probative of Arroyo's state of mind when he actually transferred the Philbrook Way property. The only relevant question is why Arroyo made the transfer when he did—on September 2—and the circumstantial evidence shows he did so because he had just been held in contempt on August 29, 2025, he had just become subject to a $200,000 daily fine (that has since accrued to over $80 million), and he had to transfer the Philbrook Way property out of his name to prevent creditors from seizing it. The imposition of contempt against Arroyo was the motivating factor for the transfer on September 2, 2025—not stale plans from early 2025. Coupled with the numerous other badges of fraud evident in the record, Plaintiffs meet their burden to show that Arroyo transferred the Philbrook Way property to Rodriguez with actual intent to hinder, delay, or defraud his creditors. Tex. Bus. & Com. Code § 24.005(a)(1).

The evidence also supports Plaintiffs on two other distinct theories of fraudulent transfer under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006(a). First, there is no dispute that Arroyo did not receive reasonably equivalent value for the Philbrook Way property. *See id.* (requiring

lack of equivalent exchange). Second, TUFTA creates a presumption of insolvency when a debtor is not paying their debts as they become due. Tex. Bus. & Com. Code § 24.003(b). And there is no dispute that Arroyo has not paid any of the nearly $80 million in contempt sanctions imposed by the Southern District of New York ("SDNY"), which have been accruing for approximately 400 days. Arroyo's failure to pay his substantial debts, first to the SDNY, and then later to Plaintiffs, for over a year, qualifies him for TUFTA's insolvency presumption. With the insolvency presumption applied, Arroyo should have reasonably believed he would incur debts beyond his ability to pay when he transferred the Philbrook Way property, Tex. Bus. & Com. Code § 24.005(a)(2)(B), and Arroyo became insolvent as a result of the Philbrook Way transfer, Tex. Bus. & Com. Code § 24.006(a).

Plaintiffs have multiple paths to victory. Defendant's inadmissible evidence disturbs none of them.

## RELEVANT BACKGROUND FACTS[1]

The timeline in the days leading to the transfer of the property at issue is both simple and illustrative. On August 28, 2025, Plaintiffs notified counsel for Media Deportes Mexico ("MDM"), Mexico Sports Distribution ("MSD"), Grupo Lauman Holding ("Grupo Lauman")—companies for which Manuel Arroyo serves as an officer or otherwise controls—that the SDNY would hold a contempt hearing on August 29, 2025 against MDM and those acting in concert with it to violate the SDNY's injunction. Ex. 41, SDNY ECF 67-4. In the early morning of August 29, 2025, Plaintiffs notified counsel for MDM, MSD, and Grupo Lauman that Plaintiffs were seeking

[1] The Court has denied Rodriguez's motion to void, and, with it, made clear that this trial will not be a re-litigation of whether the SDNY court had jurisdiction in Plaintiffs' breach of contract and trademark infringement matter against Media Deportes Mexico. To that end, much of the jurisdictional discussion in Plaintiffs' opening trial memorandum is no longer at issue in this case, but Plaintiffs still incorporate by reference the facts raised in their opening trial memorandum at ECF No. 77.

to hold those three entities, as well as Manuel Arroyo personally, in contempt. *Id.* After the morning hearing concluded, the Court issued its contempt order, holding Arroyo in contempt and imposing a $200,000 daily fine on him until he purged his contempt. Ex. 4, Order Holding MSD in Contempt, SDNY ECF 45. Plaintiffs provided counsel for MDM, MSD, and Grupo Lauman with notice of the written contempt order the same day, shortly after the SDNY issued it. Ex. 42, SDNY ECF 67-5.

On the same day Arroyo was notified that Plaintiffs were seeking to hold him in contempt, the same day of his contempt hearing, the same day he was held in contempt and accrued a substantial daily fine, and the same day that he received notice of the written contempt order by Plaintiffs' email to his companies' counsel, *see* Ex. 6, Memo. Order, SDNY ECF 73 at 2 ("notice to MDM may be imputed, as a matter of law, to . . . Arroyo."), Arroyo ordered his real estate agent, Rosaura Rebecca Valdez Chow ("Chow"), to immediately transfer his Texas mansion located at 3 Philbrook Way, The Woodlands, Texas 77382-1377 ("Philbrook Way property") to his sister, Rodriguez. That day, August 29, 2025, the Friday before Labor Day, Chow emailed the office of Arroyo's real estate attorney, Patricio Gutierrez ("Gutierrez"), stating it was "urgent" to schedule an appointment for Arroyo to execute the deed that day or as soon as possible thereafter, even offering to pay more for expedited service. Ex. 24, Chow Email to Gutierrez Law Firm. It was urgent because Arroyo told Chow it was urgent. Declaration of Marcus Tucker ("Tucker Decl."), Ex. A, Chow Depo. at 43:19–44:9.

Arroyo executed the Philbrook Way deed four days later—on September 2, 2025, the Tuesday after Labor Day. Ex. 7, Special Warranty Deed. Rodriguez paid Arroyo nothing for the transfer. *Id.* On that same day, Arroyo also deeded his only other real property in the United

States, at 87 Lakeside Green, The Woodlands, Texas ("Lakeside Green") to his daughter, also for no monetary consideration. Ex. 18, Deed for 87 Lakeside Green.

