# Exhibit B

IN THE UNITED STATES DISTRICT COURT FOR

THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| FOX CORPORATION; FOX MEDIA LLC; AND FOX SPORTS EN ESPANOL LLC, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 4:25-CV-4650 |
| | ) | |
| LAURA PAOLA ARROYO RODRIGUEZ, | ) | |
| Defendant. | ) | |

---

ORAL AND VIDEOTAPED DEPOSITION OF

PATRICIO GUTIERREZ

TUESDAY, APRIL 21, 2026

Oral and videotaped deposition of PATRICIO GUTIERREZ, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on April 21, 2026, from 10:05 a.m. to 1:52 p.m. before Jennifer E. Seitz, CSR, in and for the State of Texas, reported by oral stenographic means, pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

A. Correct.
Q. Okay. Do you know what happened?
A. I have some recollection about either him not connecting or him not responding or him not confirming. And I read something right now about vacation, so --
Q. Do you know why Mr. Arroyo was not able to execute the deed at that time?
A. No, sir.
Q. And this is -- this is where there's kind of a gap, Mr. Gutierrez, where I, you know, your file kind of stops about right here.
A. Yes, sir.
Q. Beginning of June, end of May, until Exhibit, I think it is 8 some e-mails in August. Did I pick up the right one?
A. August 8 is -- or August 11, where Ms. Rebeca has some sort of doubt of something, and Nicolle reaches out saying, following up and consulting that Mr. Arroyo has availability to coordinate. And Rebeca replies, saying that Mr. Arroyo told me he would be back the last days of the month and that she reached out to us to coordinate. Give me a couple more days and we'll coordinate.
Q. All right. Thank you for reading that. But my question -- what I was trying to get to is there's -- we had these communications between Kristy Allen and Ms. Sabbagh in early June, correct?

in it. That's all I recall in the deed, but it didn't appear. That's something I recall in conversations with -- (Cross talk.)

Q. Was that -- was that -- which deed was that related to? Do you know? You don't know?

A. (Nonverbal response.)

Q. Okay. No? You don't recall?

A. No.

Q. Okay. And so, fair to say, with respect to the coordination, what happened between the 21st and when the deed was executed, you don't have any personal knowledge of what happened?

A. I don't remember.

Q. Okay. And then the deed was executed on September 2nd. What do you remember about the issue of an LLC coming up?

A. I remember afterwards that it was, I guess, they were executed, and I said, we're done. I informed, I believe, by my staff to -- if we could help with a subsequent transfer of those two properties to LLCs at some point.

Q. And did you -- was that an added scope of work, or what happened?

A. That was going to be a totally new representation.

Q. Did you extend your scope of work to include that project?

A. It was -- it was my understanding it was a new engagement.
Q. Okay. And did you enter into that engagement?
A. I think it was via e-mail, my staff, and Rebeca.
Q. Okay. But the answer to the question is yes, we entered into a -- did you -- strike that.
Your firm entered into an engagement with Mr. Arroyo to transfer the properties to LLC?
A. I believe so.
Q. And did that happen before or after the transfer?
A. I don't recall. It was either a few days before or a few days after.
Q. If you could go to -- back to Exhibit 10, please. There's, if you go to page 3 of Exhibit 10, which is PG000 -- I'm sorry, PG0033.
A. Yes, sir.
Q. There's an e-mail in the middle of the page. It's from August 29, 2025 to -- at 3:41 p.m. You see that?
A. Yes, sir.
Q. Okay. It says -- I'm going to read it. "Hi, Kristy. I hope this e-mail finds you well. The client has informed us that they want -- plan to transfer the properties into LLCs under each of the daughters' names after the first transfer." I assume that last word is transfer. "After first transfer them into their individual names. Each daughter is the sole

