UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FOX CORPORATION, et al.,<br><br>Plaintiffs,<br><br>-v-<br><br>MEDIA DEPORTES MEXICO, S. de R.L. de C.V.,<br><br>Defendant. | 25-cv-6703 (JSR)<br><br>OPINION & ORDER |

JED S. RAKOFF, U.S.D.J.:

On December 18, 2025, the United States Court of Appeals for the Second Circuit issued an opinion in Smart Study Co., Ltd. v. Shenzhenshixindajixieyouxiangongsi. 164 F.4th 164. That opinion held that the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, 20 U.S.T. 361 (1969) (the "Hague Convention"), prohibits electronic service of process when directed into countries that have objected to service of process by "postal channels." Smart Study, 164 F.4th at 170-72. For that reason, the Circuit affirmed the denial of a motion for default judgment, and the dismissal of an action for insufficient service, as to foreign defendants that were located in a country that has objected to "postal" service and that had been served electronically. Id. at 170, 172-73.

In this case, which commenced on August 14, 2025 (prior to the Second Circuit's decision in Smart Study), the Court repeatedly authorized plaintiffs Fox Corporation, Fox Media LLC, and Fox Sports en Español LLC to effectuate electronic service on defendant Media

PLAINTIFFS
4:25-cv-4650
EXHIBIT 54

Deportes Mexico, S. de R.L. de C.V. ("MDM") of such papers as the complaint, a Temporary Restraining Order (the "TRO") that the Court issued on August 14, 2025, and an Order to Show Cause why MDM should not be held in civil contempt that the Court issued on August 20, 2025. See, e.g., ECF No. 29 at 10; ECF No. 38 at 1. Whether it was permissible under the Hague Convention for the Court to authorize such electronic service, and whether the Court had properly exercised jurisdiction over MDM and its non-party co-contemnors, were issues that were extensively litigated even prior to the Smart Study decision. See Fox Corp. v. Media Deportes Mexico, --- F. Supp. 3d ---, 2025 WL 3029941, at *5-6 (S.D.N.Y. Oct. 30, 2025). However, in light of Smart Study, the Court invited plaintiffs and non-party Mexico Sports Distribution LLC ("MSD") (a U.S. affiliate of MDM that had appeared before the Court) to submit briefs concerning whether, in view of Smart Study, the Court must alter its jurisdictional rulings in this case. Cf. Media Deportes Mexico, 2025 WL 3029941, at *5 n.9 (noting unresolved questions and requesting "[b]inding guidance from the Supreme Court or Second Circuit").[1] Briefing concluded on February 2, 2026. See ECF Nos. 162 ("Pls.' Br."), 168 ("Opp'n"), 169 ("Reply").

Upon careful consideration of the parties' arguments, and for the reasons set forth below, the Court concludes that, even in light of

[1] Except where otherwise indicated, all quotations in this Opinion and Order omit citations, quotation marks, footnotes, brackets, ellipses, and other alterations in source material.

Smart Study, the Court has had jurisdiction to enter temporary injunctive relief in this case; hold MDM, MSD, and their co-contemnors in civil contempt; and impose civil contempt sanctions on them.

## I. Relevant Procedural History

The Court has previously recounted the history of this action in some detail. See ECF No. 96 at 1-4; Media Deportes Mexico, 2025 WL 3029941, at *1-4. Here, therefore, the Court focuses only on the matters that Smart Study potentially affects.

Plaintiffs commenced this action on August 14, 2025, alleging principally that MDM breached an agreement under which a Fox Corporation affiliate assigned MDM a license to broadcast sporting events in Mexico using certain trademarks (the "Fox Sports Trademarks"). See ECF No. 1. According to the Complaint, MDM breached the license agreement by pursuing and obtaining, in the courts of Mexico, an injunction barring plaintiffs Fox Corporation and Fox Media LLC and certain of their affiliates from, among other things, using the Fox Sports Trademarks in Mexico. See generally id. That same day, plaintiffs sought a temporary restraining order prohibiting MDM "and anyone acting in concert with [it] . . . from (1) using the Fox Sports Trademarks in Mexico; (2) using the U.S. Fox Sports marks in the United States; (3) pursuing any legal or regulatory action relating to the Fox Sports Trademarks in Mexico, including seeking to enforce the injunction issued on March 26, 2025 by Civil Department 42 of the Superior Court of Justice of Mexico City; and (4) taking any action

to disrupt, hinder, or undermine Fox's business relationships with" seventeen named affiliates. ECF No. 29 at 10. The Court entered the TRO; authorized plaintiffs to electronically serve the TRO, the complaint, and associated papers on MDM; and set a hearing on plaintiffs' motion for a preliminary injunction. See id. at 9-10. Plaintiffs effectuated electronic service on MDM on August 14, 2025, the same day that the TRO issued. ECF No. 50.

