# EXHIBIT 28

PLAINTIFFS
4:25-cv-4650
EXHIBIT 60

FOX

**March 3, 2025**

**Via Email and Mail to:**

Media Deportes Mexico, S. de R.L. de C.V.
Av. Periferico Sur. No. 4355
Mexico City, Mexico 14210
Attention: Shani Mizrahi Villarruel
smizrahi@lauman.com.mx

Guillermo Gonzalez Camarena 600 - Piso 10
Col. Santa Fe
CP 01210 Mexico DF
Attention: Manuel Arroyo
marroyo@comtelsat.com.mx

RRS Abogados, S.C. (Ramos, Ripoll & Schuster)
Av. Americas 1500, floor 14
Country Club, 44610
Guadalajara, Jalisco Mexico
Attention: Alejandro Ripoll Gonzalez and Edmund Elías-Fernández
aripoll@rrs.com.mx; eelias@rrs.com.mx

**Re: License Termination**

Dear Mr. Gonzalez, Mr. Elías-Fernández, Ms. Mizrahi Villarruel and Mr. Arroyo,

We write on behalf of Fox Corporation ("Fox"). This letter serves as formal notification confirming the termination of Fox and Media Deportes Mexico, S. de R.L. de C.V.'s ("Media Deportes") license due to Media Deportes' material breach of the Amended and Restated License Assignment Agreement, enclosed hereto as Exhibit A.

Specifically, Media Deportes has violated at least the quality control provisions set forth in Section 4.1 of Exhibit 1 of the Amended and Restated License Assignment Agreement. Section 4.1 states that:

> [e]ach Party shall ensure that all services and goods provided by it, under or in association with any of the Trademarks to which it receives a license under this Agreement, shall (i) be substantially the same as or greater than the quality of the services and goods provided under such Trademarks as of the Distribution

> Effective Time and (ii) not have an adverse effect on the image or reputation of any such Trademarks,…or FOX. Without the other Party's prior written consent, a Party shall not: (i) knowingly take any action which would reasonably be expected to dilute or impair the Trademarks to which it receives a license under this Agreement, or tarnish or bring into disrepute the reputation of or goodwill associated with such Trademarks...

Media Deportes' actions and nonactions have clearly had adverse effects on the reputation of the licensed trademarks and have severely tarnished the goodwill associated with the licensed trademarks. Media Deportes' nonpayment of its bills has resulted in not only a loss of television rights in the NFL, Concacaf, Kings and Queens League, and at least four Liga MX clubs, but a barrage of negative press coverage related to the licensed trademarks in Mexico. Such reputational harm severely damages Fox and the goodwill in the licensed trademarks. The NFL's X post below received 1 million views in under 1 week, and the loss of the NFL rights by Fox Sports Mexico was picked up by multiple news outlets. While we understand the loss of NFL television rights was temporary, the reputational damage from the loss is irreversible.




Media Deportes' actions and inactions have not only adversely affected the reputation of the licensed trademarks and Fox, but underscore that the services and goods provided under the licensed trademarks do not meet the required quality control standards in the Amended and Restated License Assignment Agreement. Media Deportes has not conducted the Fox Sports Mexico business in a reputable manner and has failed to maintain the high standards, quality, style, and image of the licensed trademarks. As a result, Media Deportes' material breach of

the Amended and Restated License Assignment Agreement has caused irreparable damage to Fox.

To resolve this matter and avoid further legal action, including injunctive relief, Fox demands Media Deportes immediately:

- Permanently cease all use of the licensed trademarks and domains; and
- Transfer control of the licensed domains and any social media accounts featuring the licensed trademarks to Fox.

Please provide us with written assurances of Media Deportes' willingness to comply with this request by March 7, 2025. If we receive Media Deportes' written agreement to comply with the above demands by March 7, 2025, Fox is willing to grant you a phase out period until March 31, 2025 to comply.

Nothing in this letter should be deemed a waiver of any of Fox's rights, claims, or remedies, all of which are expressly reserved.

Sincerely,

Erin Eisner
Erin.Eisner@fox.com

Cc:

RRS Abogados, S.C. (Ramos, Ripoll & Schuster)
Blvd. Manuel Ávila Camacho 40, Floor 14, Lomas de Chapultepec
11000, Miguel Hidalgo, Mexico City, Mexico
Attention: Alejandro Ripoll Gonzalez and Edmund Elías-Fernández

Kreager Mitchell, PLLC
Attention: Jeremy Kell
7373 Broadway, Suite 500
San Antonio, Texas, USA 78209
jkell@kreagermitchell.com

# EXHIBIT A

# AMENDED AND RESTATED LICENSE ASSIGNMENT AGREEMENT

This Amended and Restated License Assignment Agreement (the "Agreement"), dated as of July 25, 2022 (the "Execution Date"), is by and between Media Deportes Mexico, S. de R.L. de C.V, a *sociedad de responsabilidad limitada de capital variable* (limited liability company) organized under the laws of Mexico ("Mexico Newco"), and TFCF Corporation (f/k/a Twenty-First Century Fox, Inc.), a Delaware corporation ("Assignor" and, together with Mexico Newco, each a "Party" and collectively the "Parties"). Any capitalized terms used but not otherwise defined in this Agreement shall have the meaning given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, FOX Corporation ("FOX") and TFCF Corporation (formerly known as Twenty-First Century Fox, Inc.) entered into a Trademark License Agreement, dated as of March 19, 2019 (the "Trademark License Agreement"), pursuant to which Assignor receives certain licenses from FOX to use the Fox Sports Trademarks (as defined below) and the Fox Sports Domain Names (as defined below) (the "Assigned Fox Sports Licenses");

WHEREAS, Section 12.1 of the Trademark License Agreement grants Assignor the right to assign certain of its rights, interests or obligations in connection with certain sales or transfers of all or substantially all of the applicable business or assets;

WHEREAS, TFCF Latin American Channel LLC (f/k/a Fox Latin American Channel LLC), a Delaware limited liability company ("FLAC"), Fox Sports Mexico Distribution LLC, a Delaware limited liability company ("FSMD", and together with FLAC, "Sellers", each a "Seller") and Altener, S.A. de C.V., a *sociedad anonima de capital variable* ("Purchaser") have entered into that certain Equity Purchase Agreement, dated as of May 21, 2021 (the "Purchase Agreement"), pursuant to which Sellers agreed to sell to Purchaser 100% of the equity interests of (i) Mexico Newco and (ii) Mexico Sports Distribution LLC, a limited liability company organized under the laws of Delaware ("U.S. Newco", and together with Mexico Newco, the "Newcos"), and Purchaser agreed to purchase and acquire all 100% of the equity interests of each of the Newcos from Sellers (the foregoing transaction, together with the other transactions contemplated under the Purchase Agreement, the "Acquisition"), on the terms and conditions set forth therein, and pursuant to which the business regarding and relating to the production, supply and licensing of three linear television sports channels under the *Fox Sports* brand to pay television operators and related distribution services in Mexico, including TV Everywhere and those provided in an "over the top" (or OTT) format (the "Transferred Business") shall be transferred by Sellers and their affiliates to the Newcos, as applicable, on or prior to the closing of the Acquisition;

WHEREAS, pursuant to the Purchase Agreement, Purchaser and Sellers agreed, among other things, that Assignor would assign the Assigned Fox Sports Licenses to Mexico Newco;

WHEREAS, the Parties entered into that certain license assignment agreement (the "Original License Assignment Agreement"), dated November 10, 2021 (the "Original Execution Date"), among the Parties;

WHEREAS, the Parties desire to amend and restate the Original License Assignment Agreement to reflect certain amendments to the Trademark License Agreement made prior to the Original Execution Date;

NOW, THEREFORE, in consideration of the mutual agreements contained herein and in the Purchase Agreement, the Parties hereby agree as follows:

1. The Parties hereby agree that this Agreement (a) amends and restates in its entirety the Original License Assignment Agreement and (b) constitutes a "writing" for the purposes of Section 9 of the Original License Assignment Agreement.

2. As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

(a) "Fox Sports Domain Names" means the domain names listed on Schedule B attached hereto;

(b) "Fox Sports Trademarks" means the trademarks listed on Schedule A attached hereto;

(c) "Mexico" means the United Mexican States; and

(d) "Redacted TMLA" means the Trademark License Agreement as attached in redacted form hereto as Exhibit 1.