On September 9, 2025, the SDNY's contempt sanctions began accruing against Arroyo; those sanctions were immediately payable as they accrued. Ex. 6, Memo. Order, SDNY ECF 73; Ex. 4, Order Holding MSD in Contempt, SDNY ECF 45 ("to be paid daily"). As of the filing of this brief, Arroyo has accrued approximately $80 million in contempt sanctions and has not paid a dollar.

Rodriguez did not sign the Philbrook Way deed and did not learn of the transfer until after it occurred. Rodriguez Depo. at 36:17–25; 94:5–12. After Arroyo transferred his entire interest in the Philbrook Way property to Rodriguez, Arroyo's agents, at Arroyo's direction, attempted to make an additional transfer of the Philbrook Way property to an LLC in the days following September 2, 2025. Ex. 26, Emails between Gutierrez Law and Jackie Ward Law Firm. In addition to retaining decision-making authority over the property's future transfer, Arroyo kept his possessions and furnishings there; paid utilities, maintenance, and upkeep expenses for the property; and suggested reimbursement to Rodriguez for property expenses. Rodriguez Depo. at 104:21–106:5. Rodriguez had not moved furnishings into, nor stayed at, the Philbrook Way property by February 2026—five months after the transfer. *Id.* at 105:5–7; 104:17–20.

## <u>ARGUMENT</u>

### A. Defendant's arguments regarding Arroyo's fraudulent intent under TUFTA Section 25.005(a)(1) are unavailing and inconsistent with the evidence

None of Rodriguez's attacks on Plaintiffs' badges of fraud have merit. The record establishes nine badges of fraud. Proof of four to five badges of fraud has been found sufficient in several reported cases. *See, e.g., Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80

S.W.3d 601, 609 (Tex. App.—Houston [1st Dist.] 2002 no pet.).

*1. Timing: Transfer occurred shortly after incurring substantial debt – TUFTA Section 24.005(b)(10).* Rodriguez claims in her trial brief that Arroyo intended to transfer the Philbrook Way property to her months before he was held in contempt on August 29, 2025. ECF No. 106-2 at 3. She ignores the ample case law Plaintiffs cited in their opening trial memorandum as to when actual intent is evaluated—at the time of transfer. ECF No. 77 at 8-9. Any potential, hypothetical, or even actual prior intent to transfer is irrelevant: the proper intent inquiry is undertaken at the time of the transfer. *See id.* (citing *In re Brass*, No. 6:23-cv-00002, 2025 WL 2162300, at *17 (S.D. Tex. July 29, 2025) ("TUFTA focuses on the debtor's intent at the time the transfer occurred"); *Roland v. United States*, 838 F.2d 1400, 1402 (5th Cir. 1988) ("We held that under the Texas Fraudulent Transfers Act the debtor's intent at the time of the conveyance was the crucial element."); *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 488 (Bankr. N.D. Tex. 2009) (evaluating intent "at the time each Transfer at issue here was made.")).

Rodriguez does not dispute the time of the transfer, but to reiterate an undisputed point: TUFTA's text makes clear that the time of the transfer here was on September 2, 2025. Section 24.007(1)(A) states that a transfer of real property is made when "the transfer is so far perfected that a good faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior of the interest of the transferee." Prior to the deed transfer, a good faith purchaser could acquire an interest in the property by, for example, placing a lien or lis pendens on the property because of a debt owed to Arroyo. Thus, the transfer occurred when the deed was executed on September 2, 2025—not when Arroyo first potentially contemplated transferring the property to his sister. And actual intent may

be established by circumstantial evidence because direct proof of fraudulent intent is often unavailable. *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008).

The case law and statutory text line up with common sense—the circumstances surrounding the date of the transfer shine the brightest light on Arroyo's state of mind when he, in fact, transferred the Philbrook Way property. On August 29, 2025, the day of the SDNY contempt hearing and the day the SDNY actually held Arroyo in contempt, Arroyo's real estate agent, on Arroyo's orders, pressed Arroyo's lawyers to have the Philbrook Way deed executed that same day, or as soon as possible, offering to pay extra for speed. Ex. 24, Chow Email to Gutierrez Law Firm. Over the next few days—the Saturday, Sunday, and Monday of Labor Day weekend—a flurry of activity occurred with Arroyo's attorneys and real estate agent scrambling to schedule Arroyo to sign the deed before a notary—something that was eventually accomplished on Tuesday, September 2, 2025. Whatever Arroyo's intent prior to August 29, 2025, the record plainly demonstrates that from August 29, 2025 through September 2, 2025 Arroyo effected the transfer so that no contempt sanction could be enforced against the Philbrook Way property. Rodriguez makes the incredulous contention that it was a coincidence Arroyo rushed to transfer the home on August 29. ECF No. 108 at 19. The record belies that weak contention.

Perhaps recognizing that she needs to somehow explain this late-August non-coincidence, Rodriguez stretches the facts too far in her trial brief. She claims that "on August 11, 2025 the agent told counsel that Arroyo wanted to sign by the end of the month." Def. Trial Brief, ECF No. 106-2 at 3. That is not what the record shows. Her trial brief on this point cites to her Findings of Fact ("FOF") and Conclusions of Law ("COL") at ECF No. 76-6 at 3–5, which in turn cites to Ms. Chow's deposition transcript at page 44, lines 20-24, and Gutierrez Deposition Tr. at 65:13–21 in an effort to prop up this August 11 contention.