member of her respective LLC."
Did I read that correctly?
A. Yes, sir.
Q. Okay. Then I'm going to read the next sentence. "In this scenario, would they need to transfer the property into their individual names first and then to the LLC, or is it preferable to transfer the property directly" --
I assume that -- it's cut off, but into the LLCs or to the LLCs. Would that read correct?
A. Yes, sir.
Q. All right. And then she further says, "I have also attached the corporate books for each LLC for your review. Could you please let me know what additional information is needed in order to proceed" -- and it's cut off, "warranty deeds, and whether there will be any additional cost involved."
Did I read that correctly?
A. Yes, sir.
Q. All right. So based on this e-mail, does it appear to you that Ms. Nayeli is conveying a request to Ms. Allen of the Jackie Ward Law Firm that the client wants to transfer the properties to the LLC -- let me -- let me strike that and ask it this way.
Does it look like that there's been a communication from the client, which in this case would be Mr. Arroyo, to request that the properties be transferred to an LLC?

A. Yes.

Q. All right. And so Ms. Nayeli is asking Kristy Allen of the Jackie Ward Law Firm specifics about actually doing that --

A. Yes.

Q. -- agreed? And one of those questions is, would it be better to transfer the properties into their individual names first or directly into the LLCs, correct?

A. Yes.

Q. And then Mr. -- Ms. Allen responds. That's, I guess, two days later. Is that two days? More than two days. On September 2nd, Tuesday, at 1:46, Kristy Allen responds. "Just need a little clarification on your question. Are you asking about our fees or the cost of placing the properties into the LLCs as far as taxes are concerned?"

Did I read that correct?

A. Yes.

Q. And then it also goes on, "As far as I'm aware, we haven't recorded these deeds, as I don't believe Mr. Arroyo has signed them as of yet. If that's the case, I believe all we need to do on our update is," again, may be cut off, "each deed to switch names from the daughters to the respective LLCs. We will need to make sure these two LLC -- these two entities are still in good standing, which just" -- it's cut off, "a SOS search, and then upload the uploaded deeds -- updated deeds to

the international notary for Mr. Arroyo to sign. He missed his rescheduled notary appointment, so there will be another notary fee. Unfortunately, they don't refund for missed appointments."

And then -- did I read that correctly?

A. Yes, sir.

Q. And then she quotes a fee for preparing the deeds or updating the deeds, correct?

A. Yes, sir.

Q. All right. And so, fair to say, from this e-mail communication, would you agree that the -- there's been a communication from the client, Mr. Arroyo, to create or transfer the properties to an LLC, correct?

A. Yes. I'm not sure if directly or first individual. I'm seeing some questionings and confusion.

Q. Okay. But there's definitely an interest to transfer the property into the LLCs, correct?

A. Yes, sir.

Q. And you've had so much interest that you've gone to the Jackie Ward Law -- or at least your staff members have gone to the Jackie Ward Law Firm and asked, hey, can we do this, correct?

A. Yes, sir.

Q. And then it says, "I just received a" -- on September 3rd at 6:01 a.m., "I just received a notification

that Mr. Arroyo signed the deed with the notary. Should I record them as-is or make the updated -- updates to remove the daughters and add their" -- and then it's cut off.

Did I read that correctly to the extent I could?

A. Yes, sir.

Q. Okay. And at least from the deed that we know that was executed, it appears that Mr. Arroyo executed a deed where the transfer was directly to Ms. Rodriguez, correct?

A. Yes, sir.

Q. And then after, were there communications with your firm to -- by Mr. Arroyo or Ms. Chow to go forward with the transfers to the LLC?

A. I'm not sure.

Q. All right. I don't want to change exhibit colors. That's a bad look. This is 29 and 30 I was talking about earlier.

MR. SHAVER: What number is this?

MR. TUCKER: Twenty-nine -- oh, I'm sorry, 11.

MR. SHAVER: 11, okay.

MR. TUCKER: So, Mr. Gutierrez, I'm showing you what's -- another e-mail that's forwarded to you on October 8th or sent to you on October 8, 2025, that we marked as Exhibit 11.

(Exhibit No. 11 was marked.)

Q. (BY MR. TUCKER) What does that document appear to be

to you?