Plaintiffs sought the TRO not only because MDM allegedly breached the license agreement but also because MDM's breach allegedly posted irreparable and catastrophic harm to plaintiffs' interests in Mexico. According to plaintiffs, in April 2025, MDM "requested an order from the Mexican Trademark Office, IMPI, to conduct a raid of MediaPro, a studio production company" that was "Fox Sports en Español's primary facility for producing Spanish-language content for Fox's U.S. audience." ECF No. 29 at 5. MDM allegedly requested that IMPI issue that order, at least in part, based on the injunctive relief that MDM had obtained from the courts of Mexico. Id. Then, in June 2025, "IMPI officials attempted to search MediaPro's facilities in Mexico for material in violation of MDM's injunction," as a result of which "MediaPro required Fox to indemnify it for any harm arising from producing content for Fox in Mexico." Id. Finally, "[o]n August 11, 2025, IMPI shutdown [sic] MediaPro's facilities in Mexico," which "disrupted" Fox's capacity to broadcast Spanish-language content to the United States and caused Fox to "incur[] costs to find alternative

avenues to produce and broadcast" relevant sports content. Id. MDM subsequently inquired of Fox personnel "where else in Mexico Fox maintains production facilities" and indicated that MDM "was seeking to disrupt additional facilities used by Fox." Id.

On August 20, 2025, plaintiffs moved for an Order directing MDM to show cause why it should not be held in civil contempt for violating the TRO. ECF Nos. 34-37. Plaintiffs principally contended that MDM, after having actual notice of the TRO by virtue of the electronic service authorized by the Court, failed to comply with the TRO's requirement that MDM cease using the Fox Sports Trademarks. Plaintiffs further asserted that MDM, rather than complying with the TRO, instead issued a press release stating, among other things, that it had "never submitted to the jurisdiction and competence of the federal courts of the United States of America." ECF No. 35 at 1-2 (quoting ECF No. 36-2). The Court granted plaintiffs' motion, ordered MDM to show cause why it should not be held in civil contempt, and scheduled a hearing on the matter for September 5, 2025. ECF No. 38.

On August 29, 2025, plaintiffs filed emergency motions requesting that the Court immediately hold MDM and third parties MSD, Grupo Lauman Holding, S. de R.L. de C.V. ("Grupo Lauman"), and Manuel Arroyo in civil contempt for further violating the TRO. See ECF Nos. 42, 43. In their motions, plaintiffs asserted that MDM and MSD, again after being on actual notice of the TRO, moved in the courts of Mexico, on August 22, 2025, for the entry of a second injunction against Fox Corporation,

Fox Media LLC, and their affiliates. See ECF No. 42 at 2, 4-6. On August 27, 2025, the Superior Court of Justice of Mexico City issued the second injunction that MDM and MSD requested. That injunction prohibited plaintiffs and their affiliates from, among other things, "using the name 'Fox' for the broadcast in Mexico of any sports content (including, but not limited to, the broadcast in Mexico of any sporting event)." ECF No. 42-1, Ex. B at 2.

On August 29, 2025, the Court held a telephonic hearing on plaintiffs' emergency motions. That same day, after the hearing, the Court (1) modified the TRO to prohibit MDM "and anyone acting in concert with [it]" from, among other things, "seeking to enforce the injunction dated August 27, 2025 (published on August 28, 2025) by Civil Department 42 of the Superior Court of Justice of Mexico City," see ECF No. 41 at 2; (2) issued an Order imposing civil contempt sanctions on MDM effective September 6, 2025, see ECF No. 44; and (3) issued a separate Order imposing civil contempt sanctions on MSD, Grupo Lauman, and Arroyo, also effective September 6, 2025, see ECF No. 45 (the "Contempt Order"). The Court again authorized plaintiffs to serve documents related to the emergency proceedings and the Court's Orders by electronic mail. See ECF No. 41 at 3. Plaintiffs effectuated electronic service on MDM and its co-contemnors. See ECF Nos. 50, 54-58, 63-65.

On September 5, 2025, MSD appeared in this action and made its initial motion to set aside the Contempt Order as against it. See ECF

No. 46. That motion was based on two grounds: lack of personal jurisdiction and insufficient service of process of the Contempt Order and associated papers. See generally id. However, at a hearing held on September 5, 2025, MSD's counsel agreed to accept service of the papers at issue, thereby leaving only the alleged lack of personal jurisdiction as a basis for MSD's motion to set aside the Contempt Order. Following the hearing on September 5, 2025, the Court issued a further Order staying the effect of the civil contempt sanctions it had imposed on MSD and scheduling an evidentiary hearing on MSD's motion. See ECF No. 48. The Court held that evidentiary hearing on September 18 and 19, 2025; issued a "bottom-line" Order denying MSD's motion on September 19, 2025; and issued a detailed Opinion setting forth the reasons for that decision on September 23, 2025. See ECF Nos. 95, 96.[2]

During the evidentiary hearing that the Court held on September 18 and 19, 2025, MSD contended that there were reasons other than the

---

[2] Of the co-contemnors identified in the Court's Orders, only MSD appeared as of September 5, 2025 (or, indeed, has appeared at all). Accordingly, on September 9, 2025, the Court issued an Order confirming, among other things, that civil contempt financial sanctions would begin to accrue against MDM, Grupo Lauman, and Arroyo as of the close of business that day. ECF No. 73. The Court further ordered that the civil contempt sanctions it had imposed were payable to plaintiffs rather than to the Clerk of Court, both because plaintiffs had demonstrated to the Court's satisfaction that the co-contemnors' conduct was working financial injury on plaintiffs and because "sanctions payable to the Clerk of Court may not be effective as a coercive measure because the Clerk lacks the ability to enforce the sanctions." Id. at 7.