3. Subject to the terms and conditions of the Purchase Agreement and this Agreement, Assignor hereby assigns, transfers and conveys to Mexico Newco all of Assignor's right, title and interest in, under and to the Fox Sports Trademarks and Fox Sports Domain Names, in each case as the same were licensed to Assignor under the Trademark License Agreement. Mexico Newco hereby accepts Assignor's assignment,

transfer and conveyance of Assignor's right, title and interest in, under and to the Fox Sports Trademarks and Fox Sports Domain Names.

4. Mexico Newco hereby undertakes, with respect to the Fox Sports Trademarks and Fox Sports Domain Names and from and after the Original Execution Date, to meet all of the disclosed obligations of Assignor as set forth in the Redacted TMLA.

5. The disclosed parts of Redacted TMLA are incorporated by reference into this Agreement, to the extent applicable, as if expressly set forth herein; provided that unless context requires otherwise any reference to:

(a) the Distribution or the Distribution Effective Time shall be deemed to mean 7:25 a.m., New York City time, on March 19, 2019;

(b) a Governmental Entity or Governmental Authority shall be deemed to mean any domestic, foreign or transnational governmental, competition or regulatory authority, court, arbitral tribunal agency, commission, body or other legislative, executive or judicial governmental entity or self-regulatory agency;

(c) Information shall be deemed to mean all information, whether or not patentable or copyrightable, in written, oral, electronic or other tangible or intangible forms, stored in any medium, including confidential or non-public information (including non-public financial information), trade secrets (including those trade secrets defined in the Uniform Trade Secrets Act and under corresponding foreign statutory Law and common law) and other proprietary information, studies, reports, records, books, accountants' work papers, contracts, instruments, surveys, discoveries, ideas, concepts, processes, know-how, techniques, designs, specifications, drawings, blueprints, diagrams, models, methodologies, prototypes, samples, flow charts, data, computer data, broadcast and IT network topology and schematics, information contained in disks, diskettes, tapes, computer programs or other Software, marketing plans, consumer data, communications by or to attorneys (including attorney work product), memos and other materials prepared by attorneys and accountants or under their direction (including attorney work product), other technical, financial, legal, employee or business information or data, information with respect to competitors, strategic plans, passwords, access codes, encryption keys, inventions, research, development, content under development, policies and procedures, consumer and guest information, information or plans regarding future projects, products or services, projects, products or services under consideration, customer relationship information, business plans or opportunities, internal or external audits, lawsuits, regulatory compliance and company telephone or e-mail directories;

(d) the International Channel Marks shall be deemed a reference to the Fox Sports Trademarks;

(e) [Reserved];

(f) the International Channel Territory shall be deemed a reference to Mexico;

(g) Law shall be deemed to mean any applicable foreign, federal, national, state, provincial or local law (including common law), statute, ordinance, rule, regulation, code or other requirement enacted, promulgated, issued or entered into, or act taken, by a Governmental Entity;

(h) Liabilities shall be deemed to mean all debts, liabilities, obligations, responsibilities, losses, damages (whether direct, indirect, compensatory, punitive, consequential, exemplary, treble, special, incidental or awarded based on any other theory (including loss of profits or revenue)), fines, penalties and sanctions, absolute or contingent, matured or unmatured, reserved or unreserved, liquidated or unliquidated, foreseen or unforeseen, on or off balance sheet, joint, several or individual, asserted or unasserted, accrued or unaccrued, known or unknown, whenever arising, including those arising under or in connection with any Law, any other pronouncements of Governmental Entities constituting a Proceeding, any order or consent decree of any Governmental Entity, any legally-binding settlement or any award of any arbitration tribunal, and those arising under any Contract, agreement, guarantee, commitment or undertaking, whether sought to be imposed by a Governmental Entity, private party, or a Party, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, or otherwise, and including any costs, expenses, interest, attorneys' fees, disbursements and expense of counsel, expert and consulting fees, fees of third party administrators, and costs related thereto or to the investigation or defense thereof;

(i) the Licensed Transferred Domain Names shall be deemed a reference to the Fox Sports Domain Names and Fox Sports Mexico Domain Names;

(j) a Proceeding shall be deemed a reference to any claim, demand, action, cause of action, suit, countersuit, arbitration, litigation, inquiry, subpoena, proceeding or investigation by or before any court, grand jury, Governmental Entity or any arbitration or mediation tribunal or authority;

(k) Remainco or to the Remainco Group shall be deemed a reference to Mexico Newco;

(l) Remainco Business shall be deemed a reference to the Transferred Business;

(m) Schedule 1 shall be deemed a reference to Schedule A attached hereto; and

(n) Schedule 2 shall be deemed a reference to Schedule B attached hereto.

6. Mexico Newco further undertakes to indemnify, defend and hold harmless Assignor and the Seller Indemnified Parties from and against any and all Loss to the extent arising out of or resulting from: (a) any breach by Mexico Newco of this Agreement; and (b) any Third Party Claim relating to, arising out of or resulting from Mexico Newco's, its Affiliates' or its or their Sublicensees' (as defined in the Redacted

TMLA) use of the Fox Sports Trademarks or Fox Sports Domain Names or the conduct of its or their respective business in connection with the Fox Sports Trademarks or Fox Sports Domain Names. Assignor undertakes to indemnify, defend and hold harmless Mexico Newco and the Mexico Newco Indemnified Parties from and against any and all Loss to the extent arising out of or resulting from: (a) any breach by Assignor of this Agreement; and (b) any Third Party Claim relating to, arising out of or resulting from Mexico Newco's, its Affiliates' or its or their Sublicensees' (as defined in the Redacted TMLA) use of the Fox Sports Trademarks or Fox Sports Domain Names or the conduct of its or their respective business in connection with the Fox Sports Trademarks or Fox Sports Domain Names solely to the extent that such use or conduct is in accordance with the terms of this Agreement.

7. In the event that Assignor receives a notice from FOX related to the Fox Sports Trademarks or Fox Sports Domain Names pursuant to Section 12.5 of the Redacted TMLA, Assignor shall promptly notify Mexico Newco (through Purchaser) of such notice, in compliance with Section 11.6 of the Purchase Agreement. In the event that Mexico Newco sends FOX any notices, requests, instructions or other documents pursuant to Section 12.5 of the Redacted TMLA, Mexico Newco shall contemporaneously provide a copy of such notice, request, instruction or other document in writing to Assignor at the contact information set forth in Section 12.5(b) of the Redacted TMLA.

8. As soon as reasonably practicable following the Original Execution Date, Assignor agrees to execute, acknowledge and deliver all such short-form license instruments and any other required documentation in customary form and as reasonably proposed by Mexico Newco as may be necessary for filing with the Mexican *Instituto Mexicano de la Propiedad Intelectual* or any other applicable Governmental Entity such that the records of such offices reflect that Mexico Newco was granted the assignment of the Assigned Fox Sports Licenses in accordance with this Agreement.

9. In the event and to the extent that there is a conflict between the provisions of this Agreement and the Purchase Agreement, the provisions of the Purchase Agreement shall control. This Agreement shall become effective as of the Execution Date. This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts, taken together, shall constitute one and the same instrument. Signatures sent by facsimile or by electronic format (in .pdf or similar format) shall constitute and be binding to the same extent as originals. This Agreement may not be amended or terminated except by an instrument in writing signed by both parties.