The Chow transcript does not support Rodriguez's contention that Arroyo told Chow on August 11 that he wanted to transfer the property by the end of August. Rodriguez selectively cites to only four lines of the Chow transcript at page 44 at 20-24, which reads as follows: "Q. And did Mr. Arroyo tell you why it was urgent that the appointment needed to be scheduled that day or as soon as possible? A. He had already previously told me that he wanted to finish with this process as soon as possible." Rodriguez misleadingly quotes Chow's transcript to suggest that Arroyo told her that he wanted to transfer the Philbrook Way property as soon as possible sometime before August 29. That is not Chow's testimony. Rodriguez does not cite to the testimony that immediately follows on the next line, which clarifies that Chow's testimony that Arroyo "previously told me he wanted to finish with this process as soon as possible" is referencing what he previously told her *on August 29*, the day Arroyo was held in contempt. Here is the complete excerpt of the relevant testimony:

> Q. And did Mr. Arroyo tell you why it was urgent that the appointment needed to be scheduled that day or as soon as possible?
>
> A. He had already previously told me that he wanted to finish with this process as soon as possible.
>
> Q. This is a conversation that you had with him on the 29th?
>
> A. You mean whether that was the reason why I wrote this email?
>
> Q. Well, what I was trying to understand when Mr. Arroyo told you that you needed it done today, it was urgent to get it done today or as soon as possible, when did Mr. Arroyo tell you that?
>
> A. That day.
>
> Q. Did he tell you by phone or text or WhatsApp?
>
> A. Yeah, by phone.

> Q. Okay. So then you immediately set out to try to get the appointment scheduled?
>
> A. Yes.
>
> Q. And you did that by reaching out to the Gutierrez Law Firm?
>
> A. Yeah, this is it.

Tucker Decl., Ex. A, Chow Depo. at 44:25-45:16. The Chow testimony Rodriguez cites in her trial brief offers no support for the contention that on August 11 Arroyo directed Chow to schedule the transfer by the end of August.

Turning next to the portion of the Gutierrez deposition that Rodriguez cites in support of her contention that Chow had "advised the Gutierrez firm on August 11, 2025, that Mr. Arroyo wanted to sign the deed by the end of the month." ECF No. 76-6 at 4. Gutierrez's actual testimony does not support that assertion. Rodriguez cites to Gutierrez's deposition at page 65, lines 13–21, which read as follows:

> Q. Beginning of June, end of May, until Exhibit, I think it is 8[,] some e-mails in August. Did I pick up the right one?
>
> A. August 8 is -- or August 11, where Ms. Rebeca [Chow] has some sort of doubt of something, and [Gutierrez's colleague] Nicolle reaches out saying, following up and consulting that Mr. Arroyo has availability to coordinate. And Rebeca [Chow] replies, saying that Mr. Arroyo told me he would be back the last days of the month and that she reached out to us to coordinate. Give me a couple more days and we'll coordinate.

*See id.* An excerpt of that transcript is accompanies this brief as Exhibit B of the Tucker Declaration.

As Gutierrez's testimony alone makes clear, he does not testify as Rodriguez claims. He does not testify that Chow said on August 11 that Arroyo said he wanted to sign the deed by the end of the month. Gutierrez actually testifies that Chow told Gutierrez's colleague Nicolle that

Arroyo would be back at the end of August and Chow would get back to Nicolle on Nicolle's follow ups to try to schedule a time to meet with Arroyo. Tucker Decl., Ex. B, Gutierrez Depo. at 65:20–25. A review of the exhibit referenced in Gutierrez's testimony makes the inaccuracy of Rodriguez's representation on this point even clearer. That exhibit, an excerpt of which is translated and accompanies this brief as Exhibit C to the Tucker Declaration, is an email chain between Chow and a staff member at the Gutierrez Law Firm. In that exchange, Chow sends an email on August 11 with no mention at all that Arroyo wants to transfer the Philbrook Way property by the end of the month. Her August 11 email is simply as follows:

> Good afternoon. I have a question about the transfer of ownership of one of the houses. The one at 87 Lakeside is in the name of Mr. Arroyo and Ms. Berenice Monge. For the virtual appointment, must both of them be present, or only him? The other house is in his name only. Since you haven't mentioned it to me, I just want to be sure before scheduling, thank you.
> Do you also handle changes of ownership for companies? Like LLCs

Tucker Decl., Ex. C.

Nicolle at the Gutierrez Law Firm responds to that August 11 email from Chow on August 12, with no mention of Arroyo signing a deed for Philbrook Way by the end of the month. *Id.* Chow does not respond to that August 12 email from the Gutierrez firm at all. *Id.* Then, on August 21—seven days after Plaintiffs sued Arroyo's company in the SDNY—the Gutierrez Law Firm reaches out again to Chow and asks if Arroyo has any availability to schedule an appointment with the notary. *Id.* Chow finally responds to these repeated follow-ups later that day, stating that she was told Arroyo would be back by the end of the month and that she needed more time before she could coordinate the transfer. *Id.* Nicole responds later that day by saying she looks forward to coordinating the appointment when Arroyo returns at the end of the month. *Id.* None of that

exchange suggests that Arroyo on August 11 told Chow to complete the transfer at the end of the month.

But then, eight days later, on August 29, the Friday before Labor Day, the day of Arroyo's SDNY contempt hearing where he was held in contempt, Chow suddenly sends her own email to the Gutierrez firm who had been waiting and following up repeatedly: "It is urgent that we get this done today. If it is necessary to pay extra, that is no problem." Ex. 24, Chow Email to Gutierrez Law Firm. That was no coincidence. The request to complete the transfer did not come on August 11; it came on August 29—and was treated with an urgency that did not exist at any time prior. The day after Labor Day, Tuesday, September 2, the deed was done.