A. An e-mail forward -- Nayeli forwarding an e-mail to me.

Q. And actually, it's kind of a series of e-mails, correct?

A. Yes, sir.

Q. Exhibit 11 has two pages?

A. Yes, sir.

Q. PG0029 and PG0030?

A. Yes, sir.

Q. So if you go to the first page -- I'm sorry, the second page of Exhibit 11, we have an e-mail on September 4th. That would be after the transfer, correct, because the transfer happened on September 2nd?

A. Yes, sir.

Q. And it's to Rebeca Chow from Nayeli at 10:15 a.m. Can you read that e-mail for me?

A. Hi, Rebeca. It's great greeting you. I'm sharing documents of special warranty deeds already registered for 3 Philbrook and 87 Lakeside. To realize the transfer of the properties from personal name to the LLCs, the process is the same. The total cost would be $2,340. If we schedule the meeting for Monday, on Tuesday, we would have the deeds under the name of the LLCs. I'll await your comments.

Q. I'm sorry, can you reread that last sentence?

A. I'll await your comments or before?
Q. Okay. So basically Ms. -- or Nayeli quotes a price to Rebeca for transferring the properties to the LLC?
A. Yes, sir.
Q. And were you aware that this quote was made?
A. I have to because I'm the one that proposes fees.
Q. Okay. So originally way back in April, you came up with that fee for the transfer. That's part of your job?
A. Yes, of course.
Q. All right. And so you came up with this fee as well?
A. There are moments that Nayeli could -- I gave her the delegation to come up with a reasonable fee. Most of the time it's me.
Q. You think it was you in this instance?
A. I don't recall exactly.
Q. Okay. Were you aware that this quote was being made for this work?
A. I was -- I was made aware at some point.
Q. Okay. Do you think it was after or before the quote -- this e-mail of September 4th?
A. I don't recall.
Q. So going back to Exhibit 10, it looks like on page 3, or PG0033, that Nayeli is communicating to Kristy Allen that no question the client wants to transfer the property to an LLC, whether it's through the daughter first or indirectly -- or

directly, excuse me.

A. That they are planning to transfer into LLCs, correct.

Q. All right. So no question, on August 29th, it's your understanding, or at least Nayeli's understanding, based on communication from the client, that the client intends to transfer the properties to an LLC?

A. Yes, sir.

Q. All right. And apparently Mr. Arroyo went ahead and executed the deed to transfer the property to Ms. Rodriguez directly, before any kind of LLC transfer?

A. Yes, sir.

Q. And then immediately after the transfer, as indicated in the communications that we just went through in Exhibit 11, a quote was made by your firm to actually transfer the property to the LLC, correct? Just a few days later, after the transfer?

A. Of course.

Q. Well, if you look at -- if you -- maybe I'm misspeaking as to how you would describe it, but if you look at PG0030, the second page of Exhibit 11, Nayeli is sending an e-mail to Rebeca quoting the price for transferring the properties into the LLC, correct?

A. Yes, sir.

Q. All right. So there's no question at that point, at

least looking at these documents, that that's what Manuel Arroyo wants to do. He wants those properties to end up in an LLC?

MR. BASDEN: Objection --

Q. (BY MR. TUCKER) Do you dispute that?

MR. BASDEN: -- speculation.

THE WITNESS: I don't know.

Q. (BY MR. TUCKER) Okay. From these documents, is it your understanding that the client, your client, Mr. Arroyo, wanted to transfer the two properties into an LLC?

MR. BASDEN: Objection, calls for speculation.

MR. SHAVER: Joined.

THE WITNESS: Yes, sir.

Q. (BY MR. TUCKER) And so did you become involved in that process at that point on or about September 4, or would that continue to be handled by your staff?

A. I got pretty involved at some point and put a hold on the project.

Q. Okay. If you could go back to Exhibit 11 -- well, I'm sorry. Yeah, the top of the second page. Ms. Chow, after the quote is made or the offer for the engagement, Ms. Chow sends a request that says, "Please send me the link to pay," correct?

A. Yes, sir.

Q. And that was only a few hours or the same day as

the -- as the offer, correct?