Court's alleged lack of personal jurisdiction why the Contempt Order must be set aside as against it. To permit MSD to make these further arguments, the Court held a second evidentiary hearing on September 26, 2025, and received two further rounds of briefing. See Media Deportes Mexico, 2025 WL 3029941, at *1.[3] On October 30, 2025, the Court issued an Opinion and Order reaffirming its decision to hold MSD in civil contempt and lifting the stay of effectiveness of the Contempt Order as to MSD. See generally id. In that Opinion and Order, the Court held, among other things, that the electronic service plaintiffs had effectuated on MDM was consistent with the requirements of the Hague Convention. Id. at *5. MSD timely noticed its appeal of the Court's ruling to the Second Circuit. ECF No. 143. That appeal remains pending. See Fox Corp. v. Media Deportes Mexico, S. de R.L. de C.V., No. 25-2983 (2d Cir. Nov. 25, 2025).

In the meantime, MSD moved in this Court to stay, pending the Second Circuit's disposition of its appeal, the accrual of civil contempt sanctions against it and the execution of judgment with

[3] While this further motion of MSD's to set aside the Contempt Order as against it was pending, plaintiffs moved for entry of a final judgment against co-contemnor Arroyo and, with the Court's permission, electronically served that motion and associated papers on Arroyo. ECF Nos. 102-106. On October 8, 2025, the Court entered judgment against Arroyo in the amount of $5,800,000, a sum representing the civil contempt sanctions that had accrued from September 9, 2025, to October 8, 2025. ECF No. 107. Plaintiffs have begun attempting to execute that judgment both in this District and in the Southern District of Texas. See Fox Corp. v. Arroyo Rodriguez, No. 25 Civ. 4650 (S.D. Tex.). Arroyo has not appeared in this action nor challenged the validity of the Contempt Order or the sanctions imposed on him.

respect to such sanctions. ECF No. 144. On December 1, 2025, the Court denied MSD's motion without prejudice. ECF No. 148. The parties then entered into discovery with regard to MSD's assets, but on December 18, 2025, MSD's then-counsel moved to withdraw. See ECF No. 152. The Court held oral argument on counsel's motion to withdraw on December 23, 2025, and granted the motion, requiring MSD to retain substitute counsel no later than January 5, 2026. See ECF No. 159.

At oral argument on counsel's motion to withdraw, the Court noted that the Second Circuit had issued its opinion in Smart Study and ordered plaintiffs' counsel and substitute counsel for MSD to submit briefing as to whether, as a result of Smart Study, the Court lacked jurisdiction over MDM "altogether from the get-go." ECF No. 160 at 10. Plaintiffs filed their brief on January 2, 2026. ECF No. 162. New counsel for MSD appeared on January 5, 2026, see ECF Nos. 166-67, and submitted a brief on January 26, 2026, ECF No. 168. Plaintiffs replied on February 2, 2026. See ECF No. 169. The issue is now ripe for the Court's determination.[4]

[4] On February 2, 2026, plaintiffs effectuated service of the summons and complaint on MDM by serving those papers within the United States on one Israel Gomez, who plaintiffs represent is designated by law to accept service of process on MDM's behalf. Plaintiffs filed proof of service on February 10, 2026. ECF No. 171. Because this Opinion and Order concerns the permissibility of plaintiffs' earlier electronic service on MDM, the Court here expresses no view as to the effect of the personal service that plaintiffs effectuated on February 2, 2026.

## II. The Second Circuit's Decision in Smart Study

In Smart Study, the eponymous plaintiff appealed the decision of another court in this District to deny a motion for default judgment against, and to dismiss for insufficient service, two defendants in an action that the plaintiff had brought under various trademark, copyright, and unfair competition laws. See Smart Study, 164 F.4th at 166, 168-69. Both defendants in question were located in the People's Republic of China, which has deposited with the Ministry of Foreign Affairs of the Netherlands declarations objecting to or limiting the application of certain provisions of the Hague Convention. See Declarations, People's Republic of China, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=393&disp=resdn (accessed February 10, 2026). Among its declarations, the People's Republic of China opposes "the service of documents in the territory of the People's Republic of China by the methods provided by Article 10 of the Convention." Id. As relevant here, Article 10 authorizes service "by postal channels," as well as directly by judicial officials, so long as the "State of destination does not object." Hague Convention, art. 10.

Smart Study sued a total of fifty-eight defendants, all located in China. At the outset of the case, the district court authorized Smart Study "to serve copies of the summons, complaint, TRO, and order to show cause on all defendants by email pursuant to Federal Rule of Civil Procedure 4(f)(3)." Smart Study, 164 F.4th at 169. No defendant

initially appeared. Id. The district court entered a preliminary injunction precluding defendants from manufacturing or selling their allegedly counterfeit products, but two defendants later appeared and moved to dissolve the injunction on the basis that "the district court lacked personal jurisdiction because the Hague Service Convention prohibits serving Chinese defendants by email." Id.