10. <u>Notices</u>. Any notice, request, instruction or other communication to be given hereunder by either Party to the other Party shall be in writing and shall be deemed to have been duly given (a) when delivered, if delivered personally to the intended recipient, (b) one (1) business day following receipt, if by delivery via a courier service of international reputation (*i.e.*, FedEx, UPS, Estafeta, DHL), and (c) if sent by e-mail transmission, upon the earlier of confirmation of receipt or one (1) business day following sending thereof; and, in each case ((a) through (c)), addressed to a Party at the

following address for such Party (or to such other address as such Party may have specified by notice given to the other Party pursuant to this provision):

If to Assignor, to:

Buena Vista International, Inc.
2121 Ponce de Leon Boulevard, Suite 1020
Coral Gables, Florida 33134
Attention: Legal Department
Email: Intl.LTAM.Legal.Notices@disney.com

With a copy to (which shall not constitute notice):

The Walt Disney Company
500 South Buena Vista St.
Burbank, CA 91521
Attention: Sean Corrigan, Senior Vice President
Facsimile: (818) 842-5789
Email: sean.corrigan@disney.com

The Walt Disney Company
Latin America
Chile 1180
Buenos Aires, 01, B1629, Argentina
Attention: Juan Verges, Chief Financial Officer
Email: juan.verges@disney.com

The Walt Disney Company
500 South Buena Vista St.
Burbank, California 91521-0128
Attention: Jim Kapenstein, Associate General Counsel
Facsimile: (818) 562-1813
Email: james.kapenstein@disney.com

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
United States
Attention: Gabriel J. Mesa
Email: gmesa@cov.com

and

Creel, García-Cuéllar, Aiza y Enríquez S.C.
Torre Virreyes Pedregal No. 24, 24th Floor
Molino del Rey
Mexico City, Mexico 11040
Attention: Jean Michel Enriquez Dalhaus / Jorge Montaño Valdes
Email: jean.michel.enriquez@creel.mx / jorge.montano@creel.mx

If to NewCo, to:

RRS Abogados, S.C. (Ramos, Ripoll & Schuster)
Ave. Americas 1500, floor 14
Country Club, 44610
Guadalajara, Jalisco
Attention: Alejandro Ripoll Gonzalez / Edmundo Elías-Fernández
Email: aripoll@rrs.com.mx / eelias@rrs.com.mx

with copies to (which shall not constitute notice):

RRS Abogados, S.C. (Ramos, Ripoll & Schuster)
Blvd. Manuel Ávila Camacho 40, Floor 14, Lomas de Chapultepec
11000, Miguel Hidalgo, Mexico City, Mexico.
Attention: Alejandro Ripoll Gonzalez / Edmundo Elías-Fernández
Email: aripoll@rrs.com.mx / eelias@rrs.com.mx

Kreager Mitchell, PLLC
Attention: Jeremy Kell
7373 Broadway, Suite 500
San Antonio, Texas, USA 78209
Email: jkell@kreagermitchell.com

11. Governing Law; Dispute Resolution.

(a) Governing Law. This Agreement, including the arbitration clause contained in Section 11(d) below, shall be governed by and construed in accordance with the laws of the State of New York, without reference to the conflict of law rules of any jurisdiction.

(b) Negotiations. In the event of any dispute, claim or controversy arising out of or in connection with this Agreement, including any questions regarding its existence, validity, breach or termination (a "Dispute"), the Parties may attempt to resolve such Dispute through good faith negotiations. The Party alleging the existence of a Dispute shall give to the other Party written notice setting out the material particulars of the Dispute (the "Notice of Dispute").

(c) Mediation. If a Dispute is not resolved by negotiation, as evidenced by the terms of a settlement reduced to writing and signed by the Parties, then the Dispute shall be referred to mediation between senior executives under the Mediation Rules of the International Chamber of Commerce (the "ICC Mediation Rules"). The commencement of mediation proceedings under the ICC Mediation Rules shall not prevent any Party from commencing arbitration in accordance with Section 11(d) below, nor shall it prevent any Party from seeking injunctive relief from any court of competent jurisdiction, or from making an application for Emergency Measures under the Emergency Arbitrator Provisions of the Rules of Arbitration of the International Chamber of Commerce, in force as of January 1, 2021 ("ICC Rules").

(d) Arbitration. Any Disputes that are not resolved through negotiations or mediation as provided above within 45 days following receipt of a Notice of Dispute or within such other period as the Parties may agree in writing, shall thereafter be finally settled under the ICC Rules by one or more arbitrators appointed in accordance with the ICC Rules. In the event a sole arbitrator is appointed, he or she shall be admitted to the New York bar and have at least 10 years' experience resolving complex commercial disputes. In the event a three member tribunal is appointed, the presiding arbitrator shall meet the qualifications set forth in the preceding sentence.

(i) The seat of arbitration shall be London, England. The arbitration shall be conducted in the English language.

(ii) The Parties shall have the right to conduct discovery, including through the deposition of witnesses and the production of documents, including the exchange of any documents with a specific bearing on the interpretation of this Agreement and any Party's performance under this Agreement, and the production of any exhibits upon which a Party intends to rely at the arbitration. A Party may not rely at the arbitration hearing on any witness which it has not previously identified to the other Party, or any document or exhibit which it has not previously produced to the other Party. Each Party shall be entitled to at least three (3) depositions. If the claim amount is greater than $1,000,000, then each Party shall be entitled to at least five (5) depositions. The arbitrator may grant additional depositions upon a showing of compelling need. All documents filed, and all oral submissions must be in English. Any Party wishing to rely on documentary or witness evidence in any other language shall provide an accurate English interpretation or translation of the same to the other Party and to the arbitrators, at the same time as the original language version is provided. In the absence of such English translation or interpretation, such evidence shall be disregarded.

(iii) The arbitrator's award (the "Award") shall be based upon the Agreement, New York law, and the facts. The arbitrator shall not be authorized to award any punitive or exemplary damages whatsoever and the Parties shall not seek to collect or enforce any part of any award inconsistent with this limitation on the authority of the arbitrator. The Award shall be final

and binding upon the Parties and judgment thereon may be entered by any court having jurisdiction thereof. The Parties agree that a judgment recognizing and enforcing the Award may be entered by any court having jurisdiction over the Parties or their assets, and the Parties irrevocably submit to the jurisdiction of any such court.

(iv) If a Party must seek enforcement of the Award by legal action of any kind, the Party against which such legal action is taken shall pay all reasonable costs, expenses and attorneys' fees, including any cost of additional litigation and/or arbitration incurred by the Party seeking to enforce the Award.

(v) Adherence to this arbitration clause shall not limit either Parties' right to obtain any provisional remedy, including without limitation, injunctive or similar relief, from any court of competent jurisdiction.

(vi) No Award or procedural order made in the arbitration shall be published. Unless otherwise required by law or to enforce an Award, the existence, conduct, outcome, and contents of the arbitration shall be confidential, which confidentiality shall protect any and all written and oral submissions made, as well as documentary, witness, and expert evidence offered by the Parties, and all procedural orders and Awards.

(vii) Any Party to this Agreement may apply to the ICC Court for the consolidation of two or more arbitrations arising out of this Agreement, the Purchase Agreement and any other Ancillary Agreement (as defined in the Purchase Agreement). The Parties agree that arbitrations that may be brought under the Purchase Agreement and the other Ancillary Agreements concern the same legal relationship as that governed by this Agreement, and that the arbitration agreements contained in the Purchase Agreement and those Ancillary Agreements are compatible with the arbitration agreement contained in Section 11(d) of this Agreement.

*[Signature page follows. The remainder of this page is intentionally left blank.]*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Execution Date.

TFCF CORPORATION,

by

Name: James M. Kapenstein
Title: Senior Vice President

MEDIA SPORTS MEXICO S. DE R.L. DE C.V.,

by

Name:
Title:

*[[5857540]]*

**EXHIBIT 1**

TRADEMARK LICENSE AGREEMENT (this "Agreement"), dated as of March 19, 2019 (the "Effective Date"), by and among FOX Corporation ("FOX"), and Twenty-First Century Fox, Inc., a Delaware corporation ("Remainco," and, together with FOX, each a "Party" and collectively the "Parties") [redacted].

W I T N E S S E T H:

WHEREAS, FOX and Remainco have entered into a Separation and Distribution Agreement, dated as of the Effective Date, (the "Separation Agreement") which sets forth, among other things, the terms of the separation, which shall occur in a series of transactions, of the FOX Business, FOX Assets, FOX Liabilities and FOX Employees from the Remainco Business, Remainco Assets, Remainco Liabilities and Remainco Employees such that Remainco will own and conduct, directly and indirectly, the Remainco Business and FOX will own and conduct, directly and indirectly, the FOX Business (such transactions, as may be amended or modified from time to time, the "Separation"); and

WHEREAS, in connection with the transactions contemplated by the Separation Agreement, FOX or members of its Group own certain Trademarks, [redacted] and domain names and Remainco [redacted] desire to obtain a license from FOX or members of its Group to use such intellectual property on the terms set forth herein [redacted].