By examining Arroyo's intent at the time of the transfer—the days surrounding September 2, 2025—the evidence plainly shows that the SDNY's contempt ruling and the substantial debt Arroyo accrued from it were the motivating factors that prompted him to direct his agents to complete the transfer of the Philbrook Way property. This was not a coincidence. The transfer date was not consistent with the discussions had between Arroyo's agents in the weeks prior. The order to complete the transfer arose the same day Arroyo was notified that Plaintiffs were pursing contempt against him personally, the same day the emergency contempt hearing was held, the same day the SDNY found Arroyo in contempt and imposed a substantial daily fine on him, and the same day Arroyo was notified of the contempt order against him. Arroyo made the September 2 transfer of the Philbrook Way property with the intent to keep the property from his creditors.

*2. Insider*. Contrary to Rodriguez's suggestion that Plaintiffs must offer proof that Arroyo was insolvent in order to satisfy the insider badge, ECF No. 106-2 at 8, neither TUFTA nor case law interpreting it requires a debtor to be insolvent for a transfer to an insider to count as a badge of fraud. TUFTA lists the insider badge, Tex. Bus. & Com. Code § 24.005(b)(1), and the

insolvency badge, id. § 24.005(b)(9), as separate items in a non-exclusive list. Specifically, § 24.005(b)(1) states: "the transfer or obligation was to an insider" without any reference to insolvency. The statutory language therefore does not inject an insolvent-debtor requirement into the insider badge of fraud.

Courts also analyze the insider badge based on the relationship between the debtor and the transferee without determining whether the debtor was solvent. In *Matter of Galaz*, 850 F.3d 800, 805 (5th Cir. 2017), the Fifth Circuit affirmed a TUFTA fraudulent-intent finding counting the transfer to the debtor's father as the badge, under § 24.005(b)(1), and insolvency as a separate badge. *Id.* In *CRCGP*, the court found the insider badge satisfied because the transferee was the debtor's stipulated insider and owned the transferee entities. It addressed insolvency as a separate badge of fraud. *In re CRCGP LLC*, No. 04-31993, 2008 WL 4107490, at *18–19 (Bankr. S.D. Tex. Aug. 28, 2008). In *In re Tegeler*, the court held that "all six of the transfers were made to insiders" and found the insider badge "significantly present." 586 B.R. 598, 675–76 (Bankr. S.D. Tex. 2018). The court then found the insolvency badge "not present" because the creditor offered no evidence of insolvency. *Id.* at 683. *Tegeler* therefore shows that a court can find the insider badge to be present when the insolvency badge is absent. In the *Strange* decision cited by Defendant, the bankruptcy court simply described the "debtor" as "insolvent" without adding a requirement that the debtor be insolvent to qualify as an insider. *In re Strange*, 664 B.R. 143, 157 (Bankr. W.D. Tex. 2024).

*3. Retention of control – TUFTA Section 24.005(b)(2).* Rather than try to negate this badge of fraud, Rodriguez concedes that Arroyo retained control of the Philbrook Way property. The debtor, Arroyo, retained control of the property through his continued possession and care for the home. Arroyo kept his personal property there and continued to pay for utilities and the upkeep

of the property. Rodriguez Depo. at 104:7–106:5. Rodriguez already owned a second home in Houston with her husband and had not stayed at the Philbrook Way property by February 2026, including at no time before the TRO in this case issued. Rodriguez Depo. at 104:17–20.

After the transfer of the Philbrook Way property to Rodriguez, Arroyo also exercised control over the property by attempting to make a second transfer of the property to a limited liability company ("LLC"). With the assistance of Chow, his real estate agent, Arroyo retained the Gutierrez Law Firm on September 4, 2025, two days after the initial transfer, to transfer the property to an LLC. Tucker Decl., Ex. B, Gutierrez Depo. at 75:14–79:18, 81:18–87:13; Ex. 49, FOX000164; Ex. 26, PG0031–00032; Ex. 34, PG0350–0354. Arroyo, not Rodriguez, paid the Gutierrez Law Firm $2,340 to arrange for this transfer. Tucker Decl., Ex. B, Gutierrez Depo. at 80:20–82:18; Ex. 27, PG0031–00032; Ex. 29, PG0191-0192. However, Gutierrez, principal of the Gutierrez Law, terminated the relationship on September 12, 2025 after he learned of the SDNY lawsuit. Tucker Decl., Ex. B, Gutierrez Depo. at 91:9–92:22, 95:17–22; Plaintiffs' Exhibit 27, PG0118. Gutierrez refunded the additional retainer to Arroyo, and the transfer to the LLC never occurred. Tucker Decl., Ex. B, Gutierrez Depo. at 95:23–96:7, 105:7–17; Ex. 29, PG0111.

Rodriguez cannot hide behind the Court's Temporary Restraining Order and Preliminary Injunction to argue that Arroyo has been forced to retain control of the Philbrook Way property. ECF No. 106-2 at 9. Rodriguez did not change the utilities into her name or pay for the upkeep of the property, and Arroyo attempted to coordinate a second transfer of the property two days after the transfer to Rodriguez, because he continued to retain control of the property. The Court's injunction explains none of that behavior. The evidence clearly shows that the Philbrook Way property is and always has been controlled by Arroyo.