A. Yes, sir.

Q. And then what does Ms. Chow say in the next e-mail?

A. Mr. Arroyo is available next Monday to finalize the process. I'll pay once you send me the link.

Q. All right. So Mr. Arroyo is making himself available to sign a deed transferring the property to an LLC? Is that the way it reads to you?

A. Yes, sir.

Q. All right. And then on the next -- first page of Exhibit 11, there's another e-mail from Nayeli to Rebeca. Could you read that e-mail?

A. Yes, sir. Hi, Rebeca. The notary is based out of New Jersey. That's why it makes mention of that state, but the register -- recording was made in Texas. The process is finalized. There's nothing else to do on behalf of Mr. Arroyo or from his behalf. I think in Spanish what it's trying to say, that Mr. Arroyo doesn't have to do anything else. Now it corresponds to his daughter and sister to schedule a call with the notary to transfer the properties under their names to the respective LLCs of each of them. I'll be sending you the link in a moment.

Q. And so when I read this or hear you read it, it sounds like the transfer is going to happen. It's being scheduled. Execution of the deed to transfer, rather.

A. It appears so.

Q. And then I'm going to jump back to Exhibit 10 real quick, the first page. And it looks like the day after Ms. Nayeli is saying to Kristy at the Jackie Ward Law Firm on Friday, September 5th, at 10:10 a.m., "Hi, Kristy. The clients have agreed to proceed with the transfer of the deeds to the LLCs. Could you please send me the invoice? The daughter, Paola -- Laura Paola, will be signing in Mexico, and the" -- it's cut off, "Mariajose, will be signing in Texas."

Did I read that correctly?

A. Yes, sir.

Q. And just for sake of completeness, it's also said that "they would also like to know if any documents will be physically mailed. If so, they'd prefer that any paperwork be sent to the registered agent's address instead."

And the next page ends with, "Please let me know if you need anything from me. Thank you."

That's from Nayeli, correct?

A. Sorry, I --

Q. I may -- I may have got ahead of you. Yeah. So I've just read the next sentence.

A. "They would also like to know if any documents will be physically mailed," that one?

Q. Yeah. Can you read that sentence for me?

A. "They would also like to know if any documents will

be physically mailed. If so, they prefer that any paperwork be sent to the registered agent's address instead."

Q. And then on Friday, September 5th, that same day, Kristy Allen asked for Laura and Mariajose's e-mail address for the notaries, correct?

A. Yes.

Q. And also Kristy Allen sends an invoice for payment, correct?

A. Yes, sir.

Q. And then on September 8th, Nayeli goes back to Kristy with the e-mail addresses of Ms. Monge and Rodriguez to set up the -- set up the execution, correct?

A. Yes, sir.

Q. All right. And then, would you please read the top e-mail?

A. "Hi, Kristy. Thank you for the update. Attorney Patricio has requested that we place a drafting of the deeds on hold for this project. He will be meeting with a client on Wednesday, and once we receive confirmation on how the project will proceed, I'll get back to you. Please let me know if you have any questions. Thank you."

Q. Why was the execution of the deed or deeds put on hold?

A. I wanted to understand why now they wanted to transfer deeds that were just executed to an LLC.

As a -- did you tell them you were going to take any kind of action as a result of what they told you during that call?

A. No. I believe I said or it was inferred that I was making -- I was going to make a determination after the call.

Q. And by determination, you mean whether you were going to continue the engagement?

A. Correct.

Q. And what did you decide after the call?

A. To terminate the second engagement.

Q. And what was the reason that you came to that decision?

A. I became aware of a lawsuit at that time that involved Mr. Arroyo or something along those lines.

Q. I want to make sure we got the timing right, okay? Because do you -- sitting here today, you think that the knowledge of a lawsuit influenced your decision?

A. I was aware of a lawsuit involving the person that wanted to transfer the properties. I don't want to be involved, terminated representation.