While that motion was pending, Smart Study voluntarily dismissed the two moving defendants from the action and moved for default judgment against the remaining defendants. Id. The district court denied Smart Study's motion for default judgment on the basis that the court lacked personal jurisdiction. See id. The district court reasoned that, because China objects to Article 10 of the Hague Convention and because the Supreme Court has held that only the methods of service expressly authorized by the Hague Convention (and not objected to by a destination State) are permissible, electronic service on defendants located in China was impermissible. Smart Study Co., Ltd. v. Acuteye-Us, 620 F. Supp. 3d 1382, 1393-97 (S.D.N.Y. 2022).

Smart Study later filed a renewed motion for partial default judgment, arguing that the Hague Convention did not apply to the substantial majority of the defendants, whose physical addresses Smart Study represented that it had been unable to obtain through reasonable diligence. See Smart Study, 164 F.4th at 169. The district court granted that motion. Id. But as to the two remaining defendants, whose physical addresses Smart Study had obtained, the district court

reiterated its ruling that it lacked personal jurisdiction. Id. Accordingly, and relying on its prior reasoning, the district court dismissed Smart Study's claims against those two defendants for insufficient service of process. See Smart Study Co. v. Happy Party-001, No. 21 Civ. 5860, ECF No. 127 at 5-24.

Smart Study appealed, and the Second Circuit affirmed. 164 F.4th at 166, 173. The Circuit's principal holding was that the Hague Convention precludes service by electronic mail when directed into a country that has objected to service by "postal channels." Id. at 170-72. The Circuit reasoned that, where a country has objected to "postal" service, the Hague Convention cannot be read to permit service by electronic mail because it "specifies certain approved methods of service and pre-empts inconsistent methods of service wherever it applies." Id. at 170 (quoting Water Splash, Inc. v. Menon, 581 U.S. 271, 273 (2017)).[5] And because China has objected to service "by the methods provided by Article 10 of the Convention," the Circuit held, electronic service on Chinese defendants "is prohibited by the Hague Service Convention, and thus improper under [Federal Rule of Civil Procedure] 4(f)(3)." Id. at 170, 172.

The Circuit went on to affirm the district court's order denying Smart Study's motion for default judgment. Id. at 172-73. The Circuit

---

[5] The Circuit did not expressly opine, however, on whether electronic service is permissible when directed into countries that have not objected to Article 10 of the Hague Convention. See id. at 170-72.

noted Smart Study's argument that Article 15 of the Hague Convention authorizes a judge to order, "in case of urgency, any provisional or protective measures." See id. at 167, 173 (quoting Hague Convention, art. 15(3)). But, the Circuit observed, Smart Study had not cited any authority explaining how "the entry of a default judgment qualifies as a 'provisional or protective measure,'" nor had Smart Study justified "the entry of default judgment where the district court otherwise lacks personal jurisdiction." Id. at 173. In closing, the Circuit acknowledged "the difficulties companies face in policing trademark- and copyright-infringement abroad, particularly in China," but it concluded that the district court had not abused its discretion in refusing to grant default judgment and in dismissing the two defendants in question, "[g]iven that Smart Study has not even attempted to comply with the Convention's requirements." Id.

## III. Analysis

At an earlier stage of this litigation, this Court held that it properly authorized plaintiffs to electronically serve the summons, complaint, TRO, and associated papers on MDM and that such service was permissible under the Hague Convention. Media Deportes Mexico, 2025 WL 3029941, at *5-6. In doing so, the Court reiterated the holdings that it and other courts had reached in other cases presenting the question of whether "service by other alternative means, including email," is permissible under the Hague Convention where the country of destination has objected to Article 10. Id. (citing, inter alia,

Sulzer Mixpac AG v. Medenstar Indus. Co. Ltd., 312 F.R.D. 329, 331 (S.D.N.Y. 2015)). That reasoning, of course, has now been overruled by Smart Study. See 164 F.4th at 170 (expressly rejecting holding of Sulzer Mixpac). Thus, the issue now before the Court is whether Smart Study entirely invalidates the Court's exercise of jurisdiction thus far in this case, or whether there is any other basis for the exercise of such jurisdiction. After careful consideration of the Second Circuit's opinion in Smart Study and the parties' thoughtful arguments about it, the Court concludes that Smart Study's holdings do not invalidate the Court's exercise of jurisdiction to either (1) grant plaintiffs' motions for temporary injunctive relief; or (2) hold MDM, MSD, and their co-contemnors in civil contempt and impose appropriate sanctions on them.

The Court reaches these conclusions principally because Smart Study concerns a district court's jurisdiction to enter final judgment where service has not properly been effectuated under the Hague Convention, but Smart Study does not address the scope of a district court's jurisdiction to order, "in case of urgency, any provisional or protective measures," even where usual Hague Convention service has not been effectuated. Cf. Hague Convention, art. 15(3). Moreover, Smart Study is factually distinguishable from the instant case, including on the basis that plaintiffs here long ago commenced the process of effectuating Hague Convention service and on the basis that the alleged conduct of MDM, MSD, and their co-contemnors has posed an

extremely urgent threat to plaintiffs.