NOW, THEREFORE, in consideration of the premises and the covenants and agreements herein contained, and intending to be legally bound, the Parties hereby agree as follows:

1. Definitions.

1.1. Certain Definitions. As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

(a) "Action" means any claim, action, cause of action, dispute, suit, proceeding or investigation, whether civil, criminal, administrative, investigative or other.

(b) "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person; provided, however, that for purposes of this Agreement, no member of either Group shall be deemed to be an Affiliate of any member of the other Group, including by reason of having one or more directors or officers in common. As used herein, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities or other interests, by Contract or otherwise.

(c) [Redacted].

(d) "Business Day" means any day of the year other than (a) a Saturday or a Sunday or (b) a day on which banks are required or authorized by Law to be closed in New York City.

(e) [Redacted].

(f) [Redacted].

(g) [Redacted].

(h) [Redacted].

(i) [Redacted].

(j) [Redacted].

(k) [Redacted].

(l) "Confidential Information" has the meaning assigned to such term in Section 7.1.

(m) "Contract" means any agreement, lease, license, contract, consent, settlement, note, mortgage, indenture, arrangement, understanding or other obligation, whether or not written, that is binding upon any Person or entity or any part of its property under applicable Law.

(n) [Redacted].

(o) [Redacted].

(p) [Redacted].

(q) [Redacted].

(r) [Redacted].

(s) [Redacted].

(t) [Redacted].

(u) [Redacted].

(v) [Redacted].

(w) [Redacted].

(x) "FOX" has the meaning set forth in the preamble to this Agreement.

(y) [Redacted].

(z) [Redacted].

(aa) [Redacted].

(bb) [Redacted].

(cc) [Redacted].

(dd) "FOX Group" means FOX and each of its direct and indirect Subsidiaries and Affiliates immediately after the Distribution [redacted] and any corporation or entity that may become part of such Group from time to time.

(ee) [Redacted].

(ff) "Fox Mark" means the "Fox" trademark.

(gg) [Redacted].

(hh) [Redacted].

(ii) [Redacted].

(jj) [Redacted].

(kk) [Redacted].

(ll) [Redacted].

(mm) [Redacted].

(nn) [Redacted].

(oo) [Redacted].

(pp) [Redacted].

(qq) [Redacted].

(rr) "Group" means the Remainco Group and/or the FOX Group, as the context requires.

(ss) "Indemnified Party" means the FOX Indemnitees (as defined in Section 9.2), for any indemnification obligation arising under Section 9.2, and Remainco Indemnities (as defined in Section 9.3), for any indemnification obligation arising under Section 9.3.

(tt) "Indemnifying Party" means FOX, for any indemnification obligation arising under Section 9.3, and Remainco, for any indemnification obligation arising under Section 9.2.

(uu) "International Channel Field" means all uses consistent with use by the Remainco Group's international television channels and networks as of the Distribution Effective Time, in any and all media now known or hereafter devised, and Promotion thereof.

(vv) "International Channel Marks" means those Trademarks [redacted] listed on Schedule 1 under the heading International Channel Marks.

(ww) "International Channel Term" means the period commencing on the Effective Date and ending five (5) years thereafter, as may be extended in accordance with Section 2.1(k).

(xx) [Redacted].

(yy) [Redacted].

(zz) "Licensed Domain Names" means [redacted] the Remainco Licensed Domain Names [redacted].

(aaa) "Licensed Field" means [redacted], (v) with respect to the International Channel License, the International Channel Field, [redacted], (vii) with respect to the Remainco Licensed Domain Names, uses consistent with current practices of the Remainco Group as of the Distribution Effective Time, [redacted].

(bbb) "Licensed Marks" means [redacted] the International Channel Marks [redacted].

(ccc) [Redacted].

(ddd) [Redacted].

(eee) "Licensed Term" means [redacted], (v) with respect to the International Channel License, the International Channel Term, [redacted], (vii) with respect to the Remainco Domain Names License, the Remainco Domain Names Term [redacted].

(fff) "Licensed Territory" means [redacted], (v) with respect to the International Channel License, the International Channel Territory, [redacted], (vii) with respect to the Remainco Domain Names License, the universe, [redacted].

(ggg) "Licensed Transferred Domain Names" means [redacted] the domain names set forth on Schedule 2 hereto.

(hhh) "Licensed Transferred Domain Names Term" means [redacted] the period commencing on the Effective Date and lasting until the end of the applicable Trademark License [redacted].

(iii) "Licensee" means Remainco [redacted].

(jjj) "Licenses" means the [redacted], International Channel License, [redacted], Remainco Domain Names License [redacted].

(kkk) "Licensor" means FOX [redacted].

(lll) "Loss" means any Liabilities, cost or expenses, including fees and expenses of counsel (whether or not arising out of, relating to or in connection with any Proceedings).

(mmm) [Redacted].

(nnn) [Redacted].

(ooo) [Redacted].

(ppp) [Redacted].

(qqq) [Redacted].

(rrr) [Redacted].

(sss) [Redacted].

(ttt) [Redacted].

(uuu) [Redacted].

(vvv) "Promotion" means (i) any and all advertising, marketing and promotion, in all forms, formats and media now known or hereafter devised, including, use in social media account names, identifiers, handles, tags, soundtrack phonorecords, score phonorecords and other phonorecords (ii) the offering of merchandise under the Licensed Marks solely in the ordinary course of business in a manner generally consistent with the practices of the Remainco Group [redacted].

(www) "Remainco" has the meaning set forth in the preamble to this Agreement.

(xxx) "Remainco Licensed Domain Names" means [redacted] the Licensed Transferred Domain Names.

(yyy) "Remainco Domain Names Term" means [redacted] (ii) with respect to the Licensed Transferred Domain Names, the Licensed Transferred Domain Names Term.

(zzz) "Remainco Group" means Remainco and each of its direct and indirect Subsidiaries and Affiliates immediately after the Distribution, and any corporation or other entity that is or may become part of such Group from time to time after the Distribution.

(aaaa) "Representatives" has the meaning assigned to such term in Section 7.2.

(bbbb) [Redacted].

(cccc) [Redacted].

(dddd) "Sublicensees" has the meaning set forth in Section 2.2.

(eeee) "Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries.

(ffff) "Third Party" means any Person other than FOX, Remainco, and their respective Affiliates.

(gggg) "Trademark" means all trademarks, trade dress, service marks, certification marks, logos, slogans, design rights, symbols, characters, names, titles, trade names and other similar designations of source or origin throughout the universe, whether registered or unregistered, together with the goodwill associated with any of the foregoing.

(hhhh) [Redacted].

(iiii) [Redacted].

(jjjj) [Redacted].

(kkkk) [Redacted].

(llll) [Redacted].

(mmmm) [Redacted].

(nnnn) [Redacted].

(oooo) [Redacted].

(pppp) "Fox Sports Mexico" means the business regarding and relating to the production, supply and licensing of three linear television sports channels under the *Fox Sports* brand to pay television operators and related distribution services in Mexico, including TV Everywhere and services provided in an "over the top" (or OTT) format.

(qqqq) "Fox Sports Mexico Domain Names" means the domain names set forth in Exhibit C, which Remainco may amend from time to time upon obtaining FOX's prior written consent.

(rrrr) "Fox Sports Mexico Domain Names Term" means the period commencing on the Effective Date and ending on March 19, 2023.

(ssss) [Redacted].

(tttt) [Redacted].

(uuuu) [Redacted].

(vvvv) [Redacted].

1.2. Other Definitions. Other capitalized terms have the meaning set forth elsewhere in this Agreement. [Redacted].

2. Licenses.

2.1. License Grants.

(a) [Redacted].

(b) [Redacted].

(c) [Redacted].

(d) [Redacted].

(e) Grant of International Channel Trademark License. Subject to the terms and conditions of this Agreement, FOX hereby grants to the Remainco Group [redacted] during the International Channel Term [redacted] a non-exclusive, [redacted] irrevocable and royalty-free license to use the International Channel Marks, solely in the International Channel Field in the International Channel Territory (the "International Channel License").