*4. Concealment – TUFTA Section 24.005(b)(3).* Arroyo claims the Philbrook Way

property transfer was not concealed because he recorded the deed. ECF No. 106-2 at 8. But he nevertheless concealed the transfer from one of the most important parties to the transaction—Rodriguez. Rodriguez did not learn about the transfer until after it occurred. Keeping Rodriguez in the dark about the transfer was important to Arroyo because he was still working with a real estate agent and counsel to make a second transfer of the Philbrook Way Property to an LLC—*after* he had transferred property ownership to Rodriguez and *without* Rodriguez's knowledge of his plans for a second transfer. Concealment is "the act of refraining from disclosures; … an act by which one prevents or hinders the discovery of something." *In re Ritz*, 567 B.R. 715, 748 (Bankr. S.D. Tex. 2017) (quoting Black's Law dictionary 282 (7th ed. 1999)). Concealment can be established by showing 'a transfer of title coupled with the retention of the benefits of ownership.'" *In re Bradley*, 501 F.3d 421, 434 (5th Cir. 2007) (quoting *Thibodeaux v. Olivier*, 819 F.2d 550, 553 (5th Cir. 1987)). Here, Rodriguez denies that she knew about the September 2, 2025 transfer at the time it was made, Rodriguez Depo. at 94:5–12, and Arroyo attempted to a coordinate a second transfer of the property into a limited liability company to further conceal ownership—without Rodriguez's knowledge of his plan for a second transfer, Tucker Decl., Ex. B, Gutierrez Depo. at 75:14–79:18, 81:18–87:13; Ex. 25, FOX00164; Ex. 49, FOX000164; Ex. 26, PG0031–00032; Ex. 34, PG0350–0354; Rodriguez Depo. at 83:22–25; 93:20–22; 101:21–102:6. And Arroyo continued to keep his personal property at the home and to pay for all utilities and upkeep. Rodriguez Depo. at 94:5–20; 36:17–25; 104:7–106:5.

That fact pattern aligns with the *Olivier* case, in which bankruptcy debtors "sold" their home to a family member but continued to act as the owner by living there and maintaining it without paying rent. The Fifth Circuit treated that as concealment of their continuing interest. 819 F.2d 550, 551, 554. Here, title was transferred to Arroyo's sister, but Arroyo continued to keep

his belongings there at home, paid to maintain it, and tried to hide the first transfer for the purpose of effecting a second transfer outside of Rodriguez's knowledge or involvement. The record establishes this badge of fraud.

5. *Notice of Suit – TUFTA Section 24.005(b)(4).* Another badge of fraud is "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." Before the September 2 transfer, Arroyo had been threatened with contempt if he did not comply with the SDNY's injunction, as well as held in contempt. Rodriguez does not dispute that Arroyo had been both threatened with contempt and held in contempt before transfer on September 2. That should be dispositive as to this badge—she cites to no case law that interprets this badge differently from its plain text. But Rodriguez nevertheless complains that the notice to Arroyo of a legal suit against him prior to the transfer was insufficient, that "the only 'notice' the SDNY found was imputed to [Arroyo] from emails sent to MDM[.]" ECF No. 106-2 at 9. "And Arroyo could not have intended on September 2 to hinder a claim he did not know existed . . . it was not emailed to him until September 6." *Id.* at 7.

As Rodriguez herself notes in her trial brief, the SDNY court already has decided this issue—Arroyo had notice. MDM, MSD, and Grupo Lauman's counsel received notice of the proceedings and contempt order when Plaintiffs emailed them a copy of those papers on August 29. Ex. 9, Certificate of Service re Contempt Order, SDNY ECF 55; Ex. 41, SDNY ECF 67-4; Ex. 42, SDNY ECF 67-5; Ex. 6, Memo. Order, SDNY ECF 73. As the SDNY held, "Because Grupo Lauman is MDM's corporate parent and Arroyo is one of MDM's corporate officers, notice to MDM may be imputed, as a matter of law, to Grupo Lauman and Arroyo." Ex. 6, Memo. Order, SDNY ECF 73 at 2. Days before the transfer on September 2, and even before the SDNY contempt hearing began on August 29, Arroyo was aware of the legal trouble he was personally facing in

SDNY. And while legally irrelevant given the notice that had already been imputed to Arroyo on August 29, nowhere in the record is there any indication that when Arroyo again received the contempt papers via yet another email on September 6, he then suddenly made efforts to unwind the transfer. That is because it was not a shock to Arroyo on September 6 that he had been held in contempt. Arroyo had known for days that Plaintiffs had initiated contempt proceedings against him, at least by August 29, and that he had been personally held in contempt on that same day. Based on that very knowledge he took steps to quickly move properties to his sister and daughter to avoid them being used to pay his significant contempt fines. By September 2, the first day after a holiday weekend, it was done.