Q. Okay. What lawsuit do you -- were you aware of?

A. I recall googling Manuel Arroyo, and I saw a lawsuit. New York.

Q. Let me break that down a little bit. So after the call, you said you googled Manuel Arroyo?

A. Yes, sir.
Q. And when -- by googling Manuel Arroyo, my understanding of that is you put his name in the search bar and searched?
A. Yes, sir.
Q. And what came up was a lawsuit up in the Southern District of New York?
A. I believe so.
Q. And do you remember who that lawsuit was against?
A. I don't recall who the defendant was, but it was clearly against either Mr. Arroyo or some of his companies. I'm not sure.
Q. Okay. Was Fox involved in that? Do you remember?
A. I remember Fox was -- some sort of Fox company or entity was plaintiff.
Q. So it was Fox versus Arroyo company just generally?
A. I believe so.
Q. All right. And your decision at that point was, I don't want to be involved?
A. Yes, sir.
Q. Why?
A. Just was -- I was concerned there was a lawsuit.
Q. Were you concerned that this case -- that this transfer might be related to that lawsuit?
A. I was not aware of the content of the lawsuit or

our firm is no longer handling the second engagement of Mr. Arroyo. We have notified him directly regarding the termination of our representation. The refund of fees related to this engagement has also been processed. Thank you again for the introduction. I hope we can collaborate on other projects in the future. Best regards, Patricio."

Q. So did you have a separate conversation with Mr. Arroyo about termination?

A. Yes, sir.

Q. Was that a phone call?

A. No, sir.

Q. Was that just a separate e-mail?

A. Yes, sir.

Q. I haven't seen that e-mail. Is that one that you thought you would have produced?

A. Yes, sir.

Q. All right. Well, there are some other e-mails in there to Mr. Arroyo from you, so -- but they're in Spanish, so I -- I don't want to misrepresent, but it's your recollection that you sent Mr. e-mail -- Mr. Arroyo an e-mail on or around September 12, 2025?

A. It was most likely before that one.

Q. Okay. So -- and I take it you had received a fee or a flat fee from Mr. Arroyo, correct?

A. Yes, sir.

Q. For the LLC transfer, correct?
A. Yes, sir.
Q. And so you transferred that fee back to Mr. Arroyo?
A. Yes, sir.
Q. And that was the end of your relationship as far as providing services to Mr. Arroyo?
A. Yes, sir.
Q. And so to kind of summarize, there's -- based on the documents we reviewed and the communications you had with your staff, there's no question that Mr. Arroyo wanted to transfer the properties to an LLC, correct?
A. From what I've read, there was an effort to transfer to an LLC.
Q. All right. And there was interest in doing so before the transfer of September 2, 2024, correct?
A. Yes, sir.
Q. But then Mr. Arroyo signed the deed --
A. Yes, sir.
Q. -- on September 2, and that was just to transfer to the individuals, correct?
A. Yes, sir.
MR. TUCKER: All right. I'll take a short break. Let me go over notes. I may be -- pass the witness.
THE VIDEOGRAPHER: All right. We're off at 1:13.

Okay. Hang on, I smeared it. But anyway, okay, so this is 191, 192, and 111, PG0.

MR. TUCKER: I'm going to hand you these documents. Here you go. I'm sorry.

MR. BASDEN: That's all right.

(Exhibit No. 15 was marked.)

Q. (BY MR. TUCKER) So if you look at the first two documents, Mr. Gutierrez, would you agree with me that a cardholder named Manuel Arroyo paid for the engagement to transfer the property into the LLC?

A. This says the -- went to the -- yes.

Q. Okay. And looking at the third page of Exhibit 15, I believe that the refund that you sent out, it -- that document reflects the refund you sent out went to a -- for that engagement went to Mr. Manuel Arroyo as the account holder, correct?

A. Yes, sir.

MR. TUCKER: Do you have 119 there, Steve? I can't put my hands on it. Or 121?

MR. SHAVER: I got 121. Just saw it in here.

MR. TUCKER: No, it's -- yeah.

MR. SHAVER: I got it. I got it.

MR. TUCKER: This is 119 and 120.

(Exhibit No. 16 was marked.)

Q. (BY MR. TUCKER) Can you identify those documents,