Mexico, like China, has objected to the provisions of the Hague Convention that authorize service of process by "postal channels." See Government of United Mexican States, Declarations of May 1999, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=412&disp=resdn, ¶ V (accessed February 10, 2026). But even though Mexico's and China's objections to Article 10 of the Hague Convention are substantially similar, and the Second Circuit's analysis of Article 10 therefore applies here, the instant case is before the Court in a meaningfully different procedural posture than that of Smart Study. In that case, Smart Study moved for the entry of default judgment, which, if granted, would have finally resolved Smart Study's claims and imposed damages and a permanent injunction on the defaulting defendants. That is to say, the entry of default judgment would have concluded the action on the merits as to those defendants. Cf. Aghaeepour v. N. Leasing Sys., Inc., 378 F. Supp. 3d 254, 265 (S.D.N.Y. 2019) (noting well-settled rule that default judgments are final judgments on the merits).

Here, in contrast, plaintiffs have not sought the entry of judgment on any of their claims against MDM. Instead, plaintiffs initially sought, and the Court initially granted, temporary injunctive relief in the form of the TRO and preliminary injunction prohibiting MDM and those acting in concert with it from continuing to engage in conduct that plaintiffs allege is in violation of the

parties' underlying agreement. See ECF Nos. 29, 49. Then, when plaintiffs brought forward evidence that MDM, along with MSD, Grupo Lauman, and Arroyo, violated the TRO and preliminary injunction, the Court took the further steps of holding MDM and its co-contemnors in civil contempt and of imposing appropriate sanctions on them. See ECF Nos. 44-45, 73.[6]

Thus, plaintiffs have requested, and the Court has taken, no step in this case that is remotely similar to the motion for entry of default judgment that was at issue in Smart Study. Rather, the Court has exercised jurisdiction only by entering temporary injunctive relief and by sanctioning contumacious conduct. The text of the Hague Convention, as well as the well-reasoned opinions of other courts that have interpreted it, fully support the conclusion that the Hague Convention authorizes the Court to do so, for the reasons set forth below:

First, the text of the Hague Convention itself supports this conclusion. As the Second Circuit acknowledged in Smart Study, Article 15(3) thereof "preserves a judge's authority to 'order, in case of urgency, any provisional or protective measures.'" Smart Study, 164 F.4th at 167 (quoting Hague Convention, art. 15(3)). Article 15(3)

[6] As noted above, the Court granted plaintiffs' motion for the entry of final judgment against co-contemnor Arroyo. ECF No. 107. But that judgment did not concern any of plaintiffs' claims against defendant MDM; it pertained only to the sanctions that the Court imposed for Arroyo's contumacious conduct. Accordingly, it is in no way analogous to the default judgment sought by Smart Study.

does not impose any requirements regarding the form of service, electronic or otherwise, that is required before a court may order such measures. In that sense, Article 15(3) is distinct from the provisions of the Hague Convention on which the Second Circuit primarily focused in Smart Study. See id. at 166-68 (discussing Articles 8, 10, 11, and 19 of the Hague Convention). Moreover, it has long been recognized that the Hague Convention "authorizes special forms of service in cases of urgency if convention methods will not permit service within the time required by the circumstances." Fed. R. Civ. P. 4(f)(3), 1993 adv. comm. note; see also Reply at 5-6.

Article 15(3) follows two provisions in which the Hague Convention prohibits entry of default judgments in certain circumstances, but Article 15(3) provides that it operates "[n]otwithstanding" those neighboring provisions. And while Mexico has twice objected to one of those neighboring provisions, Article 15(2), it has entered no such reservation as to Article 15(3). See Government of United Mexican States, Declarations of May 1999, ¶ VII; Declaration of May 2011, ¶ VII. Accordingly, the Court concludes that Mexico has not objected to the authority of a court outside Mexico, in a "case of urgency," to impose "provisional or protective measures" against defendants located in Mexico, even where the Hague Convention's usual service requirements have not been satisfied.

The Court further concludes that the entry of temporary injunctive relief and the imposition of civil contempt sanctions squarely fall

within the category of "provisional or protective measures," terms which the Hague Convention leaves undefined. Cf. Hague Convention, art. 15(3). That being said, the terms almost define themselves. Both a temporary restraining order and a preliminary injunction are "protective" in that they are designed to prevent irreparable injury that would otherwise likely occur while litigation continues. A temporary restraining order seeks to preserve the status quo until a court holds a hearing for a preliminary injunction, and a preliminary injunction does the same until a court renders a decision on the merits. See 11A Fed. Prac. & Proc. Civ. §§ 2947, 2951 (3d ed.); Fed. R. Civ. P. 65. Temporary injunctive relief is also, by definition, "provisional" because both a temporary restraining order and a preliminary injunction remain in force only until a court renders a subsequent decision on the merits. Indeed, in this case, the TRO provided that it would be in effect only "pending the hearing of Plaintiffs' application for a preliminary injunction," ECF No. 29 at 10, and the preliminary injunction provided that it would be in effect only "during the pendency of this litigation," ECF No. 49 at 2. Thus, the TRO and preliminary injunction are expressly protective and provisional.