(f) [Redacted].

(g) Updates to Licensed Marks. Subject to the terms and conditions of this Agreement, the foregoing Licenses shall include the right of Remainco [redacted] to modernize the appearance of the Licensed Marks, provided that such updates shall not change the overall commercial impression of such Licensed Marks so as to increase the relative prominence of the Fox Mark.

(h) Remainco Domain Names. Subject to the terms and conditions of this Agreement, FOX hereby grants to the Remainco Group [redacted] (ii) during the Licensed Transferred Domain Names Term, an exclusive license to use the Licensed Transferred Domain Names solely in the ordinary course of business in a manner

generally consistent with the practices of the Remainco Group in connection with such Licensed Transferred Domain Names as of the Distribution Effective Time ("Remainco Domain Names License"). [Redacted]. Where a Licensed Transferred Domain Name contains a Trademark to which Remainco receives a non-perpetual license under this Agreement, Remainco shall either transfer the domain name to FOX or, if transfer is impracticable, abandon use of the domain name at the end of the applicable Licensed Term, provided that Remainco shall provide reasonable notice to FOX of its intent to abandon (which notice shall be at least one (1) month prior to the expiration of the applicable domain names).

(i) [Redacted].

(j) [Redacted].

(k) Extension of International Channel Term. The International Channel Term shall be extended solely to the extent (on a territory by territory, channel by channel, network by network and contract by contract basis) necessary for such channels and networks to comply with any contractual commitments of Remainco that, as of the Distribution Effective Time (without giving effect to any extensions, amendments, supplements, or modifications thereof after the Distribution Effective Time that either extend the term of such commitment regarding the Fox Mark or impose additional obligations to use the Fox Mark), prohibit a change in name of such channel or network [redacted]. Notwithstanding the foregoing, upon and following the sale of any part of the Remainco Business pursuant to an order by a Governmental Entity, the International Channel License shall extend to the applicable purchaser, and with respect to such purchaser the International Channel Term shall be for five (5) years upon and following the applicable sale; provided, that the foregoing extension shall apply solely to the purchaser of the applicable business and to the International Channel Marks required for use by such purchaser pursuant to such order. For clarity, the five (5) year extension described in the foregoing sentence shall commence on the date of the applicable sale and expire five (5) years thereafter.

(l) [Redacted].

(m) [Redacted].

(n) [Redacted].

(o) No Name Changes. Nothing in this Section 2.1 shall govern changes to corporate or trade names, which are solely governed by Section 2.3 herein.

(p) [Redacted].

(q) [Redacted].

(r) [Redacted].

(s) Grant of Fox Sports Mexico Domain Names License. Notwithstanding anything to the contrary in the Trademark License Agreement or the Separation Agreement, FOX hereby grants to the Remainco Group and TWDC and its direct and indirect Subsidiaries and Affiliates, during the Fox Sports Mexico Domain Names Term, a non-exclusive, universe-wide, irrevocable and royalty-free license to use the Fox Sports Mexico Domain Names solely in the ordinary course of business in a manner generally consistent with the practices of Fox Sports Mexico as of the Effective Date.

(t) [Redacted].

(u) [Redacted].

(v) [Redacted].

2.2. Sublicenses. Licensee may sublicense (i) the Licenses set forth in Sections 2.1(a), 2.1(b), 2.1(c), 2.1(d), 2.1(e), 2.1(f), 2.1(h), 2.1(i) and 2.1(l) in the ordinary course of business in support of Licensee's and its Affiliates' business in the relevant Licensed Field [redacted] (such sublicensees, the "Sublicensees"), provided any such sublicense is within the scope of the licenses granted pursuant to this Agreement and in furtherance of Licensee's licensed use of the Licensed Marks, Licensed Domain Names [redacted]. Licensee shall ensure that any sublicense that it grants to a Sublicensee does not conflict with this Agreement (and immediately and automatically terminates upon the termination of this Agreement), and Licensee shall remain responsible for its Sublicensees' compliance with the terms and conditions of this Agreement applicable to Licensee. At the reasonable request of Licensor from time to time, Licensee shall use reasonable efforts to confirm whether a Person identified by Licensor is a Sublicensee.

2.3. Business Names.

(a) [Redacted]

(b) [Redacted].

2.4. Opportunity to Cure. (i) With respect to the Licensed Domain Names for which there is a non-perpetual Licensed Term and the Licensed Marks [redacted], Licensee shall use reasonable best efforts to cease all use of the relevant Licensed Marks and Licensed Domain Names at the end of the relevant term. In the event that Licensee has unintentionally failed to cease all use of a Licensed Mark or Licensed Domain Name at the end of the applicable term, Licensee shall have an opportunity to promptly cease such use upon becoming aware of such failure (such time period to cure not to exceed ninety (90) days), and such failure shall not constitute a breach of this Agreement. (ii) [Redacted]. (iii) With respect to unintentional failure to comply with the Licenses other than as covered in parts (i) and (ii) of this Section 2.4, Licensee shall have ninety (90) days upon becoming aware of such failure to cure any such failure, and such failure shall not constitute a breach of this Agreement.

2.5. Third Party Rights. The terms and conditions of this Agreement (including the licenses granted herein) are subject to any and all rights of and obligations owed to any Third Parties with respect to the Licensed Marks, [redacted] or Licensed Domain Names under any Contracts existing as of the Distribution Effective Time (without giving effect to any extensions, amendments, supplements or modifications to such Contracts after the Distribution Effective Time) to which Licensor or any of its Affiliates is a party or is otherwise bound.

2.6. Reservation of Rights. Each Party hereby reserves all rights not expressly granted to the other Party under this Agreement. [Redacted].

2.7. [Redacted].

2.8. [Redacted].

3. Use of the Licensed Marks.

3.1. Use in Licensed Field. (i) Neither Party shall use the Trademarks, [redacted] or domain names to which it receives a license under this Agreement outside of the applicable Licensed Field absent the other Party's prior written consent. [Redacted].

3.2. No Other Marks. Absent FOX's prior written consent, Remainco shall not: (i) combine the Licensed Marks with any other Trademark, including a Trademark owned by FOX, to create a unitary or composite mark, other than those combinations in use by Remainco as of the Distribution Effective Time, or (ii) use any Trademark that is confusingly similar to a Licensed Mark (other than (A) the Licensed Marks themselves as expressly permitted hereunder and (B) to omit the word "fox" from any Licensed Mark that contains the word "fox"). For the avoidance of doubt, nothing in this Section 3.2 shall prohibit Remainco from placing a Licensed Mark or element thereof in proximity to another term or Trademark consistent with the normal business practices of the Remainco Group [redacted] in connection with placement of Trademarks. Nothing in this Agreement shall prohibit Remainco from making use of any word (including, for example, the words "fox" and "searchlight") as a generic term and not as a source identifier. For clarity, any other uses by Remainco that are required by applicable Law will not violate this Agreement.

4. Quality Control.

4.1. Quality. Each Party acknowledges and is familiar with the high standards, quality, style, and image of the Trademarks to which it receives a license under this Agreement and shall, at all times, conduct its business under such Trademarks and use such Trademarks in a manner consistent with these standards, quality, style, and image. [Redacted]. Each Party shall ensure that all services and goods provided by it, under or in association with any of the Trademarks to which it receives a license under this Agreement, shall (i) be substantially the same as or greater than the quality of the services and goods provided under such Trademarks as of the Distribution Effective Time and (ii) not have an adverse effect on the image or reputation of any such Trademarks,

Remainco, or FOX. Without the other Party's prior written consent, a Party shall not: (i) knowingly take any action which would reasonably be expected to dilute or impair the Trademarks to which it receives a license under this Agreement, or tarnish or bring into disrepute the reputation of or goodwill associated with such Trademarks or (ii) use the Trademarks to which it receives a license under this Agreement in any jurisdiction, including within the Licensed Territory, after such time that such Party has received a judgement from a court of competent jurisdiction that such use infringes, dilutes or otherwise violates the trademark rights or other proprietary rights of another Person.