*6. Transfer was substantially all of debtor's assets – TUFTA Section 24.005(b)(5).* Rodriguez claims that Plaintiffs cannot prove that the transfer of the Philbrook Way and the Lakeside Green properties constituted the transfer of substantially all of Arroyo's assets because Plaintiffs' asset searches were limited to the United States. That is wrong. The reason Plaintiffs' asset searches have been so limited is because Arroyo has failed to comply with a court order compelling him to disclose his assets. In the SDNY action, Plaintiffs subpoenaed Arroyo asking him to "Describe in detail all of Manuel Arroyo's assets anywhere in the world, including the address where they are located and/or the institution, entity, or company at which they are held or maintained." Attached hereto as Exhibit D is a copy of Plaintiffs' subpoena. Arroyo refused to comply with that subpoena. After Arroyo disobeyed a court order compelling him to respond to the subpoena, the SDNY held him in contempt. Attached hereto as Exhibits E and F are copies of the SDNY's order compelling Arroyo to comply with the subpoena and order holding him in contempt for disobeying that order.

Thus, Arroyo has obstructed Plaintiffs from obtaining information about his assets outside

the United States. Neither he nor Rodriguez should be able to obtain an evidentiary benefit arising from his contempt. *See Williams v. Woodard*, 384 F.3d 567, 627 (9th Cir. 2004) ("Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong.") (quoting *Illinois v. Allen*, 397 U.S. 337, 350 (1970) (Brennan, J., concurring)). As a result, Plaintiffs investigated Arroyo's material assets in the United States (real property) that they could independently verify. That search revealed that the transfer of the Philbrook Way and the Lakeside Green properties on September 2, 2025 constituted the transfer of substantially all of Arroyo's assets that are verifiable through public records searches. Ex. 37, StoneTurn Report. Because Arroyo and Rodriguez should not be able to extract an evidentiary benefit from Arroyo's contempt, Plaintiffs' evidence establishes that Arroyo's transfer of the Philbrook Way and Lakeside Green properties constituted a transfer of substantially all of Arroyo's assets under Tex. Bus. & Com. Code § 24.005(b)(5).

*7. Lack of reasonably equivalent value – TUFTA Section 24.005(b)(8)*. Rodriguez does not contest this badge of fraud, as it is plain that Rodriguez receiving $5.1 million for no monetary consideration is not an exchange of reasonably equivalent value.

*8. Insolvency – TUFTA Section 24.005(b)(9).* Arroyo's contumacious conduct in the SDNY has also obstructed Plaintiffs from learning whether Arroyo was "insolvent or became insolvent shortly after the transfer" of the Philbrook Way property. Tex. Bus. & Com. Code § 24.005(b)(9). Despite Arroyo's refusal to disclose information about his assets, Plaintiffs' evidence still establishes that Arroyo became insolvent shortly after the transfer of the Philbrook Way property. TUFTA creates a presumption of insolvency: "A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent." Tex. Bus. & Com. Code § 24.003(b). On August 29, 2025, the SDNY imposed a $200,000 daily contempt fine

against Arroyo. Ex. 4, Order Holding MSD in Contempt, SDNY ECF 45. That contempt fine began to accrue on September 9, 2025 and was made payable to Plaintiffs on the same day. Ex. 6, Memo. Order, SDNY ECF 73. That means Arroyo has incurred a debt of $200,000 each day from September 9, 2025 to October 13, 2026—the day this brief was filed. In other words, Arroyo has been in contempt for nearly 400 days, which means he has incurred nearly 400 distinct debts of $200,000 each, for a total indebtedness of approximately $80,000,000, all of which are past due. *See* Ex. 4, Order Holding MSD in Contempt, SDNY ECF 45 ("to be paid daily"). Arroyo has not paid a single dollar of those debts. When determining whether a debtor's payments of its debts shows insolvency, courts consider the number and amount of unpaid debts, the age and number of unpaid debts, and the total amount of indebtedness, among others. *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 387 (5th Cir. 2017). Here, Arroyo has about 400 unpaid debts owed to Plaintiffs of $200,000 each for a total of nearly $80,000,000, all of which are past due, many for over a year. This evidence is sufficient to apply the presumption of insolvency to Arroyo.

*9. Pattern of conduct – Non-statutory factor*. The Court should reject Rodriguez's contention that two deeds signed on the same day are "one event." ECF No. 106-2 at 10. TUFTA defines a "transfer" as "every mode . . . of disposing of or parting with an asset or an interest in an asset," Tex. Bus. & Com. Code § 24.002(12). Thus, each deed, which conveys a different parcel to a different grantee, is its own transfer however close in time the signatures are. Courts apply the statute that way. In *CRCGP*, the debtor, Behnad, deeded all seven of its properties to insiders while a usury suit was pending. *In re CRCGP LLC*, No. 04-31993, 2008 WL 4107490, at *4, *18 (Bankr. S.D. Tex. Aug. 28, 2008). Three of the deeds (Ashford Brook, Rankin Road, and FM 529) were dated the same day, went to the same transferee, and were recorded together. *Id.* at *1. The court nonetheless analyzed each deed on its own. It found fraudulent intent as to Rankin

Road and FM 529, but held that Ashford Brook was fully encumbered and so was not an "asset." *Id.* at *5, *17, *21. Deeds dated and recorded together—to the same transferee, unlike here—received different treatment, which could not happen if they were a single action or event.

The *CRCGP* court described what happened as a "systematic transfer of assets during the pendency of the usury lawsuit," *id.* at *5, and a "systematic disposition of essentially all of Behnad's assets," *id.* at *21. It examined "not only the individual transfers, but also the fact that the transfers together were of all or substantially all of Behnad's property," *id.* at *4, and asked whether "there was an overarching scheme to remove assets," *id.* at *19. Here, two deeds to two insiders, Arroyo's sister (Philbrook Way) and Arroyo's daughter (Lakeside Green), on the same day constitute a series of transactions that demonstrate a pattern of conduct to divest assets.