Likewise, civil contempt sanctions are inherently "protective" in that a court has authority to impose such sanctions when its "orders to preserve the status quo, such as temporary restraining orders or preliminary injunctions," are violated. See 13D Fed. Prac. & Proc.

Juris. § 3537 (3d ed.); see also Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 657-58 (2d Cir. 2004) (holding that principal purpose of civil contempt sanctions is "to secure future compliance with court orders"); Reply at 8. Civil contempt sanctions are also "provisional," lasting only as long as the contemnor persists in the contumacious conduct. As has been said for more than a century, a contemnor "carries the keys of his prison in his own pocket" and can "discharge himself at any moment by doing what he had previously refused to do," or, as relevant here, by ceasing the conduct that has been enjoined. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 442 (1911).

Second, numerous courts, both in this District and elsewhere, have cited Article 15(3) as a basis for granting temporary injunctive relief even where service has been effectuated electronically upon defendants located in countries that have objected to Article 10 of the Hague Convention. See Pls.' Br. at 13-15 & n.6; Reply at 6. For example, in King Spider LLC v. 884886 CH Store, No. 23 Civ. 3472, 2024 WL 5145837, at *1 (S.D.N.Y. Dec. 17, 2024), Judge Furman explained that "Article 15 of the Hague Convention allows alternative methods of service in cases of 'urgency,' when courts are permitted 'to issue any provisional or protective measures.'" Indeed, Article 15(3) applies with particular force where a plaintiff "alleges that it would 'face irreparable threats to its brand, business interests, and reputation without immediate court intervention.'" Id. (quoting

Footprint Int'l, LLC v. Footprint Asia Ltd., No. 24 Civ. 93, 2024 WL 1556347, at *3-4 (D. Ariz. Apr. 9, 2024)); see also TushBaby, Inc. v. Jinjang Kangbersi Trade Co., Ltd., No. 24 Civ. 6150, 2025 WL 358409, at *2 n.2 (S.D.N.Y. Jan. 31, 2025) (Furman, J.) (noting court's authorization of "alternative service with respect to [plaintiff's] motion for preliminary injunctive relief" under Article 15).

Similarly, in ABC v. DEF, No. 24 Civ. 8341, 2024 WL 5168624, at *2 (S.D.N.Y. Dec. 13, 2024), Judge Cote held that the Hague Convention's "restriction on entry of a final judgment" unless service is effectuated in the Convention's usual manner "does not prevent a court from granting interim relief." Accordingly, while she declined to enter default judgment against fourteen defendants as to whom usual Hague Convention service was required because their country of residence had objected to service by "postal channels," Judge Cote authorized electronic service of a temporary restraining order and related court orders. See id. at *1-2.

Likewise, Judge Liman took the same approach in Overnight Blowout LLC v. Shenzhen Kairuijia E-Commerce Co., Ltd., No. 25 Civ. 6086, 2025 WL 2381588, at *1-3 (S.D.N.Y. July 31, 2025), in which he held that "although a plaintiff cannot obtain final relief" over a defendant residing in a country that has objected to postal service until such time as the plaintiff "compl[ies] with the Convention's pr[e]scribed methods of service," Article 15 is properly read to "authorize relief such as temporary restraining orders or preliminary injunctions."

Judge Liman noted that the issuance of temporary injunctive relief often "dissipates, at least in large part," a plaintiff's urgency and that, therefore, such relief falls into the category of "quintessential 'provisional or protective measures.'" Id. at *3.

To similar effect, see Quantum Mango, LLC v. Individuals, Corps., Ltd. Liab. Cos., P'ships & Unincorp. Ass'ns Identified on Schedule A, 25 Civ. 7732, 2025 WL 3215649, at *2 (S.D.N.Y. Nov. 18, 2025) (Rearden, J.) (authorizing electronic service of temporary restraining order in circumstances of urgency and where usual Hague Convention service would likely take months; Spin Master Ltd. v. Aganv, No. 24 Civ. 4007 (S.D.N.Y. Sept. 13, 2024) (Woods, J.), ECF No. 20 at 6-7, 12-13 (same).[7]

MSD seeks to avoid these conclusions by arguing that (1) this case is not in a different posture than Smart Study; (2) Article 15(3) of the Hague Convention does not apply here; (3) Article 15(3) does not authorize the imposition of "provisional or protective measures"

[7] Numerous courts outside this District have reached similar results. E.g., Lonati, S.p.A. v. Soxnet, Inc., No. 20 Civ. 5539, 2021 WL 9839476, at *3 (C.D. Cal. Sept. 20, 2021) (finding "urgency exception of Article 15 of the Hague Convention" met where plaintiff "establish[ed] irreparable harm"); Seiko Epson Corp. v. Dongguan Ocbestjet Digit. Tech. Co., Ltd., No. 22 Civ. 4123, 2023 WL 8254471, at *4 (C.D. Cal. Apr. 18, 2023) (concluding that "Article 15 does not preclude entry of default" where court authorized alternative service and plaintiff faced risk of irreparable harm); cf. NOCO Co. v. Liu Chang, No. 18 Civ. 2561, 2019 WL 3135665, at *5 n.23 (N.D. Ohio May 16, 2019) (noting that "Hague Convention does allow interim relief in cases of urgency," pending usual Hauge convention service); D Squared Plant Traps LLC v. Guandong Bixing Trading Co., Ltd., 716 F. Supp. 3d 352, 357-58 (W.D. Pa. 2024) (holding that plaintiff had failed to establish "factual basis" for "urgency exception," which, if applicable, permits "alternative service under Rule 4(f)(3).").