4.2. Compliance with Laws. In exercising its rights under this Agreement, the Parties shall comply with all applicable Laws. Remainco and FOX shall, to the extent not prohibited by confidentiality obligations or Law, promptly provide FOX or Remainco, respectively, with copies of all communications with any governmental, regulatory, or industry authority relating to the status or validity of the Licensed Marks, [redacted] or Licensed Domain Names respectively (including, without limitation, communications relating to Trademark filings with the U.S. Patent and Trademark Office [redacted]).

4.3. Samples. At the reasonable request of Licensor from time to time, Licensee shall submit to Licensor representative samples of uses of the Licensed Marks for purposes of Licensor confirming compliance with this Agreement.

5. Ownership and Registration.

5.1. Ownership.

(a) Licensee acknowledges that (i) Licensor is the owner of the Licensed Marks throughout the world and all goodwill related thereto, and (ii) all use of the Licensed Marks under this Agreement and any goodwill accruing from such use will inure solely to the benefit of Licensor. If Licensee acquires any rights in the Licensed Marks (or any Trademark that is confusingly similar thereto), by operation of Law or otherwise, Licensee hereby irrevocably assigns such rights to Licensor without further action by the Parties. Each Licensee agrees not to dispute or challenge, or assist any Person in disputing or challenging, Licensor's rights in and to the Licensed Marks or, in each case, the validity or enforceability of the applicable Trademarks. Notwithstanding the foregoing, this Section 5.1(a) shall not apply if Remainco [redacted] or another member of the Remainco Group [redacted] obtains ownership of any Licensed Marks pursuant to an agreement entered into after the Effective Date.

(b) [Redacted].

5.2. Restrictions. Licensee agrees that without Licensor's prior written consent, it shall not, during the Licensed Term or thereafter:

(a) apply for, or obtain, or assist any Person in applying for or obtaining any registration of the Licensed Marks (other than as permitted in Section 5.3), or any Trademark that confusingly similar to or a literal translation, transliteration, or local language version of the Licensed Marks; or

(b) take any action which would reasonably be expected to invalidate or jeopardize any registration of the Licensed Marks.

5.3. Maintenance of Registrations.

(a) [Redacted].

(b) For the duration of the applicable term, FOX shall, in the ordinary course consistent with its general practices prior to the Effective Date or otherwise as reasonably requested by Remainco, search, file, prosecute, and maintain [redacted] (ii) the International Channel Marks [redacted] in FOX's name at both Parties' cost and expense, such that FOX shall bear 55% of the costs and expenses and Remainco shall bear 45% of the costs and expenses therefor (including the use of coordinating counsel in the ordinary course of business in connection therewith). [Redacted].

(c) [Redacted].

(d) The Parties shall reasonably consult and coordinate with each other at the other Party's request with respect to the matters set forth in this Section 5.3. Licensor shall have no obligations under this Section 5.3 with respect to standard renewal deadlines that occur prior to two (2) months following the Effective Date.

5.4. Recordation and Filings.

(a) Upon a Party's reasonable request, the other Party shall assist the requesting Party at the requesting Party's cost and expense in preparing instruments to record Licensee as licensee of the Licensed Marks [redacted] or Licensed Domain Names with the applicable Governmental Authority or registrar, in each case in form and substance reasonably acceptable to the Parties and in accordance with the applicable Law of the jurisdiction to which such instrument pertains.

(b) [Redacted].

6. Enforcement.

6.1. [Redacted].

7. Confidentiality.

7.1. General. Each Party acknowledges that such Party has in its possession and, in connection with this Agreement, such Party will receive, nonpublic, confidential, or proprietary Information, including knowledge, Information, or materials whether of a technical or financial nature or otherwise relating to the business or affairs of the other Party (including any Subsidiary or Affiliate thereof), including memoranda, notes, analyses, compilations, studies, and other materials prepared by or for the receiving Party which contain or reflect such knowledge, Information, or materials, or Information received from a Third Party that a Party is required to treat as confidential ("Confidential Information"); provided, that "Confidential Information" shall not include Information

that (i) is or becomes generally available to the public other than as a result of a breach of this Agreement by the receiving Party or its Affiliates or Representatives or (ii) becomes available to the receiving Party or its Affiliates or Representatives on a nonconfidential basis from a source other than the disclosing Party or its Affiliates or Representatives; provided, that such source is not known by the receiving Party to be bound by a confidentiality agreement or other legal or fiduciary obligation of secrecy to the disclosing Party or its Affiliates or Representatives or (iii) is independently developed by the receiving Party or its Affiliates without use of or reference to Confidential Information.

7.2. Protection of Confidential Information. Subject to Section 7.3 and except as otherwise required by Law or legal process or by any Governmental Entity, Remainco, on behalf of itself and each of its Affiliates, and FOX, on behalf of itself and each of its Affiliates, hereby agree to, from and after the Effective Date, hold or cause to be held, and to cause its or its Affiliates' respective directors, officers and employees, auditors, agents, third party contractors, vendors, accountants, and advisors (including legal, financial and accounting advisors) (collectively, "Representatives") to hold all Confidential Information in strict confidence, with at least the same degree of care that such Party applies to its own confidential and proprietary Information pursuant to its applicable policies and procedures in effect as of the Effective Date, to not disclose such Confidential Information to any Person other than those of its or its Affiliates' Representatives who need to know such Confidential Information in connection with the performance of such Party's and its Affiliates' obligations under this Agreement, and to not use such Confidential Information for any purpose other than for such purpose as may be expressly permitted hereunder or to comply with its own obligations pursuant to this Agreement, except, in each case, as may be required by Section 7.3. Each Party shall ensure that, from and after the Effective Date, each Representative to whom it discloses Confidential Information complies with the receiving Party's obligations hereunder regarding that Confidential Information, and in the case of any Representative who is not an Affiliate of the receiving Party, such Representative is bound by confidentiality restrictions and limitations which are at least as restrictive as those terms imposed upon the receiving Party as contained herein. As of the Effective Date, Remainco, on behalf of itself and each of its Affiliates, and FOX, on behalf of itself and each of its Affiliates agrees that such Party will be solely responsible for any disclosure or use of Confidential Information by a Representative that would constitute a breach of this Agreement if made by such Party.

7.3. Protective Arrangements. In the event that, from and after the Effective Date, a receiving Party or any of its or its Affiliates' Representatives are requested or required to disclose any of the disclosing Party's Confidential Information in a Proceeding or are otherwise legally compelled (including by deposition, interrogatory, requests for documents, subpoena, civil investigative demand, or similar process) or are compelled by any rule, regulation, or policy statement of any national securities exchange, market, or automated quotation system to disclose any of the Confidential Information, such receiving Party will provide the disclosing Party with prompt written notice of the existence, terms, and circumstances of such request (to the extent legally permitted and not impracticable in light of the circumstances) so that such disclosing

Party may seek an appropriate protective order or other remedy (and, if the disclosing Party seeks such an order, the receiving Party will provide such cooperation as the disclosing Party shall reasonably request at the expense of the disclosing Party). If disclosure of such information is required and no such protective order or other remedy is obtained, then the receiving Party and its Representatives may, without liability hereunder, disclose only that portion of the Confidential Information that is legally required to be disclosed (and only in the manner required to be disclosed), and upon the request and at the expense of the disclosing Party, and shall exercise commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information which the disclosing Party so designates.

8. Further Assurances.

Each of the Parties shall use commercially reasonable efforts, on and after the Effective Date, to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws, regulations and agreements in order to effectuate the provisions and purposes of this Agreement.

9. Disclaimer, Limitation of Liability, and Indemnification.

9.1. Disclaimer of Warranties. EACH PARTY (ON BEHALF OF ITSELF AND ITS AFFILIATES) ACKNOWLEDGES AND AGREES THAT THE LICENSED MARKS AND LICENSED DOMAIN NAMES ARE PROVIDED AND LICENSED "AS IS," EACH PARTY ASSUMES ALL RISKS AND LIABILITIES ARISING FROM OR RELATING TO ITS USE OF, AND RELIANCE UPON THE LICENSED MARKS AND LICENSED DOMAIN NAMES, AND NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES IN RESPECT OF THE LICENSED MARKS OR LICENSED DOMAIN NAMES OF ANY KIND, NATURE OR DESCRIPTION, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND FOX AND REMAINCO HEREBY EXPRESSLY DISCLAIM THE SAME.