**B. Plaintiffs also prevail on two independent constructive fraud theories under TUFTA**

*1. TUFTA Section 24.005(a)(2).* Plaintiffs prevail on their constructive fraud theory under Tex. Bus. & Com. Code § 24.005(a)(2) for the same reason that they can prove the insolvency badge of fraud. Arroyo transferred the Philbrook Way property to Rodriguez "without receiving a reasonably equivalent value in exchange for the transfer or obligation," *id.*, because the property is appraised at $5.1 million but he transferred it for $0, Ex. 40, Appraisal Report; Ex. 7, Special Warranty Deed. That transfer occurred on September 2, 2025—four days after the SDNY imposed a $200,000 daily fine against Arroyo. Ex. 7, Special Warranty Deed; Ex. 4, Order Holding MSD in Contempt, SDNY ECF 45. As a result of that contempt sanction, Arroyo "reasonably should have believed that [he] would incur" "debts beyond [his] ability to pay as they became due." Tex. Bus. & Com. Code § 24.005(a)(2)(B). His inability to pay the contempt sanction is overwhelmingly supported by the evidence, as he has accrued nearly $80 million in contempt sanctions over the course of 400 days and has not paid a cent. That inability to pay is

further supported by his transfer of his two material assets in the United States, the Philbrook Way property and the Lakeside Green property on September 2, 2025. Under the TUFTA insolvency presumption, failure to pay debts as they become due is treated as the inability to pay those debts. Tex. Bus. & Com. Code §§ 24.003(a)-(b). Based on Arroyo jettisoning his real property assets after being held in contempt, and based on the imposition of a substantial daily fine against him, Arroyo reasonably should have known that he would incur debts beyond his ability to pay them as they became due. Accordingly, the record establishes the two elements required to find a fraudulent conveyance under Tex. Bus. & Com. Code § 24.005(a)(2).

*2. TUFTA Section 24.006(a).* Plaintiffs can show the Philbrook Way transfer was a fraudulent conveyance on yet another independent ground. "A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . [1] if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and [2] the debtor was insolvent at the time or became insolvent as a result of the transfer." Tex. Bus. & Com. Code § 24.006(a). Fox prevails on its 24.006(a) theory because, as discussed above, (1) Arroyo transferred a $5.1 million house to Rodriguez for $0 in return and (2) Arroyo is presumed insolvent at the time of the transfer because of his failure to pay debts to creditors as they came due starting one week after the transfer.

Rodriguez contends that Plaintiffs cannot maintain a § 24.006(a) theory because Plaintiffs were not creditors of Arroyo on September 2, 2025. ECF No. 106-2 at 13. That is wrong. In 2023 and 2024, Plaintiffs and their affiliates conducted due diligence into the business unit Fox Sports Mexico, J. Lancer Depo. at p. 30, a joint venture of two of Manuel Arroyo's companies, Mexico Sports Distribution and Media Deportes Mexico, Ex. 53, Memo. Order, SDNY ECF 96 at 12–13. Those companies are controlled by a company called Grupo Lauman, J. Lancer anticipated

testimony, for which Manuel Arroyo serves as president, *id*. As a result of that diligence, Plaintiffs knew that Manuel Arroyo was responsible for directing those companies in their misuse of Plaintiffs' Fox Sports trademarks. That is why on November 9, 2024 Justin Lancer, Fox Corporation's Executive Vice President of Corporate Development, wrote a letter to Manuel Arroyo accusing Grupo Lauman of causing reputational and commercial damage to the Fox Sports trademarks and demanding that Grupo Lauman cease using the Fox Sports trademarks 30 days after November 11, 2024. Ex. 44, November 2024 Fox Letter to Grupo Lauman. Fox Corporation confirmed the termination of the Fox Sports trademark license on March 3, 2025. Ex. 60, License Termination Letter.

Plaintiffs then alleged before the SDNY that Media Deportes Mexico ("MDM") breached the Fox Sports trademark license agreement and committed trademark infringement by continuing to use the Fox Sports trademarks after March 3, 2025. Ex. 43, Memorandum of Law in Support of Ex Parte Motion, SDNY ECF 9. Based on Plaintiffs' knowledge of Arroyo's role in directing MDM's conduct arising from the Fox Sports Mexico diligence process, by March 3, 2025 Plaintiffs knew they had claims against Arroyo directly for inducement to breach contract and inducement to infringe trademarks. Plaintiffs made that position known to Arroyo on August 29, 2025 when they filed an emergency motion for contempt against Arroyo, accusing him of directing MDM to continue to use the Fox Sports trademarks without authorization and to otherwise violate the SDNY's temporary restraining order. Ex. 19, Emergency Motion for Contempt, SDNY ECF 42. As Plaintiffs explained in their opening trial memorandum, ECF No. 77 at 11, Plaintiffs have claims against Arroyo for inducement to breach contract, inducement to infringe trademarks, and for damages arising out of his directing MDM to violate the SDNY's temporary restraining order—all of which arose well before the September 2, 2025 transfer of the Philbrook Way

property—including inducement to breach contract claims that arose as early as December 2024, *see* Ex. 44, November 2024 Fox Letter to Grupo Lauman.