where a court does not independently have jurisdiction; (4) the Contempt Order against MSD is not a provisional or protective measure; and (5) even if Article 15(3) applied, plaintiffs did not invoke it when they requested the Court's authorization to effectuate electronic service. None of these contentions is meritorious:

MSD first argues that this case and Smart Study are on equal footing because MDM, "just like the defendants in Smart Study, has not been served in accordance with the Convention." Opp'n at 18. This argument begs the question because, as the Court explained above, Smart Study primarily concerned whether the district court properly denied a motion for default judgment and dismissed two defendants for insufficient service of process under Article 10 of the Hague Convention. See Smart Study, 164 F.4th at 170-72. Although the Second Circuit affirmed that Article 15(3) of the Hague Convention does not permit the entry of a default judgment as a "provisional or protective measure[]," id. at 172-73, it did not consider, much less decide, whether Article 15(3) authorizes the kinds of measures that the Court has taken here. Id. Noting that Smart Study had not cited relevant authority with regard to the interpretation of Article 15(3), the Circuit decided only that the district court in that case had not abused its discretion by proceeding as it did. Id. Hence, contrary to MSD's view, the procedural posture of this case is substantially different from that of Smart Study.

Next, MSD contends that "[t]his is not a Convention . . . Article 15(3) case." Opp'n at 18. MSD argues that it would render the Hague Convention's requirements "a nullity" if "all a plaintiff had to do is say there is an 'urgency'" in order to "avoid the inconvenience of Convention service." Id.; see also id. at 4 (asserting that "[t]here is nothing exceptional or extraordinary about this case"). These contentions simply cannot be squared with the record. Throughout this litigation, plaintiffs have alleged numerous exigencies: the raid that a Mexican government agency conducted, allegedly at MDM's request, at the office of one of plaintiffs' production facilities; the Mexican agency's subsequent decision to shut down certain such facilities; and the judicial relief, including sanctions in the billions of dollars, that MDM and MSD have sought in the courts of Mexico. See, e.g., Reply at 6-7. Plaintiffs have presented evidence that MDM and MSD have continued litigating in Mexico as recently as January 7, 2026, allegedly in ongoing violation of the Court's preliminary injunction. See ECF No. 170-1. Moreover, while MSD has raised a host of objections to this Court's jurisdiction, it has not presented evidence that plaintiffs' factual allegations are incorrect or overstated.

Indeed, statements by entities that the Court has found are closely intertwined with MSD bear out, at least in part, plaintiffs' version of events. On August 18, 2025, a press release jointly issued by MDM and Grupo Lauman acknowledged that the Mexican government agency in question "granted provisional measures in favor of MDM" and "closed

an establishment in which a person other than MDM produced sports content" using the Fox Sports Trademarks. See ECF No. 36-2. That same press release declared, as the Court noted above, that MDM "has never submitted to the jurisdiction and competence of the federal courts of the United States of America" and that U.S. courts "are not -- and should not be used as -- courts of appeal for decisions validly issued by national courts." Id. These and other circumstances catalogued in the Court's previous decisions show that this is, contrary to MSD's assertions, an exceptional and extraordinary case. See Media Deportes Mexico, 2025 WL 3029941, at *3-4, 12.

Then, MSD maintains that "Article 15(3) does not permit circumvention of Convention service in order to secure personal jurisdiction for the lawsuit proper." Opp'n at 19. But that goes well beyond the issue presently before the Court, which is whether Article 15(3) authorizes it to issue temporary injunctive relief and to enforce its orders by imposing civil contempt sanctions. As the Court discussed above, numerous other courts have interpreted Article 15(3) to permit the imposition of such "quintessential 'provisional and protective measures'" as those at issue here. E.g., Overnight Blowout LLC, 2025 WL 2381588, at *3; King Spider LLC, 2024 WL 5145837, at *1; ABC, 2024 WL 5168624, at *2. Notably, MSD's brief does not even cite any of these cases, much less attempt to distinguish them.

MSD also contends that, even if Article 15(3) applies, the Contempt Order does not fall into the category of "provisional and

protective measures," apparently because the Court amended the Contempt Order to provide that the daily contempt fine be payable to plaintiffs rather than to the Clerk of Court. See Opp'n at 19.[8] See id. But MSD offers nothing more than conclusory rhetoric in support of this contention. To the contrary, one of the applications that plaintiffs made to the Court in connection with the Contempt Order sought the entry of civil contempt sanctions against MDM and its co-contemnors precisely because the contemnors' conduct had "functionally shut[] down [plaintiffs'] sports business in Mexico" and because sanctions were necessary to compel the contemnors' compliance with the TRO that the Court entered. See ECF No. 43 at 1, 3. Moreover, when the Court modified the Contempt Order to provide that sanctions were to be paid to plaintiffs rather than the Court, it expressly did so "to compensate plaintiffs for their alleged losses" and to make the Contempt Order more "effective as a coercive measure," both of which are clearly "protective" aims. See ECF No. 73 at 7.