9.2. Indemnification by Remainco. Notwithstanding Section 9.1, Remainco shall indemnify, defend and hold harmless FOX and its Affiliates and their respective current and former directors, officers, employees and agents and each of the heirs, executors, successors and permitted assigns of any of the foregoing (collectively, the "FOX Indemnitees"), from and against any and all Losses to the extent arising out of or resulting from (a) any breach by Remainco [redacted] of this Agreement and (b) any Third Party Action relating to, arising out of or resulting from Remainco's or its Sublicensees' [redacted] use of the Licensed Marks or Licensed Domain Names or the conduct of its or their respective business in connection with the Licensed Marks or Licensed Domain Names, other than Actions to the extent arising out of a breach of this Agreement by FOX or fraud, bad faith, gross negligence or willful misconduct of FOX or its Affiliates.

9.3. Indemnification by FOX. Notwithstanding Section 9.1, FOX shall indemnify, defend and hold harmless Remainco and its Affiliates and their respective current and former directors, officers, employees and agents and each of the heirs, executors, successors and permitted assigns of any of the foregoing (collectively, the "Remainco Indemnitees") from and against any and all Loss to the extent arising out of or resulting from (a) any breach by FOX of this Agreement; and (b) any Third Party Action relating to, arising out of or resulting from FOX's or its Sublicensees' use of the Licensed Marks or Licensed Domain Names or the conduct of its or their respective business in connection with the Licensed Marks or Licensed Domain Names, other than Actions to the extent arising out of a breach of this Agreement by Remainco or fraud, bad faith, gross negligence or willful misconduct of Remainco or its Affiliates.

9.4. Procedures for Indemnification; Third Party Claims.

(a) If an Indemnified Party shall receive notice or otherwise learn of the assertion by any Person who is not a member of the Remainco Group or the FOX Group, as the case may be, of any claim, or of the commencement by any such Person of any Proceedings, with respect to which an Indemnifying Party may be obligated to provide indemnification to such Indemnified Party pursuant to Section 9.2 or Section 9.3, or any other Section of this Agreement (collectively, a "Third Party Claim"), such Indemnified Party shall promptly (and in any event within twenty (20) days) give such Indemnifying Party written notice thereof after such Indemnified Party received notice or otherwise learned of such Third Party Claim for which it seeks indemnification hereunder. Any such notice shall describe the Third Party Claim in reasonable detail, including, if known and quantifiable to the reasonable satisfaction of the Indemnified Party, the amount of the Loss for which indemnification may be available. Notwithstanding the foregoing, the failure of any Indemnified Party or other Person to give notice as provided in this Section 9.4(a) shall not relieve the related Indemnifying Party of its obligations under this Section 9, except to the extent that such Indemnifying Party has been actually materially prejudiced by such failure to give notice.

(b) An Indemnifying Party shall be entitled (but shall not be required) to assume and control the defense and, subject to Section 9.4(e), settlement of such Third Party Claim at its expense and through counsel of its choice that is reasonably acceptable to the Indemnified Party if it gives notice of its intention to do so to the Indemnified Party within 30 days of the receipt of such notice from the Indemnified Party. In the event of a conflict of interest between the Indemnifying Party and the Indemnified Party, the Indemnified Party shall be entitled to retain, at the Indemnifying Party's expense, separate counsel as required by the applicable rules of professional conduct with respect to such matter. If the Indemnifying Party elects to undertake any such defense at its own expense, the Indemnified Party shall cooperate with the Indemnifying Party in such defense in accordance with this Section 9.4(b) and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent Records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as are reasonably required by the Indemnifying Party. Similarly, if the Indemnified Party is conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make

available to the Indemnified Party, at the Indemnifying Party's expense, all witnesses, pertinent Records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as are reasonably required by the Indemnified Party. The Indemnifying Party shall consult with and keep the Indemnified Party informed of the progress of the defense or settlement of the Third Party Claim and the Indemnified Party may employ its own counsel at its own expense to assist in the defense or settlement.

(c) If, in such notice, an Indemnifying Party elects not to assume responsibility for defending a Third Party Claim for which indemnification is required under this Agreement, or fails to notify an Indemnified Party of its election as provided in Section 9.4(b), such Indemnified Party may defend and, subject to Section 9.4(d), settle such Third Party Claim at the cost and expense of the Indemnifying Party.

(d) The Indemnified Party may not settle or compromise any Third Party Claim without the consent of the Indemnifying Party (such consent not to be unreasonably withheld, conditioned or delayed).

(e) The Indemnifying Party shall have the right to compromise or settle a Third Party Claim the defense of which it shall have assumed pursuant to Section 9.4(b). Notwithstanding the foregoing sentence, the Indemnifying Party shall not settle any such Third Party Claim without the prior written consent of an Indemnified Party (not to be unreasonably withheld, conditioned or delayed) unless such settlement (A) completely and unconditionally releases the Indemnified Party in connection with such matter, (B) provides relief consisting solely of money damages borne by the Indemnifying Party and (C) does not involve any admission by the Indemnified Party of any wrongdoing or violation of Law.

(f) In the event of Proceedings in which the Indemnifying Party is not a named defendant, and either the Indemnified Party or Indemnifying Party in its reasonable judgment believes that under the circumstances the Indemnifying Party should be substituted in as the named defendant, either Party can request such substitution and the other Party will consider that request in good faith. If the Parties do not agree on the substitution, the Indemnified Party shall be permitted to seek the substitution in that Proceeding, and the Indemnifying Party shall be permitted to object to such substitution in that Proceeding. This provision shall not be read to mean (and does not mean) that any particular request for substitution should be either granted or denied. If such substitution cannot be achieved for any reason or is not requested, the named defendant shall allow the Indemnifying Party to manage the proceedings as set forth in, and subject to, this Section 9. Nothing herein shall preclude either Party from seeking to dismiss itself from the Proceedings, including without limitation, filing of an appropriate motion with the court and/or seeking the stipulation of the opposing party to the Proceedings.

(g) With respect to any Third Party Claim that implicates both the FOX Group and the Remainco Group in a material fashion due to the allocation of Liabilities or potential impact on the operation of the Remainco Business or FOX Business, responsibilities for management of defense and related indemnities pursuant to

this Agreement, FOX and Remainco agree to use commercially reasonable efforts to cooperate fully and enter into a mutually acceptable joint defense or common interest agreement (in a manner that will preserve for the relevant members of the FOX Group and Remainco Group the attorney-client privilege, joint defense or other privilege with respect thereto). The Party that is not responsible for managing the defense of such Third Party Claims shall, upon reasonable request, be consulted with respect to significant matters relating thereto and may retain counsel at its own expense to assist in the defense of such claims.

10. Termination.

10.1. [Redacted].

10.2. Consequences of Termination or Expiration. In the event that this Agreement or any of the Licenses is terminated or expires:

(a) (i) for all Licensed Marks not used by Licensee for physical installments and Licensed Domain Names, within one hundred eighty (180) days of termination or expiration, Licensee shall cease all use of such Licensed Marks and the Licensed Domain Names subject to such termination or expiration and (ii) for all Licensed Marks used by Licensee for physical installments, within one (1) year of termination or expiration, Licensee shall cease all use of such Licensed Marks subject to such termination or expiration;

(b) the Parties shall reasonably cooperate in the cancellation of any applicable licenses recorded pursuant to this Agreement and shall execute such documents and do all acts and things as may be necessary to effect such cancellation; and

(c) all sublicenses subject to such termination or expiration shall immediately and automatically terminate.

10.3. Survival. Section 3.1, Section 5.1, Section 9, Section 10.2 and Section 12 shall survive the termination or expiration of this Agreement.

11. Bankruptcy. The Parties acknowledge and agree that if a case under the US Bankruptcy Code ("USBC") is filed by or against Licensor or its Affiliates, then Licensee may exercise all rights hereunder, including any rights beyond those provided by Section 365(n) of the USBC with respect to this Agreement, including the right to retain each and every right to use the Licensed Marks, Licensed Domain Names [redacted], as applicable, which may not be included within the statutory definition of "intellectual property," under the licenses granted herein. The rights and licenses granted to Licensee pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of

Section 365(n) of the USBC, 11 U.S.C. Section 101 et seq., licenses of rights to "intellectual property" as defined under Section 101(35A) of the USBC.