As Rodriguez concedes, "TUFTA protects the holder of an unmatured, contingent" claim. ECF No. 106-2 at 14; *see also Zahra Spiritual Tr. v. United States*, 910 F.2d 240, 248 (5th Cir. 1990) ("The Texas courts have given broad construction to the term creditor, so that [TUFTA] protects the holders of unliquidated unmatured contingent claims."). Plaintiffs' claims against Arroyo for inducement to breach contract and inducement to infringe trademarks are still unfiled because they are unmatured, contingent claims. A threshold element for both of those claims is a ruling that MDM breached its license agreement and infringed the Fox Sports trademarks—issues that are still being litigated in the SDNY. Once a final judgment issues from the SDNY resolving those issues in Plaintiffs' favor, Plaintiffs can then proceed with their claims against Arroyo.

Nevertheless, Rodriguez claims that Plaintiffs' tort claims against Arroyo do not grant creditor status to Plaintiffs because they are "unproved." ECF No. 106-2 at 14. TUFTA has no such requirement, and Rodriguez cites no authority to the contrary. Because Texas courts give a broad construction to the term "creditor," including claims that are unmatured and contingent, there is a low bar to showing the existence of a claim under TUFTA. For example, in *Zahra*, the court found the IRS was an existing creditor for purposes of a fraudulent transfer where there was a pending investigation against the debtors into their tax payments, and the debtors knew of that investigation at the time they made the fraudulent transfer. 910 F.2d at 248. The Fifth Circuit in *Zahra* did not require the IRS to prove the basis for its claim against the debtors—the existence of an investigation and the transferor's knowledge of it was sufficient for the IRS to have creditor status under TUFTA.

Plaintiffs have gone above and beyond that low bar. They alleged a colorable basis for

their independent tort claims against Arroyo when they filed their emergency motion to hold him in contempt. Ex. 19, Emergency Motion for Contempt, SDNY ECF 42. Arroyo was made aware of that motion because it was sent to the attorneys for his companies MDM, MSD, and Grupo Lauman on August 29, 2025—days before the September 2, 2025 transfer. Ex. 41, SDNY ECF 67-4; Ex. 6, Memo. Order, SDNY ECF 73 (because "Arroyo is one of MDM's corporate officers, notice to MDM may be imputed, as a matter of law to . . . Arroyo"). And Plaintiffs have provided an evidentiary basis explaining how Arroyo directs the actions of MDM, including as to the use and misuse of the Fox Sports trademarks. *See* Ex. 44, November 2024 Fox Letter to Grupo Lauman; J. Lancer anticipated testimony. Plaintiffs have met the low evidentiary burden of establishing the existence of claims against Arroyo that predated the September 2, 2025 transfer. They therefore satisfy all the elements necessary to prevail on their 24.006(a) theory.

*3. Rodriguez's improper 24.009(f)(2) affirmative defense.* In her trial memorandum, Rodriguez seeks to establish the affirmative defense offered in Tex. Bus. & Com. Code § 24.009(f)(2), which provides: "A transfer is not voidable under Section 24.006(b) of this code . . . if made in the ordinary course of business or financial affairs of the debtor and the insider." Rodriguez is barred from raising this defense because her counsel represented to Plaintiffs on October 2 and October 7, 2026 that she withdrew all affirmative defenses in this case. Correspondence from Rodriguez's counsel representing to Plaintiffs that Rodriguez is withdrawing her affirmative defenses accompanies this brief at Exhibits G and H of the Tucker Declaration. Rodriguez's attempt to resurrect her 24.009(f)(2) affirmative defense is improper and the Court should estop her from doing so.

Even if the Court permits Rodriguez to present that affirmative defense, it only serves as a defense to a fraudulent conveyance theory brought under Section 24.006(b). Plaintiffs do not

assert a § 24.006(b) theory in this case. Plaintiffs are presenting theories under § 24.005(a)(1), § 24.005(a)(2), and § 24.006(a). Thus, the Court should not permit Rodriguez to present evidence on this affirmative defense for the independent reason that such evidence is irrelevant.

## **CONCLUSION**

As the foregoing shows, and as will be presented at trial, Arroyo transferred the Philbrook Way property to Rodriguez with actual intent to hinder, delay, or defraud his creditors. The transfer, which was made to an insider for no consideration shortly after Arroyo was held in contempt, also satisfies Plaintiffs' independent theories under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006(a). The Court should enter judgment in Plaintiffs' favor.

Respectfully submitted,

**PHELPS DUNBAR LLP**

*/s/ Marcus Tucker*
Marcus R. Tucker
Federal Bar No. 12769
State Bar No. 20282360
1001 Fannin, Suite 2200
Houston, Texas 77002
Telephone: 713-626-1386
Telecopier: 713-626-1388
Email: marcus.tucker@phelps.com

**ATTORNEY FOR PLAINTIFFS**

**OF COUNSEL:**

**PHELPS DUNBAR LLP**

D. Michael Hurst, Jr.**
MSB No. 99990
1905 Community Bank Way, Ste. 200
Flowood, MS 39232
Telephone: 601-352-2300
***Admitted Pro Hac Vice*

**STEPTOE LLP**

Katherine A. Petti**
kpetti@steptoe.com
Christopher T. Berg (Bar No. 24082682)
cberg@steptoe.com
633 W. Fifth Street, 19th Floor
Los Angeles, California 90071
Telephone: (213) 439-9543
Facsimile: (213) 439-9599
***Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I certify that on this October 13, 2026, the foregoing was served on all counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Marcus Tucker*
Of Phelps Dunbar LLP