MSD's final argument is that plaintiffs did not "seek leave of the Court to serve by e-mail pursuant to Article 15(3) of the Convention" and that such electronic service cannot be "retroactively authorized." Opp'n at 19. But the text of Article 15(3) contains no requirement that it must be expressly invoked whenever a court

[8] MSD does not argue -- nor could it -- that the TRO and preliminary injunction that the Court has entered in this case are not "provisional or protective measures." See id.

authorizes electronic service in cases involving the imposition of provisional or protective measures, and MSD cites no authority holding that such an express invocation is necessary. See generally Opp'n.

For all the foregoing reasons, the Court concludes that Article 15(3) of the Hague Convention permits it to exercise jurisdiction in this matter for the purposes of entering temporary injunctive relief and of enforcing that relief by appropriate civil contempt sanctions and that Smart Study is not to the contrary. In light of this conclusion, it follows that the Court's repeated authorization of electronic service on MDM, MSD, and their co-contemnors was permissible under Federal Rule of Civil Procedure 4 because electronic service, in these circumstances, was not "not prohibited by international agreement." See Fed. R. Civ. P. 4(f)(3).

The Court adds only a few words about the factual circumstances of this case that further distinguish it from Smart Study. First, unlike in Smart Study, plaintiffs here did initiate the process of serving MDM under the Hague Convention. See Pls.' Br. at 1 n.2.[9] Approximately four months have gone by since plaintiffs did so, during which time plaintiffs have asserted that MDM and its co-contemnors

[9] As the Court noted above, plaintiffs claim to have effectuated service of the summons and complaint on MDM on February 2, 2026, through service in the United States on a person alleged to be authorized to accept service. ECF No. 171. The Court expresses no view about the adequacy of that service, but if it turns out to be valid, it may relieve plaintiffs of the obligation to further pursue service under the Hague Convention.

have engaged in "ongoing, affirmative acts of contempt." See Reply at 1-2. In Smart Study, by contrast, the plaintiff had "not even attempted to comply with the Convention's requirements" at the time it sought the entry of default judgment. See 164 F.4th at 173.

Second, again unlike in Smart Study, proceedings to date in this matter have provided the Court with ample reason to conclude that MDM, MSD, and their co-contemnors have been on actual notice of and have actively defied the Court's orders. "[T]here is no question" that both MDM and MSD were on actual notice of the TRO no later than August 18, 2025. See Media Deportes Mexico, 2025 WL 3029941, at *5-8. Yet on and after that date, MDM, MSD, and their co-contemnors engaged in conduct that clearly defied the TRO and the subsequently issued preliminary injunction. See, e.g., id. at *13-14 (concluding that "there is clear and convincing proof that MSD failed to comply with the TRO"). By contrast, in Smart Study, the district court's rulings give no indication that it had occasion to even consider holding any of the defendants in civil contempt. See Acuteye-Us, 620 F. Supp. 3d 1382; Happy Party-001, ECF No. 127 at 5-24.

The Court stresses that, in circumstances such as these, for the Court to require plaintiffs to effectuate service under the Hague Convention before issuing temporary injunctive relief or imposing sanctions to enforce that relief would risk working manifest injustice. As the Second Circuit acknowledged in Smart Study, Hague Convention service is often not "as efficient and fast as domestic service in the

United States." 164 F.4th at 173. Perhaps recognizing the harms that could flow from delayed service in cases of urgency, the Hague Convention's drafters included in Article 15(3) a safety valve that is appropriately limited to the issuance of "provisional or protective measures." MSD's approach would read that safety valve out of the Hague Convention and, in doing so, would enable litigants who reside in countries that have objected to Article 10 of the Convention to evade the jurisdiction of United States courts during the period when service remains pending.

## IV. Conclusion

For all the foregoing reasons, the Court concludes that the jurisdiction it has exercised over MDM, MSD, and the other non-party co-contemnors in this action is not invalidated by the Second Circuit's opinion in Smart Study. Because the Court reaches this conclusion, it need not (and does not) reach plaintiffs' alternative arguments concerning the validity of the service that plaintiffs effectuated upon Grupo Lauman and Arroyo. See Pls.' Br. at 19-25.[10]

In light of the foregoing determination, the Court directs plaintiffs and MSD to jointly telephone Chambers within two business days of the issuance of this Opinion and Order to set a briefing

---

[10] The Court also does not address plaintiffs' argument that Smart Study is inapplicable to this case because MDM "consented to the Court exercising personal jurisdiction over it." Reply at 1. While closely related, the questions of whether the Court may properly exercise personal jurisdiction over a defendant and whether that defendant has been properly served are distinct.

schedule on plaintiffs' anticipated motion for an order directing MSD to show cause why it should not be further sanctioned for improperly dissipating its assets.

SO ORDERED.

New York, New York
February 17, 2026

JED S. RAKOFF, U.S.D.J.