12. Miscellaneous.

12.1. Assignment. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their permitted successors and assigns. Neither this Agreement nor any of the rights, interests or obligations of any Party under this Agreement shall be assigned, in whole or in part, by operation of Law or otherwise, by any Party without the prior written consent of the other Party to this Agreement [redacted]; provided, however, that each Party (a) may assign any of the foregoing to one or more of its Affiliates; provided further, that such Affiliate agrees to be bound by all of the terms, conditions and provisions contained herein and (b) may assign any of the foregoing in connection with the sale or other transfer of all or substantially all of the applicable business or assets of such Party or its Affiliates to which this Agreement relates; provided further, that assignments pursuant to clause (b) of this sentence shall not relieve the assigning Party of any of its obligations hereunder arising prior to such assignment unless agreed to by the non-assigning Party [redacted]. Any assignment in contravention of this Section 12.1 shall be null and void *ab initio*.

12.2. Relationship of the Parties. Each of FOX and Remainco acknowledges that they are separate entities, each of which has entered into this Agreement for independent business reasons. The Parties shall be independent contractors hereunder for any and all purposes (including federal, state and local tax purposes), and nothing contained herein shall be deemed to create a relationship of joint venture, partnership or fiduciary. None of the Parties is an agent of any other, or has any authority to bind any other Party, transact any business in any other Party's name or on its behalf, or make any promises or representations on behalf of any other Party unless agreed to in writing by the Parties. [Redacted].

12.3. Governing Law and Submission to Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each Party irrevocably consents to the exclusive jurisdiction, forum and venue of the Commercial Division of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York over any and all claims, disputes, controversies or disagreements between the Parties or any of their respective successors and assigns under or related to this Agreement.

12.4. [Redacted].

12.5. Notices. (a) Notices, requests, instructions, or other documents to be given under this Agreement shall be in writing and shall be deemed given, (i) on the date sent by email of a portable document format (PDF) document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient (provided, however, that notice given by email shall not be

effective unless either (A) a duplicate copy of such email notice is promptly given by one of the other methods described in this Section 12.5 or (B) the receiving party delivers a written confirmation of receipt of such notice either by email or any other method described in this Section 12.5 (excluding "out of office" or other automated replies)), (ii) when delivered, if delivered personally to the intended recipient, and (iii) one Business Day later, if sent by overnight delivery via a national courier service (providing proof of delivery).

(b) In each case, except for notices, requests, instructions or other documents related to routine trademark maintenance matters given under Section 5.3, Section 5.4 and Section 6 of this Agreement, addressed to a Party at the following address for such Party:

(a) If to FOX or any member of the FOX Group

Fox Corporation
10201 W. Pico Boulevard
Los Angeles, CA 90064
Attention: Viet Dinh, Chief Legal and Policy Officer
Jeffrey Taylor, EVP and Chief Litigation Counsel
Chris Reed, SVP, Intellectual Property
Tirzah Lowe, VP, Intellectual Property
Email: viet.dinh@fox.com
jeff.taylor@fox.com
chris.reed@fox.com
tirzah.lowe@fox.com

with copies to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
Attention: Howard L. Ellin, Esq.
Brandon Van Dyke, Esq.
Email: howard.ellin@skadden.com
brandon.vandyke@skadden.com

(b) If to Remainco or any member of the Remainco Group

c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, CA 91521
Attention: Senior Vice President and Associate General Counsel,
Senior Executive Vice President, General Counsel and Secretary,
Deputy General Counsel, Intellectual Property, and
Assistant General Counsel – Intellectual Property
Email: james.kapenstein@disney.com
alan.n.braverman@disney.com
jill.ratner@disney.com
Catherine.bridge@disney.com

with copies to (which shall not constitute notice):

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Faiza J. Saeed, Esq.,
George F. Schoen, Esq.
Email: fsaeed@cravath.com
gschoen@cravath.com

or to such other persons or addresses as may be designated in writing by the Party to receive such notice as provided above.

(c) Notwithstanding the foregoing, notices, requests, instructions or other documents related to routine trademark matters given under Section 5.3, Section 5.4 or Section 6 of this Agreement shall be addressed to a Party at the following address for such Party:

(i) If to FOX or any member of the FOX Group

Fox Corporation
10201 W. Pico Boulevard
Los Angeles, CA 90064
Attention: Tirzah Lowe, VP, Intellectual Property
Chris Reed, SVP, Intellectual Property
Email: tirzah.lowe@fox.com
chris.reed@fox.com

(ii) If to Remainco or any member of the Remainco Group

c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, CA 91521
Attention: Minnie Alexander, Assistant General Counsel
Email: minnie.alexander@disney.com

12.6. Other Remedies; Specific Performance.

(a) Except as otherwise expressly set forth herein, any and all rights and remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other right or remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. Without prejudice to remedies at law, the Parties shall be entitled to specific performance in the event of a breach or threatened breach of this Agreement.

(b) Except as otherwise expressly set forth in Section 2.4: (i) The Parties acknowledge and agree that irreparable damage would occur and that the Parties would not have any adequate remedy at Law if any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached, and that monetary damages, even if available, would not be an adequate remedy therefor. (ii) The Parties accordingly agree that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the performance of the terms and provisions hereof, without proof of actual damages (and each Party hereby waives any requirement for the security or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. (iii) The Parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to applicable Law, or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy for any such breach or that either Party otherwise has an adequate remedy at Law. (iv) Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

12.7. Waiver.

(a) Any provision of this Agreement may be waived if, and only if, such waiver is in writing and signed by the Party against whom the waiver is to be effective.

(b) No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. Any waiver pursuant to this Section 12.7 shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or a waiver of another term or condition of this Agreement.

12.8. Counterparts; Effectiveness. This Agreement may be executed in any number of counterparts (including by facsimile or by attachment to electronic mail in portable document format (PDF)), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement, and shall become effective when one or more counterparts have been signed by each of the Parties hereto and delivered to the other Party hereto.

12.9. Interpretation; [Redacted].

(a) The Section and paragraph headings or captions herein are for convenience of reference only, do not constitute part of this Agreement, and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a Section or Schedule, such reference shall be to a Section of or Schedule to this Agreement unless otherwise indicated. Whenever the words "include", "includes", or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "hereof", "herein", "hereby", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "or" when used in this Agreement is not exclusive. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if". With respect to the determination of any period of time, the word "from" means "from and including". The terms "Dollars" and "$" mean United States Dollars. References to "written" or "in writing" include in electronic form. References herein to any Contract (including this Agreement) mean such Contract as amended, supplemented, or modified from time to time in accordance with the terms thereof. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any statute defined or referred to herein means such statute as from time to time amended, modified, or supplemented, including by succession of comparable successor statutes. References herein to any Law or statute shall be deemed also to refer to all rules and regulations promulgated thereunder. Unless the context requires otherwise, references in this Agreement to "Remainco" shall also be deemed to refer to the applicable member of the Remainco Group, references to "FOX" shall also be deemed to refer to the applicable member of the FOX Group and references to a "Party" shall also be deemed to refer to the applicable member of that Party's Group (as applicable). Any agreement or instrument defined or referred to herein includes all attachments thereto and instruments incorporated therein. [Redacted].

(b) The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

12.10. Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision negotiated in good faith by the Parties hereto shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not, subject to clause (a) above, be affected by such invalidity or unenforceability, except as a result of such substitution, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

12.11. No Duplication; No Double Recovery. Nothing in this Agreement is intended to confer to or impose upon any Party a duplicative right, entitlement, obligation, or recovery with respect to any matter arising out of the same facts and circumstances (including with respect to the rights, entitlements, obligations and recoveries that may arise out of one or more of the following Sections: Section 9.2, Section 9.3 and Section 9.4).

**Schedule A**

Fox Sports Trademarks

[see attached]

**Schedule B**

Fox Sports Domain Names

1. www.foxsports.com.mx
2. www.foxsports.mx

**Schedule C**

Fox Sports Mexico Domain Names

1. www.foxinc.com
2. www.foxeg.com